UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: 1:23-cv-897

| | | |
|---|---|---|
| STACIE MCLEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| LIBERTY MUTUAL GROUP, INC. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. INTRODUCTION

1. Stacie McLean ("Plaintiff" or "McLean" or "Stacie") began working for Liberty Mutual Group, Inc. ("Defendant" or the "Company") on or around May 24, 2021. Stacie brought nearly twenty years of experience working with global clients to the job. The Company had severe diversity issues, and it specifically communicated to Stacie that it wanted her help.

2. That wasn't true. Stacie is a black woman, and she brought sorely lacking perspective and experiences to the Company—she was the only black executive in her department. However, the Company devalued Stacie's wealth of experience and expertise from the beginning. It could not see past her race and set her up to fail. She regularly faced racial bias at the workplace, and when she voiced her concerns the Company brushed her aside. The racially biased climate that Stacie was nominally recruited to fix wound up costing her dearly, ultimately resulting in her termination in September 2021.

3. But that wasn't the end for Stacie. She still lives with the pain and suffering that come

1

with such an illegal, humiliating decision every day. Her emotional health and well-being have suffered tremendously, as has her career. The Company turned her life upside down.

4. Stacie now turns to this Court to be made whole for her harms and losses. She brings this action against the Company for wrongful discharge in violation of North Carolina public policy ("WDPP") (Count I), violations of Title VII of the Civil Rights Act of 1964 (Count II), and violations of 42 U.S.C. § 1981 (Count III).

## II. PARTIES, JURISDICTION AND VENUE

5. Plaintiff resides in Cabarrus County, North Carolina.

6. Liberty Mutual Group, Inc. is a Massachusetts based corporation, headquartered in Massachusetts at 175 Berkeley Street, Boston Massachusetts 02115-5066.

7. Plaintiff worked for Defendant from her home in Cabarrus County, North Carolina.

8. Defendant's registered agent is Corporation Service Company, which is located at 2626 Glenwood Avenue, Suite 550, Raleigh, North Carolina 27608.

9. Venue is proper in the Middle District of North Carolina because: Plaintiff would have worked in Cabarrus County, North Carolina but for Defendant's unlawful employment practices and because they are subject to the Court's personal jurisdiction there in light of the business it transacts in Cabarrus County and elsewhere in the Middle District of North Carolina. Moreover, the facts and circumstances of the case arise in Cabarrus County, North Carolina because that's where Plaintiff worked for Defendant.

## III. FACTUAL STATEMENT

10. On May 24, 2021, the Company hired Stacie as Vice President and Senior Talent Advisor. Stacie seemed to be a perfect fit for the role. She had nearly twenty years experience

working with global clients.

11. During the intensive, six-month-long interview process, Stacie asked Kathy Jonas, her point of contact in human resources, why the process was so vigorous. Jonas assured Stacie that she was the Company's "top candidate." Jonas went on to say that, because Stacie is a black woman, she would face "some hate" and that, because of this, the Company wanted to do everything right.

12. Upon hire, the Company assured Stacie she would have the support and training necessary for her to excel in her new role.

13. However, Stacie quickly realized the Company was not living up to its promises. Almost as soon as she began working, Stacie began to experience IT problems with her Company issued computer.

14. These IT problems made attending daily meetings, which occurred over Microsoft Teams, extremely difficult. Additionally, upon starting she was inundated with meeting requests and requests for help with HR related matters.

15. On or around June 21, 2021, Stacie met with Jonas to discuss her IT issues, as well as her concerns with being pulled in so many directions and the lack of support from her executive assistant. Jonas simply stated that Stacie needed to "take control of her time" and "not get sucked in." She didn't offer any real help.

16. Stacie went on to complete her systems training, but did not receive access to critical HR systems required to do her job until approximately July 2021.

17. Around the same time, Stacie attended separate meetings with her boss, Jennifer Ughetta, Jonas, and the executives she supported to discuss the fact that she did not have the

3

support or proper equipment to do her job effectively. Stacie further mentioned that tech support had still not fixed the recurring issues with her computer.

18. In addition to her technical issues, Stacie raised concerns over the way she had been treated by Ughetta and Jonas. In separate instances, the two women would mention to Stacie how "articulate" and "intelligent" she was. These comments, which came from two white women, showed obvious racial bias.

19. On another occasion, Ughetta embarrassed Stacie in front of her peers and senior leadership by discussing how difficult it was for Stacie to join a financial services company "as a black woman." Stacie was the sole black female executive in her large department. Ughetta routinely asked Stacie to share her experiences and "black perspective." But she simultaneously told Stacie to be careful of the words and examples she used about race and culture.

20. Stacie expressed to Jonas and Ughetta that she felt like she was hired for diversity, but the Company had failed to include her in business decisions. Jonas reiterated that Stacie had been hired to "help change the culture." Specifically, this culture involved a stark lack of diversity at the Company, especially at the executive level.

21. Stacie's issues with the Company continued. Jonas and Ughetta dismissed any concerns she had when she asked for help. To make matters worse, Jonas and Ughetta began spreading rumors that Stacie was struggling with her job. They told employees she was unhappy in her position, and that she'd be leaving the Company soon. Stacie did not have any intention of leaving the Company. They were undercutting her and making life at the Company extremely difficult for her to navigate.

22. On or around August 11, 2021, Stacie met with Melanie Foley, Ughetta's direct supervisor. In the meeting, Foley said she had received excellent feedback on Stacie's work. During their discussion, Foley told Stacie she needed to "go back to the business and be bold and say 'no' to these unproductive things they were doing."

23. Foley's next comment raised serious concerns. Foley said Stacie would "either get fired and receive a severance" or that she could just quit because "it was going to take a long time to change the culture." As a reminder, the specific culture she was referencing involved racial bias and the Company hired Stacie to fix it.

24. Although the meeting with Foley left her demoralized, Stacie continued to do the best work she could. She began to notice, however, that she was simply left off of the invite lists for meetings with senior leadership. If she were invited to meetings, they would end up being cancelled.

25. Around the same time, Ughetta asked three other black female employees to reach out to Stacie about her experiences with the Company. The three women—Charlotte Streat, Dawn Frazier-Bohnert, and Tiffany Dotson—all contacted Stacie individually. During one conversation with Streat, she mentioned that Ughetta and Jonas were attempting to "blacklist" Stacie by telling people that she was "challenging" to work with and that she was struggling.

26. Stacie found these conversations both awkward and dehumanizing. The Company was once again singling her out for being a black woman. Streat's comments also made Stacie fear she may lose her job.

27. On or around August 17, 2021, Stacie again met with Ughetta. In this meeting, Stacie

5

reiterated her lack of resources and support. Ughetta agreed with Stacie's assessment and explained there would be changes happening on the teams that she supported. Ughetta then suddenly suggested that Stacie should "step away between now and Labor Day" to "get the grounding" she needed. She went on to say it would be helpful after Stacie's "shaky start."

28. Ughetta further explained that Julie Haase and her team would be out on PTO for two weeks, which would allow Stacie time to focus on onboarding and to get her laptop working properly and study up on work processes.

29. After their meeting, Ughetta began to cancel meetings with Stacie and stopped speaking to her directly. It seemed that Stacie's fate was sealed.

30. On September 15, 2021, Ughetta and Jonas scheduled a meeting with Stacie. Upon arrival, Jonas said Stacie was "consistently not aligned" with the work the Company did and did not have the right temperament for the job. Jonas went on to say that Stacie needed to begin thinking of an exit plan.

31. Several days later on September 22, 2021, Stacie attended another meeting with Jonas and LaTichia Fleming in human resources. Jonas said she believed Stacie to be inappropriate and disruptive. This was untrue and fueled by racial bias towards Stacie. Jonas said Stacie was not performing her job within the operating model. Jonas then said several of Stacie's primary clients had lodged complaints against her. This was all pretext for illegal race discrimination.

32. Jonas then terminated Stacie's employment, effective September 24, 2021.

33. On February 25, 2022, Stacie filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On August 28, 2023, Stacie received her

6

Notice of Right to Sue Letter from the EEOC.

### IV. Legal Claims

### Count I
### *(Wrongful Discharge in Violation of Public Policy)*

34. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

35. Plaintiff was an at-will employee of Defendant.

36. Defendant employed at least fifteen (15) employees at all relevant times.

37. The public policy of North Carolina, codified in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2(a), seeks to protect and safeguard the opportunity and right of all individuals to "seek, obtain, and hold employment without discrimination" on the basis of race, religion, color, national origin, age, sex or handicap.

38. Defendant violated the public policy of North Carolina as set forth above by terminating Plaintiff because of her race.

39. As an actual, proximate, and foreseeable result of Defendant's actions, Plaintiff has suffered lost back and front pay, lost benefits, diminution in her earning capacity, severe emotional distress, damage to her reputation, anxiety, depression, embarrassment, humiliation, and her peace of mind has been disturbed.

40. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant's officers, directors, and

managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages.

## Count II
### *(Violation of Title VII of the Civil Rights Act of 1964)*

41. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

42. Plaintiff is, and at all relevant times was, an employee covered by the protections of Title VII of the Civil Rights Act of 1964 ("Title VII") as defined in 42 U.S.C. § 2000e(f).

43. Defendant is, and at all relevant times was, an employer as defined in 42 U.S.C. § 2000e(b) subject to the prohibitions of Title VII.

44. Defendant employed at least fifteen (15) employees at all relevant times.

45. Title VII prohibits discrimination on the basis of race.

46. Title VII prohibits retaliation for complaining about race discrimination.

47. Defendant violated Title VII by subjecting Plaintiff to higher performance expectations and by terminating her employment on the basis of her race and/or in retaliation for her race discrimination complaints.

48. Defendant also violated Title VII by discriminating against Stacie on the basis of her sex and race—i.e., Defendant discriminated against Stacie for being a black woman, ultimately resulting in her disparate treatment and termination.

49. As an actual, proximate, and foreseeable consequence of Defendant's conduct, Plaintiff has suffered lost income, diminution in expected earnings, emotional distress,

anxiety, humiliation, expenses, reputational harm, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

50. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages.

## Count III
### *(Violation of 42 U.S.C. § 1981)*

51. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

52. The foregoing allegations against Defendant constitute a deprivation of Plaintiff's right to make and enforce contracts on the same terms enjoyed by white persons, and otherwise continue discriminatory conduct on the basis of race against Plaintiff, in violation of 42 U.S.C. § 1981.

53. Defendant violated Section 1981 by subjecting Plaintiff to higher performance expectations, and terminating her employment on the basis of her race and/or in retaliation for her race discrimination complaints.

54. As an actual, proximate, and foreseeable consequence of Defendant's conduct, Plaintiff has suffered lost income, diminution in expected earnings, emotional distress, anxiety, humiliation, expenses, reputational harm, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

55. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays the Court to:

1. Enter a judgment against Defendant and order the Defendant to pay Plaintiff compensatory damages in an amount to be determined at trial;

2. Award Plaintiff punitive damages pursuant to N.C. Gen. Stat. § 1D-1 *et seq.*, 42 U.S.C. § 1981a *et seq.*, and 42 U.S.C. § 1981 *et seq.*;

3. Order Plaintiff reinstated or order Defendant to pay front pay;

4. Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

5. Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances; and

6. Grant Plaintiff a trial of this matter by a jury.

This the 25th day of October, 2023.

                                                */s/ Sean F. Herrmann*
                                                Sean F. Herrmann
                                                North Carolina Bar No. 44453
                                                Kevin P. Murphy
                                                North Carolina Bar No. 41467

Herrmann & Murphy, PLLC
1712 Euclid Avenue
Charlotte, North Carolina 28203
Phone: 704-940-6399
Fax: 704-940-6407
Email: sean@herrmannmurphy.com
Email: kevin@herrmannmurphy.com

*Attorneys for Plaintiff*