IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:23-CV-897-LCB-JCW

C O P Y

STACIE McLEAN, )
Plaintiff, )
vs. )
LIBERTY MUTUAL GROUP, INC., )
Defendant. )

V I D E O
D E P O S I T I O N

STACIE DENISE McLEAN

400 Clarice Avenue, Suite 100
Charlotte, North Carolina

Wednesday, July 31, 2024
9:40 o'clock a.m.

Atlantic Professional Reporters, Ltd.
Winston-Salem, NC 27116-1672

Q. Do you consider yourself African American?
A. Yes.
Q. Were you born in the United States?
A. Yes.
Q. Did you go to high school in Connecticut?
A. Yes.
Q. I'd like to show you Exhibit Number 1, please.
The court reporter will mark it, and then show it to you, then I'll ask you some questions about it.
(* Exhibit 1 was marked *)
THE WITNESS: Thank you.
Q. (Ms. Stricklin) Does Exhibit Number 1 appear to be a copy of the resume that you submitted to Liberty Mutual prior to your hire?
A. It appears to be.
MS. STRICKLIN: And for the record, it's marked Defendant 15984 to 15985.
I'll wait till you get your reading glasses on if you feel like you'll need -- need them.
THE WITNESS: Okay.
Q. (Ms. Stricklin) On the first page of the resume it lists your education, including University of Pennsylvania, the Wharton School.

at Liberty Mutual involved supporting the global retail market.

Is that correct?

A. Yes, that sounds right.

Q. And at Liberty Mutual that's known at GRM? Is that right?

A. Yes.

Q. Okay. I may use the term, GRM, today. I wanted to be sure that we both were on the same page as to what that meant.

Would you agree that when you were hired at Liberty Mutual you would expect Liberty Mutual to favorably view your previous work with global clients?

A. Yes.

Q. And would you expect Liberty Mutual to perceive your previous work with global clients as a way in which you met job qualifications or were well-qualified for the position that you held?

A. Yes.

Q. Let's take a look at your professional experience, and I've given you your resume to use as -- as a guide here.

You show that you were an independent HR consultant from January 2020 until the time that you

were hired by Liberty Mutual.
Is that right?
A. Yes.
Q. And that includes managing and skilling in an independent consulting practice, drawing on extensive global network and a strong return client base to deliver business and HR consulting.
Is that right?
A. That's what it says.
Q. That's what you listed in your resume?
A. Yes.
Q. Did anybody help you prepare this resume, or did you prepare it yourself?
A. I've had several people and companies over the course of the years prepare different resumes for me, so I have -- this isn't my only resume.
Q. But this is the resume you submitted to Liberty Mutual. Right?
A. It appears so.
Q. Do you remember who might have helped you prepare, if anyone, this resume?
A. I've had several people -- I don't -- over the course of time
Q. But you were responsible for the content. Right?

A. I am, correct.
Q. Was this independent consulting business that you were engaged in from January 2020 to the time that you joined Liberty Mutual -- was that your own business or did you work for another company?
A. It's me as an independent consultant.
Q. So you were a sole proprietor? Would that be fair?
A. If that's the language you want to use, that's....
Q. So at the time you were consulting were you entering into independent contracts with clients?
A. I was trying to do consulting.
Q. Okay. Did you actually do any consulting in that period between January 2020 and the time you joined Liberty Mutual?
A. Not to my recollection.
Q. Did you have any strong return client base as indicated here in your resume?
A. I do have a client base. I do know clients. Those are the ones that I was trying to network with to do my consulting.
Q. But you didn't actually do any business with them ---
A. --- No.

Q. --- Between January 2020 and ---
A. --- Not to my recollection.
Q. Okay, and so where it lists here that you partnered with C-suite Executives to build operating models, define organizational structures and create highly productive cultures, that's not something that you actually did between January 2020 and the time you joined Liberty Mutual?
A. Well, it's a partner, as in that's what I want to do. Not partnered, as in past tense, as if I did.
Q. Well, you show here that your business activities as an independent HR consultant were from January '20 to present. Right? So that implies that you are presently doing that work.
Would you agree?
MR. HERRMANN: Objection to form.
MS. STRICKLIN: You should still answer.
THE WITNESS: No, I don't agree.
Q. (Ms. Stricklin) Do you agree that if -- if someone at Liberty Mutual read your resume, they would believe that in the January 2020 time period to the present that you engaged in the activities that you've listed here for clients?

MR. HERRMANN: Objection to form.
THE WITNESS: No.
Q. (Ms. Stricklin) Do you think it would be reasonable for someone to believe, when reviewing this, that you were actually doing the work that you listed here in your resume from the January 2020 date to the present?
A. Not necessarily, no.
Q. Your resume also lists that you analyzed current processes to optimize effectiveness and enhance internal capabilities to leadership development, performance management and talent acquisition.
Is that right?
A. That's what it says.
Q. And again, you didn't do any of that work for any client between January '20 and the time that you joined Liberty Mutual. Is that right?
A. Not to my recollection.
Q. And then your resume also says that you maximized business performance by creating targeted human capital strategies in alignment with business goals. Is that right?
A. That's what it says.
Q. And again, you didn't do any of that type

of work for any clients between January 2020 and the time that met -- that you joined Liberty Mutual.
Is that right?
A. I don't recall.
Q. You don't recall what you did between January 2020 and the time you joined Liberty Mutual?
A. I don't.
Q. Do you have any records that would show whether you've done any of the work that you've listed in your resume between -- as an independent consultant between January 2020 and the time you joined Liberty Mutual?
A. What type of records?
Q. Any records. Purchase orders, contracts, invoices, bank records showing that you received income for any of those services. Any records.
A. Not to my recollection, no.
Q. That's because you didn't do any of that work, did you?
A. I think I just said that.
Q. Okay. And in fact, during that entire January 2020 through -- let me strike that.
In fact, between December 13, 2019, and December 24th, 2020, you were receiving ongoing salary continuation and severance pay from Aetna.

MS. STRICKLIN: I'm sorry.

I want to try not to capsize my -- or pull off my microphone here.

Please take a look at what we'll mark Exhibit Number 2 -- once the court reporter marks it -- I'm sorry.

THE WITNESS: Oh, sorry.

MS. STRICKLIN: Thank you, ma'am.

And for the record, this is Defendant 2948 through 2953.

(* Exhibit 2 was marked *)

Q. (Ms. Stricklin) Does the first page, 2948, appear to be -- excuse me -- appear to be a print -- a Teams message ---

A. --- Yeah.

Q. --- That you sent to Jennifer Ughetta, your boss at the time, on August 13, 2021?

A. I'm sorry. Was that a question? I didn't hear.

Q. Yeah.

A. What was the question?

Q. Does the first page of Exhibit Number 2 ---

A. --- Okay.

Q. --- Marked 2948 at the bottom, appear to

be a copy of a Teams message that you sent on August 13, 2021, to Jennifer Ughetta, your boss at the time?

A. It appears to be, yes.

Q. And in that Teams messages you said and, Jen, to be completely transparent, a former boss of mine reached out to see how it's going here for me.

A. Uh-huh.

Q. I was honest. He has asked me to consider a bigger role, next level up, an SVP -- that's senior vice president. Right?

A. Yeah.

Q. Like maybe RTOs here, and come work for him again.

I want to stay where I'm at and have the opportunity to potentially move up here in the future. I don't want my onboarding experience and observations to limit me or mark me here.

Do you see that?

A. I do.

Q. Is that a message that you sent to your boss?

A. It appears so.

Q. And in that message you told her basically that a former boss of yours had reached out and asked you to consider a bigger role, next step up, like a

senior vice president.

A. Uh-huh.

Q. And come work for him again.

A. Uh-huh.

Q. Does this refresh your memory?

A. Yeah. It wasn't a former boss, per se. It was someone that I reported into. It was a leader that I supported.

Q. Okay, so it was not a former boss of yours?

A. He was kind of like a boss of mine.

Q. But it wasn't somebody ---

A. --- But not a direct.

Q. --- You reported to?

A. Yes.

Q. Who was that?

A. Floyd Green.

Q. And where did Mr. Green work?

A. At Aetna.

Q. Where -- where is Mr. Green based in Aetna?

A. I don't think -- he's no longer with Aetna. He left a few years back.

Q. Was he still with Aetna on August 13th of 2021?

Q. What do you mean by that?
A. Creating an LLC to, umm, do something on my own without a partner.
Q. What type of a something? What type of business?
A. Same stuff that I was doing with my cousin.
Q. So the luxury retreats for black women that ---
A. --- It's personal leadership development for black women in -- at retreats. I'm sorry.
Q. Are you in the process of -- of creating an LLC?
A. Umm, it's created.
Q. What is it called?
A. Umm, Staewynn.
Q. How do you spell that?
A. S-t-a-e-w-y-n-n
Q. Is this an LLC that's registered on the North Carolina Secretary of State website?
A. Yes, ma'am.
Q. When did you ---
A. --- Around the same time that Tisha and I dissolved Enside.
Q. And what progress have you made towards

don't know, maybe the first few months that I left. I really don't remember.

Q. And because of the allegations that you've made in this case, I need to ask.

A. Uh-huh, sure.

Q. Is Charlotte Streat -- what is her race?

A. She's black.

Q. Black female.

A. Black female.

Q. And then, Tiffany. Is that Tiffany Dotson?

A. Correct.

Q. Is she also a black female?

A. Correct.

Q. Anthony Lewis, what is his race?

A. Black male.

Q. Don Roach?

A. Black male.

Q. Ashleigh White?

A. I believe Ashleigh is a white female.

Q. Have you ever seen Ashleigh before, like in video conferences for work or anything?

A. Oh, no. But that doesn't mean anything.

Q. Well, that's right.

A. Yeah.

before.

Q. There's a note about Julie. Julie has 1,000 people in her organization.

Is that what it says?

A. Uh-huh, yes.

Q. Is that Julie Haase?

A. Correct.

Q. And Julie was one of the two business leaders who you were assigned to -- whose organization you were supined -- assigned to support while you worked at Liberty.

Is that right?

A. Yes.

Q. And this other note beneath it is about Parker.

A. Correct.

Q. I think it says has 200 people in her organization.

A. Correct.

Q. And that's Parker Koppelman. Right?

A. Correct.

Q. And Parker is the other of the two business leaders whose organizations you were assigned to provide human resources support or talent support.

A. I was.
Q. Did you interview for it?
A. Umm, with -- yeah, with Loralie, with the recruiter, with Shane.
Q. Do you recall Loralie telling you during that interview process that this was an individual contributor role?
A. Vaguely.
Q. Do you know what I mean by individual contributor?
I want to make sure you and I are on the same page.
A. Of course.
Q. Okay. My understanding of the term is that it's somebody who would be responsible for performing their job duties without having a team of other employees supporting them.
A. Oh, of course. Right.
Q. Is that right?
A. Yes.
Q. Is that what you understood, too?
A. Yes.
Q. Do you remember expressing some surprise to Loralie about the fact that this position was not supported by a team?

Q. Okay, and were you told by anybody at the company that they were not considering you for that role, but they would be interested in considering you for the role that Kristy Fairman was vac -- was vacating?

A. I don't think it was exactly communicated like that, but along those lines, yes.

Q. How do you recall it being communicated?

A. Both Jen and Kathy said they wanted me and they were going to figure something out.

Q. They told you that?

A. Yes.

Q. Each of them did?

A. Yes.

Q. And because we're talking about race ---

A. --- Uh-huh.

Q. --- What is Kristy Fairman's race?

A. I believe she's a white woman.

Q. And I understand, you know, we're talking about appearances.

A. Yeah.

Q. Was Shane Cox -- is that true also that you're going on appearances ---

A. --- Yeah.

Q. --- In thinking she's a black woman?

A. There was one more person. I forget.
There was another H -- Cassandra was on, I think, the last interview.
Q. For the position that you were hired into?
A. That I got, yeah.
Q. Is that Cassandra McKiernan?
A. Correct.
Umm, it wasn't presented to me in that manner, that it's like you would go through two panels.
It was just presented to me that I would meet with Jen and then I would meet with, umm, the leaders that I would be supporting. And then it morphed into, you know, like 10 people.
Q. So Kristy Fairman was the senior talent advisor who had held the role previously. Right?
A. Yeah. She was there.
Q. She was your predecessor?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Thank you.
And I think you've already said Kristy Fairman is a white woman.
Do you know what race Matt Johnson is?

A. From the looks of him, he's a white male, but I'm not certain.

Q. Same question for Kate Stevenson.

A. White female.

Q. Kara Oliveto?

A. Umm, white female.

Q. Stevan Chase?

A. White male.

Q. And Kristen Goodrich?

A. White female.

Q. How about Cassandra McKiernan?

A. White female.

Q. Okay. After going through this interview process you were interested in the role. Right?

A. Yes.

Q. And this role would support two leaders. One over the actuarial business and one over the finance business, both of which were in global retail markets, or GRM.

Is that right?

A. Correct. And their leadership teams.

Q. And their leadership teams. Okay.

And the businesses and the leaders that this role supported, were those the same businesses and leaders that you understand Kristy Fairman also

supported when she held the role?

A. Yes, I believe so.

Q. And this, again, was an individual contributor role?

A. Yes, as it stood.

Q. Okay, so you would not have a team supporting you?

A. Correct.

Q. And the same was true for Ms. Fairman when she held the role. Is that right?

A. I'm not certain. I don't know.

Q. To your knowledge, did Kristy Fairman have any employees reporting to her when she was the STA, supporting actuarial and finance in GRM?

A. Not to my knowledge, but I wasn't aware of that.

Q. But you weren't there?

A. I wasn't there. That's why I don't know.

Q. Okay. I understand.

At the time were you talking with any other prospective employers?

A. I don't remember at the time. I'm sure I was.

Q. Did you have any other offerings?

A. I don't know. I don't remember.

from, because I had been a global road warrior in two other roles, and that's something that I wanted to stay away from due to my family commitments.

So it's not like I would have turned it down, but it -- this other role was more attractive to me because it didn't have a travel component in -- in it.

Q. And all the people that you have mentioned or referenced as participating in the decision to hire you ---

A. --- Uh-huh.

Q. --- You had participated in a video conference with -- one or more video conferences with each of those people. Right?

A. Yes.

Q. Okay. In your experience as a talent or HR professional, throughout your career is it typically the HR or talent person who is advising the business people on human resources related issues?

Or does the talent or HR person actually make the business decisions?

A. It's an advisory role, and the business makes business decisions. You're consulted on them.

Q. At the time that you joined Liberty were you aware that the role that you would be filling

would involve both strategic and also tactical functions or skills?

A. The way that the role was described to me before I was hired, and after I was on board, was that it was strategic in nature, umm, a strategic consultant, a strategic advisor. And the tactical piece of the work would be done through what they called the talent delivery team.

Q. Is that also known as TDT?

A. Yes.

Q. And the talent delivery team was a team full of talent staff who could help run analytics or do some of the detail-oriented work?

A. Correct.

Q. Is that right?

A. Yes.

Q. And if you needed help from a -- from the TDT, was the typical process to submit a request, and you'd be sort of placed in the queue and somebody within the TDT would help you?

A. Correct.

Q. Okay. Who was -- you said that you were told, both before and after you joined the company, was that the job would primarily be strategic in nature, and the tactical piece would be done through

Q. And your start date with Liberty Mutual is May 24th, 2021. Right?
A. That sounds accurate.
Q. Do you have concerns that taking the two vacations after you started might disrupt your onboarding process with Liberty Mutual?
A. Not at all.
Q. Okay. Why did you -- who -- who picked your start date?
Who picked May 24th, 2021, as your start date?
A. Umm, Jen and Kathy did. They did, not me.
Q. Did you propose that date?
A. I don't believe so, no, huh-uh.
They wanted me to start as soon as possible.
Q. When you started working remotely for the company, what company-issued equipment did you receive at that time?
A. I mean, a PC, a monitor or -- I think two monitors, if I remember correctly.
Q. Do you remember getting a printer?
A. Not right away, but that came.
Umm, of course, the phone came eventually, too. Some little speaker thing for meetings. And I

A. It appears so, yes.

Q. Okay. Do you recall, when you first set up your PC you were issued by Liberty Mutual, having some issues with the technology?

A. I had, yes, issues from day one, up till when I left.

Q. Okay, what sort of issues with technology did you have from day one up to when you left?

A. A lot of the issues were on Teams. But I don't remember all the specifics around issues because there were so many. Bizarre issues.

Q. So initially you were just issued a PC -- right -- not a Mac?

A. Yeah. And there was issues on that PC.

Q. What kind of issues do you remember having on that PC?

A. I don't remember what the issues were.

Q. Were they issues with connectivity with your home Internet service?

A. Could be.

Q. Were they issues just getting the equipment set up properly in your remote office?

A. I don't think they were issues around that.

Q. No?

A. I don't remember.

Q. Okay. Do you remember whether there were issues -- you mentioned issues with Teams.

Were there issues with you getting Teams to work on your PC, or being able to join calls, anything like that?

A. Yes.

Q. Please tell me what you remember about that.

A. I just remember having a hard time having people see me on calls, and the calls constantly dropping, and not being able to dial in to the calls. Stuff like that.

Q. And what did you do to resolve the issues or to try to resolve the issues?

A. I reached out to my EA to help connect me with tech support, where I'd call tech support on my own and spend hours at a time trying to troubleshoot it.

And then eventually asked both Kathy and/or Jen to get involved and escalate it to get me somebody who could fix the stuff.

Q. Okay, and -- and how did they respond when you asked for help getting someone to fix this stuff?

A. How did I respond?

Q. How did they respond?
A. Oh.
Q. I think you said that you ---
A. --- Jen pretty much delegated it to Kathy to get somebody to figure out for me initially. And then, as time went on, and I still had issues, she reached out to somebody else in tech support, umm, to try and assist.
Q. And this is Jen Ughetta?
A. Yes.
Q. Okay. I just want to be sure, because we've got Jennifer Soucek, also.
A. Oh, yeah.
Q. And I want to be sure the record is clear.
A. No, that's Jen.
And Jen Soucek might have as well. I'm -- I don't really remember.
But there was a bunch of people trying to get tech support to help me, but issues just continued to happen over the course of my entire four months there.
Q. Okay, so the issues were never resolved?
A. Sometimes they were resolved and then they would recur. Or sometimes they were resolved and other things would pop up.

Q. Okay. And do you recall Jen Ughetta and others help connecting you with an employee at Liberty Mutual named Priscilla Brown?

A. I do. I don't remember her name, but I know she was -- the name sounds familiar.

Q. And was Priscilla Brown a Liberty Mutual employee who helped executives with technology issues?

A. I'm not sure what her role was, but I know they reached out to her.

Q. And did Ms. Brown attempt to help you with your technology issues?

A. I believe she did, yes.

Q. And do you recall also being connected to a technology employee, an IT employee named Chris Moon?

A. I don't remember the names of the tech people who -- there were a variety of them that I -- yeah.

Q. And these were all tech people that either Jen Ughetta, Jennifer Soucek or ---

A. --- Myself or -- I reached out to IT as well, and sat on calls for hours.

Q. Okay. So let me be sure I'm clear.

A. Uh-huh.

Is the HR center another system at Liberty Mutual that you needed to do your job?
A. Yeah.
Q. Okay. And then at the top of the page, you respond, hi, Jen. Yes, Danielle scheduled a meeting originally when I started, but I asked Kelsie to reschedule as I can only meet with so many people at once.
So does it appear that there was a meeting scheduled as part of your onboarding program with Danielle Pita in order to demo Power BI?
A. There was.
Q. And that you asked your executive assistant to reschedule it?
A. Yes, I did.
Q. And then ultimately it was scheduled. Right?
After you engaged in this email correspondence in July of 2021?
A. I think at some point I did meet with Danielle.
But Power BI wasn't a major, umm -- I needed to meet with all those dozens other people that they had on my calendar. There's only so many hours in a day. She wasn't the top priority, Power

Do you see that?

A. I see it.

Q. Did you access those links at the time?

A. I have no clue whether I did or not.

Q. Please take a look at what we'll mark Exhibit Number 24.

(* Exhibit 24 was marked *)

A. Okay.

Q. It's already set up for you.

A. Thank you.

Yes, I did access this.

Q. Okay. Is this a copy of the onboarding schedule that was prepared for you when you joined Liberty Mutual?

A. Uh-huh.

Q. And does it contain links, hyperlinked resources to the onboarding Teams channel, technology help hub, HR center, talent services hub, onboarding website, Teams quick start guide, Teams quick tips, meeting quick start guide, OneNote quick tips, learning OneNote, account and enterprise systems and so forth?

A. Yeah. I think it echoes what I said. It was just a dump of a bunch of slides. And half the links didn't work for me, because there were all

A. That's what's on the -- the page.
Q. Was there essentially a weekly check-in with Jennifer Soucek about your onboarding program during the time that you were going through it?
A. I think check-in is very loose term, but I'll say yes to that.
Q. Okay. The next page is marked 13004 at the bottom.
A. Okay.
Q. And on June 17, 2021, Jennifer Soucek is emailing you regarding onboarding check-in, setting up ---
A. --- Oh.
Q. --- Setting up the time to see how everything is going and offer my support in anything you may still need for your onboarding.
MR. HERRMANN: Objection. Mischaracterizes the document.
Q. (Ms. Stricklin) Do you see the email at the bottom of the page?
A. I do.
Q. Did I read it correctly?
A. I believe you did.
Q. And then your response is above that on June 2nd, the same day.

didn't want to hire you, did you?

A. I don't recall that. I do recall specific emails between Parker and Julie.

Q. Parker complimenting Julie Haase?

A. Uh-huh.

Q. Okay. Thank you.

Please take a look at Exhibit 25, the page that's numbered 13086 at the bottom. I've got it open for you.

A. Okay.

Q. I'd like to direct your attention to an email in the middle of this page, and the email is June 16, 2021.

Do you see that?

A. Yes.

Q. At 5:42 p.m.?

A. Yes.

Q. And that's an email from you to Jennifer Soucek. Is that correct?

A. Okay.

Q. And you say, hi, Jen, thanks for checking in, and absolutely we can meet. Does 6/28 at 11 a.m. work for you?

A. Okay.

Q. Then you say I should have stuck to

whatever the onboarding plan is. A quick glance day one and I haven't really seen -- I haven't seen it really again ---

A. --- Uh-huh.

Q. --- As I have yet to do any of it, being eager to get started and meet with the business key stakeholders, and then doing the same has set me back.

A. Uh-huh.

Q. It's quite enough to keep up with, whew, the volume of lengthy meetings and emails.

All I can do is my personal best and with a smile.

A. Uh-huh.

Q. I'm concerned about what I'm missing, though, and I'm trying my best to manage my calendar and carve out time to get that onboarding stuff done and manage my busy family and life at that same time. It'll all work out and be fine.

Do you see that?

A. I do.

Q. And that was your email on June 16, 2021?

A. Yep.

Q. And at that point you had not completed any of the onboarding, as put in this email?

advisor role at Liberty Mutual?
A. And black, yes.
Q. Okay. Well, just -- let's just think about you as an external hire.
That alone was unusual. Right?
A. That alone, yeah.
Q. Okay. Please take a look at what we'll mark -- I believe we're on 27.
Thank you. I appreciate the prompts.
(* Exhibit 27 was marked *)
Q. (Ms. Stricklin) Does this appear to be an email exchange between you and Jen Ughetta on July 26, 2021?
A. Uh-huh.
Q. And in your email, at the bottom you emailed Jen on July 25th, 2021, and sent her a message about what it was going to take for you to reset.
Do you see that?
A. I do see that.
Q. Okay, and basically, what you're saying to Jen is I would like to step back from the business and onboard in a way that I feel will be meaningful for me and, therefore, the business.
I'm having a difficult time acclimating to

the level of production and the volume of marathon meetings. I feel like I can't gain any traction, as most people seem to have forgotten that I'm new and talk in nonstop acronyms and first-name-only, like Madonna, etcetera.

The culture is definitely a lot different than what I'm used to. I want to be successful at Liberty. I need time to gain a solid foundation and feel like I'm in -- I feel like I'm in Groundhog Day.

Please let me know your thoughts.

Do you see that?

A. I do.

Q. Okay. So basically you were expressing to her that you wanted to step away from the business, meaning step away from your role in supporting and advising the business while you completed your onboarding?

A. This, I mean, I think is taken out of context.

This was not the first time Jen and I had talked about this. Jen, in fact, was the person who suggested this to me. I just put it in an email to outline what we had talked about, and agreed with her that I should take some time to focus on onboarding.

Not necessarily not have anything to do

outrageous things they ask you to do, push back, be bold.

Q. That's what Jen Ughetta said to you?

A. This is what her manager said to me, and Jen echoed.

Q. What Melanie Foley said?

A. That's right.

Q. Okay, we'll get to that in a moment.

A. No problem.

Q. Had you -- did you have the understanding that Kristy Fairman, your predecessor in the role, had done a lot of hand-holding of the businesses, and the leaders within the businesses she supported?

A. That's what Jen Ughetta and Kathy told me.

Q. Okay, and so it was your understanding that that hand-holding was really what you just said, getting in the weeds, doing the tactical work that the businesses asked her to do?

A. More than that. It's like everything is urgent. Drop what you're doing, I have a request. Do it now. That's what I mean by order-taking.

Umm, you can't have priority over your calendar if every time you start to do something, you get one of these hundreds of leaders sending you emails to -- can you -- like that's just not --

that's not the operating model for a hub-and-spoke model, which is what Liberty has. That's -- which is a traditional HR model.

Umm, but -- I mean, Melanie doesn't have an HR background, so I don't expect any less. It was her model that she put in place, which Jen told me to shut up about, because she didn't want to make her manager mad, because she agreed that it was a dumb model.

Q. Okay, and this was the model that applied to all the STAs. Right?

A. That's right. It's the HR operating model.

Q. And it was an HR operating model that you understood Melanie Foley devised?

A. Yes. That's what Jen and Kathy told me. And to be careful about mentioned it, because she is the CHRO and it was her model.

Q. In your complaint you've alleged that Jen Ughetta told you to be careful about communicating your concerns.

Is that what you mean there?

A. That's just one instance of it.

Umm, she mentioned around -- she basically said to me words matter and be careful of the

A. It appears so.
Q. And in this first one, she says Julie mentioned today you shared that you haven't been onboarding. Help me help you prioritize. Skip ELM tomorrow morning and take the time to focus on onboarding.
Show me what else you have on your plate so I can move things for you.
Is that right?
A. Yes, it says that.
Q. And then there's some ongoing exchange ---
A. --- Uh-huh.
Q. --- In which you say you're trying to -- you don't want to focus on what's not working. You're trying your best to find solutions and what makes sense for you and for Liberty. Is that right?
A. That's right.
Q. And you say that Liberty, they don't operate strategically for the most part. Lots of swirl and it feels like being on a merry-go-round, and it's exhausting.
A. It was.
Q. Is that a fair summary of your ---
A. --- Absolutely, yes.
Q. --- Experience with Liberty Mutual at that

time?

A. The entire time. It was Groundhog Day every day.

Q. Okay, and is there any reason to think that your experience in that regard was different than other STAs who held the same role that you did?

A. I can't speak for them. I have no line of sight to that.

Q. Okay. Do you recall in mid-August 2021 Jen Ughetta arranged for you to have a talent advisor aligned to you to support you in your work?

A. Umm, vaguely.

Q. Was that Brian Prozeller?

A. Umm, I don't really remember his name. That sounds vaguely familiar.

I know she had someone that was very junior she wanted to align to me to help out with, umm, the tactical stuff.

Q. Okay, and was that a request that you made of her and that she granted?

A. I made a request for support. It was her that came up with the idea of -- she came up with several ideas. And then mixed some.

Like one was to have some woman from TDT. I think her name was Bree. I don't remember. Could

be the wrong name. Who basically just wrote me diaries every day and led me in a circular fashion back to me on everything that I requested her help and support on. It was just -- that was one of the merry-go-round.

And then Brian was upset, he shared with me, because he didn't want to run point from the audio and technical stuff. And he was going to share that with his manager.

Brian, instead, wanted to be senior talent advisor. He had been a Liberty for a minute, and he was pissed that Kara and Jen wanted him to do this work. So he wasn't really trying to be supportive of me and I wasn't going to keep pushing him to do work that he didn't want to do.

Q. Okay. Do you recall meeting with Jen in August 2021 and outlining what you felt you needed to do -- what you needed in order to succeed at Liberty Mutual?

A. Umm, I had several conversations, and I might have outlined something, yes.

Q. And as a result of that meeting, did you ask to step away from the business again until after Labor Day?

And this was the time period that some

folks would be out and the businesses that you supported would be out on PTO?

A. That was Jen's idea and I agreed to it.

Q. Okay, and that was intended to help you get your feet underneath you and acclimatize and finish your onboarding?

A. I don't -- wouldn't say get my feet underneath me.

It was an opportunity to read through the millions of DEX that were sent to me that I didn't have time to read because I'm in meetings all day in huddle, muddles and chit-chats.

Q. Okay. And then as a result of that meeting in August 2021, Jen also agreed to align a talent advisor to you.

And that was Brian Prozeller?

A. Okay.

Q. And then she also agreed to align a talent delivery Team person to you for a period of time, and that was Bree Marston?

A. Yeah. Those were the two people I just told you.

Q. Are you aware of any other senior talent advisor who received those additional resources in their jobs?

A. I don't know that. I'm not aware.

Q. And at the time leading up to Labor Day that you stepped away from the business a second time to focus on the onboarding, do you recall that the company was in the middle of a leadership reorgani- zation ---

A. --- Yes.

Q. --- In the financial group?

A. I don't know that I was made aware of that prior to Jen making the suggestion of me stepping away during that holiday period. I don't know for certain.

But I -- I do know of the leadership changes, org changes. I just don't know when I was made aware of them.

Q. Okay, and while you stepped away from the business, do you recall that Kristy Fairman stepped in and worked with Stevan Chase to support the businesses during that reorganization?

A. It's possible. But I supported the changes as well.

Q. Did you do work during this late August 2021 time period relating to the reorganization?

A. I did work every day there, yes.

Q. Even during the time that you stepped away

after -- after that. I don't remember. I don't remember.

MS. STRICKLIN: Let's take a break.

VIDEOGRAPHER: All right, we are going off the record.

The time is 5:34.

(5:34 - 5:59 p.m. - recess)

VIDEOGRAPHER: We are back on the record.

It is 5:59.

Q. (Ms. Stricklin) Just to recap, in August 2021, leading up to Labor Day, you attempted to step away from the business a second time in order to complete the onboarding and review all the materials that you had been provided regarding the business.

Is that right?

A. It sounds about right. I don't remember the exact timing ---

Q. --- Okay.

A. --- Or how many attempts there were.

Q. And -- and is it fair to say that you never got up to speed on Liberty Mutual's systems and the way work was done there?

A. I don't know that that's fair to say. I understood the way the work got done. I didn't agree

with it.

Q. Did you do the work an Liberty systems?

A. I didn't have access to most of the systems still, even in August.

Q. Even in August?

A. Yeah.

Q. Okay, so I guess the answer is no?

A. You can infer that.

Q. Okay, would it be reasonable to infer that?

A. I think it's reasonable.

Q. Okay, please take a look at Exhibit Number 31.

A. Uh-huh.

(* Exhibit 31 was marked *)

MS. STRICKLIN: And let's go off the record for a second and let you look it over.

THE WITNESS: Okay.

MR. HERRMANN: I'm going to object to going off the record while she looks over an exhibit.

We'll go after that.

Q. (Ms. Stricklin) Well, I'll ask you some specific questions about the document.

A. Okay.

Q. Does this look like a document that

having issues doing Teams meetings where people can't hear me or see me. It's not my Internet, it's my Liberty equipment.

I never had -- had an issue with any other employer or companies I've worked with -- I've worked for being able to do meetings virtually, not with my own personal equipment or their company-provided equipment.

I need this to be fixed and I'm just tired and frustrated. Can you please help someone to fix this shit for me once and for all.

Do you see that?

A. I do.

Q. Is that a message that you sent to Jen Ughetta in early September of 2021?

A. It seems like something that I said to her, yes.

Q. Okay. And then, in response, two messages down, did Jen Ughetta suggest that you reach out to Chris Moore in IT. He's a lead tech support consul- tant and has been her best resource and usually responds ASAP.

A. That looks like she says that.

Q. And she tells you in the same exchange to tell Chris that Jen Ughetta sent you.

A. I mean, you skipped over some, but yes, that's there.

Q. Okay, and then on Tuesday, 10:21 a.m. ---

A. --- Uh-huh.

Q. --- You message Jen Ughetta, and say I literally am at my limit this morning with these tech guys here. I'm not built for this day in and day out, Jen.

A. Uh-huh.

Q. I shared with Kathy all this stuff with TDT -- that's the talent delivery team?

A. Yes.

Q. And the merry-go-round I'm still on there is too much for me.

A. Uh-huh.

Q. And the merry-go-round with TDT was your efforts to use your TDT resources in order to obtain information that you needed to get your job done?

A. Correct.

Q. And you felt that you were given the run-around by them?

A. Correct.

Q. Is that fair?

A. Uh-huh.

Q. Okay. And in response Jen says I'm in a

GRM ELT offsite meeting, so I can't jump on a call.

I don't know the detail of your challenges to really be able to help. Would you like me to connect with Chris and ask him to please prioritize getting you fully set up.

And then she says I'd also like to better understand what TDT -- TDT challenges are. Right?

A. I mean, she already knew them, but yes.

Q. Okay. And then on the next page, 359 ---

A. --- Okay.

Q. --- After some additional back and forth about TDT and Brian Prozeller, and other matters, on Tuesday at 10:36 a.m. you message Jen Ughetta and say it's okay, Jen, really it is. I'm likely not the right person for Liberty and the way things get done here. I don't have the temperament for it.

Do you see that?

A. I do.

Q. And then you go on to provide some additional information about, you know, I spent yesterday going around and around for a simple ask on EOS.

Is that right?

A. Uh-huh.

Q. Is that employee opinion survey?

A. Correct.

Q. And literally five people on the email trail couldn't get me what I needed. It's too much for me.

A. Uh-huh.

Q. Do you see that?

A. I do.

Q. Okay. After sending these emails to Jen Ughetta in early September 2015, were you called into a meeting with Jen and Kathy to discuss your employment with Liberty Mutual?

A. That sounds about right. Somewhere in that timeframe. I don't know the specific date off my head.

Q. Okay. If the company records show that that occurred on September 14, 2021, would you have any reason to dispute that?

A. Well, you just said it was after, and this is September 16th, so was that before?

Q. This is a September 16th email that -- well, let's just say is this -- does September 14th, 2021, sound like the right period of time for the time that you met with Jen and Kathy?

A. It was in late September, yes.

Q. Okay. And Jen and Kathy scheduled the

meeting with you?

A. Umm, I don't remember. It could have been their EA. I just don't remember who scheduled it, but I know it was going to be the two of them.

Q. Okay, and do you recall going into that meeting expecting that you're going to leave Liberty Mutual?

A. Not at all, no.

Q. Had you sent emails or sent messages to any other colleagues at Liberty Mutual indicating that you might not be at Liberty Mutual for long because Jen and Kathy had scheduled this meeting with you?

A. I don't remember. That could have happened.

Q. Do you remember coming in to that meeting pretty hot in terms of your demeanor?

A. No, I don't. I came into the meeting very frustrated.

Q. Okay, did you express that frustration?

A. I had been expressing it all along, yes.

Q. Were you initially defensive during the meeting because you thought that you were going to get reprimanded for using profanity in your text messages?

A. I don't specifically remember that, but okay.

Q. What do you recall being said during that meeting with Jen and Kathy in September of 2021?

A. I recall a meeting where I met with Jen and Kathy where Jen said not one word. It was all Kathy talking.

And Kathy told me that I was not aligned with the way the work gets done here. That I was disruptive.

Umm, kind of like inferred like angry. And like you said, came in hot. Umm, and I need to think about an exit strategy.

That's all I really remember from that conversation.

Q. You said inferred angry.

Did Kathy actually say that you were angry?

A. You just inferred that. You said I came in hot.

Q. Well, I asked you if you came in hot.

A. I told you I came in frustrated.

Q. Right.

A. And Kathy inferred that I was angry somehow. I don't remember her specific language that

she used.

But I didn't really say much in that meeting. I just listened.

Q. Okay. Do you recall Kathy telling you that -- in the meeting that you were -- that you consistently have said that you're not aligned with the way work got done at Liberty Mutual?

A. Yeah, I did share that.

Q. And do you recall Kathy telling you that yesterday you had said in Instant Messaging that you were not likely the right person for the job at Liberty and the way things got done there?

A. Sure. That was my frustration speaking. Absolutely.

Q. Okay, and did Kathy reference your Instant Message where you indicated to Jen Ughetta that you didn't have the temperament for the job?

A. I just remember her focused on the word, shit, and I was like aghast. Like -- yeah, she said I was like inappropriate or something. And I was like of all people to say that to me, the way both her and Jen talk. But I just let it go.

I just -- my boss was quiet, so I was quiet. I just let Kathy talk.

Q. Okay, was this a video conference, a Teams

conference?

A. No. It was -- oh, it might have been. It was a dial-in, so yes.

Q. Okay.

A. Yeah. We were on the phone. There was no video.

Q. Do you recall Kathy Jonas saying to you that you don't like the way things get done here and that's not changing overnight?

A. I don't remember her saying that, but she could have.

Q. Do you remember Kathy saying that she needed to understand where you were at and how you were seeing it, because it didn't seem like this is working?

A. She might have said that. I don't really remember her exact words.

I think I was shocked from the start, where she opened with you need to be thinking about a exit plan.

Q. Is that how Kathy opened up the meeting?

A. Not right in the beginning, but it was in the beginning. It was pretty early.

Q. Okay, what -- what did Kathy say during the meeting about an exit plan?

A. That I need to start thinking about that and what that would look like.

Q. Do you remember acknowledging during the meeting that you were in the place that was described, that you weren't feeling positive about your employment with Liberty Mutual?

A. I didn't say much at that meeting, so no, I don't remember saying that.

Q. Do you remember saying that you didn't have the patience to be turned around every day for the smallest task?

A. I've said that in lots of different ways. Emails, IMs, directly to Melanie, to Jen, to Kath -- I mean, yeah.

Q. Do you remember saying it during that meeting on September 14?

A. I don't remember saying it. I was stunned at this meeting.

Q. I want to focus on that meeting.

A. Okay, great.

Q. Do you remember Kathy -- do you remember telling Kathy and Jen that you felt you were not set up for success during this meeting?

A. Absolutely.

Q. Do you remember telling Kathy and Jen that

concerns about the way I was being treated by Ms. Ughetta and others, which I believed was related to my race.

For example, in meetings, Ms. Ughetta and Ms. Jonas would mention how articulate and intelligent I was.

Comments like this from those women, who are white, show racial bias.

Do you see that?

A. I do.

Q. What type of concerns did you raise about the way you were being treated by Ms. Ughetta and others?

A. I shared with Jen and Kathy that I felt I was being held to a different standard than others in the organization. I felt like they were constantly talking about my black lens that they wanted me to share.

Kathy mentioning on occasion that she did not see, umm, color to me was absolutely ridiculous, when I was the only black person on the team. Kathy mentioning on occasion that I was angry when it was just frustration. That leads to like stereotypes about black women.

Parker asking me about my hair, and like

what type of hair was that and, you know, fetishizing me, kind of. I'm certain she wouldn't ask anybody else that type of question. I mean, like lots of things like that.

Microagressions that I felt like I experienced over time. And just not having the support that I needed that other people got.

Like Alice Lin. She's -- I don't know if she's still there, but from what I understand like they did wrap their arms around her to help her be successful, even though she did have challenges in the beginning. Not, perhaps, the exact same challenges, but she had challenges nevertheless.

I didn't get the support that I needed, and it just seems like what other reason could there be. And then with the anecdotal comments about not seeing color, umm, fetishizing my hair, umm, talking to me about me being angry instead of me just being frustrated. Things of that nature.

I had mentioned both of these things to Jen and Kathy. And Jen -- I mean, Jen just listened more than anything. She never really said anything, other than, you know, I'm here to help support you. And she kept putting that in writing every day.

Kathy said she didn't understand what it

was like to be a black person at Liberty, but she felt sorry for me.

Q. Okay, lets -- I want to understand just very, very clearly what you said when you raised these concerns about your treatment.

First of all, when did you raise a concern about your treatment to either Jen or Kathy or anyone else?

A. I don't know specific dates for Jen and Kathy, or really anybody else.

But really, I -- this probably started back in July at some point, having these conversa- tions with -- I mean, I put it in writing as well -- I'm sure you've seen that in discovery -- to Kathy and Jen.

My conversations with black execs at Liberty like Tiffany Dotson and Charlotte Streat and ---

Q. --- Well, hold on. I need to know about -- what I want to know about -- and I don't mean to interrupt you ---

A. --- Okay.

Q. --- But I need you to respond to my question.

A. I was trying to.

And Kathy said she did not understand really any of what I was sharing, but she felt sorry for me -- was really her response.

Q. And do you remember anything else about these -- it sounds like you had two separate conversations.

One with Jen and one with ---

A. --- It wasn't just two. It was multiple conversations.

There was -- over the course of -- remember, she started blowing me off, so there wasn't like a ton of conversations, but -- because she was blowing me off. That's why I put it in writing.

So, hey, I'm following up with you and -- you know, about these things that I talked to you about. The lack of support, umm....

Q. The concerns that you raised to Jen and Kathy, were they surrounding the lack of support and your concerns about the Liberty Mutual operating model or systems?

A. That was one piece of it. That was one piece.

Q. What I want to know is any point in time in which you raised concerns about bias because of your race or because you're a black woman.

That's what I want to focus on and make sure I understand what -- what was said and when.

A. I just answered. I mean, I feel like I asked -- you asked and I answered that three times just now.

I shared with them that I felt they were biased against me because I was black. I said that in several meetings with both Kathy and Jen. Jen never really said anything.

Kathy would say she didn't understand it, she didn't see color and she felt sorry for me.

Q. Okay. And you indicated, I think, these were separate conversations.

Did you ever have a meeting with both Kathy and Jen, when you said this, together?

A. I don't recall.

Jen really relegated Kathy to do all her dirty work. She kind of like just disappeared.

Q. Okay, and it sounds like you don't have any sense of the dates on which any of these concerns were made.

A. It's in July. I mean, my head was spinning having all these conversations, umm, with Kathy, then Latichia and whoever else. Like yeah, in July and August.

Q. Okay.
A. I just know we had -- it -- it was on the phone.
Q. Do you remember if she just listened or if she responded?
A. She does a lot of that. I don't remember her saying much of anything.
Q. Okay.
A. Other than, you know, I'm here to support you.
Q. You mentioned the term, microaggressions.
What does microaggressions mean to you? What is your definition around microaggressions?
A. It's low-key insults to people of color. Like you -- oh, look at your hair. What is that. Are they braids or locks. Like these little insults. Or, oh, Stacie, you're so intelligent and you speak so -- yeah, those are microaggressions.
Q. Okay.
A. Like I couldn't be just an intelligent person. It's shocking to have a black person speak intelligently.
Q. Okay, on how many occasions did Kathy or Jen talk about you being intelligent and articulate?
A. There wasn't a ton of them, and it was

actually early on where everything was nice. So they thought that maybe I wouldn't think anything of it.

Q. So early on in your employment at Liberty Mutual, Jen Ughetta and Kathy Jonas commented that you were articulate and intelligent?

A. Correct.

Q. And there was no mention of your race or your status as a black woman during those comments. Right?

A. No.

Q. Do you recall when that occurred?

A. I just said early on.

Q. Early on.

Do you recall whether those comments were made in a single meeting or a discussion?

In other words, was there one incident in which those comments were made?

A. Umm, yeah, I'm -- I don't remember.

Q. Okay, do you remember if Kathy and Jen were together when these comments were made about you being articulate or intelligent?

A. Umm, I don't believe they were together, but I can't be a hundred percent certain.

I didn't have a lot of meetings with Kathy and Jen together until the end.

Q. Okay, and do you recall the context in which these statements were made by either Jen or Kathy about you being articulate and intelligent?

A. It was all around, umm -- you know, Stacie, you're heads above all the other applicants and candidates. You speak so intelligently, you present well, all that kind of stuff.

Q. So it was around your application ---

A. --- Yeah.

Q. --- And your interviewing process?

A. It was -- it was early on, like -- and I'm like, okay, yeah.

Q. Okay, and you perceived that as being a microaggression?

A. It definitely is. It's insulting.

Q. Microaggressions can reflect unconscious bias. Is that right?

A. Yes.

Q. Yes? Okay.

Is that part of the definition of microaggression, that it reflects unconscious bias?

A. I don't know what Webster -- I don't know. But that's what I deem to be the definition of it.

Q. Okay. Do you know anybody of another race or gender that was told something similar about their

performance during the interview process or application process at Liberty Mutual?

A. For the positions that I applied for?

Q. For any position.

A. I don't know anybody there. No.

Q. Okay. You allege in your complaint that Jen Ughetta embarrassed you in front of your peers and senior leadership by discussing how difficult it was for you to join a financial services company as a black woman.

A. Yeah. That was -- yeah.

Q. And when did that occur?

A. That was during some type of -- I don't know if it was a huddle, muddle, chat or whatever. It was one of those meetings.

And after that meeting -- well, first of all, I was embarrassed. And then Ashleigh called me after to say I can't believe she just said that. Everybody knew it's you. You're the only black one here. Yeah.

Q. So Jen Ughetta didn't call you out by name ---

A. --- She did.

Q. --- When she was talking about how difficult it was for a black woman?

A. She did not call me out by name. What she said was a new black woman executive on her team, and I'm the only one.

Q. And what did she say about how difficult it was for you?

Simply that it was difficult for you to join?

A. Simply that it was difficult, and that she -- she said something to the effect -- and this is when the tears again started to like well up.

Something about she had a difficult time. She knows what it is like being an outsider and a white woman, but she doesn't know what it's like to be black woman coming from the outside here.

Yeah, something to that effect.

Q. Okay, and do you recall when that meeting occurred?

A. I don't. Excuse me.

Q. And at the time, this was 2021, after George Floyd's murder in 2020 ---

A. --- Uh-huh.

Q. --- And a lot of corporations were sort of reckoning with race and racial justice. Is that right?

A. Yeah, pro performative, certainly.

Q. And do you recall that at Liberty Mutual if there was discussion with -- about white allies putting themselves in the shoes of ---

A. --- Yeah. Trying on ---

Q. --- Black people, and trying on different lenses?

A. Uh-huh.

Q. Do you recall that?

A. I do.

Q. Okay, and do you recall -- excuse me.

There's an allegation in your complaint that Jen Ughetta routinely asked you to share your experiences and black perspective.

Do you see that?

A. Umm, I ---

Q. --- Or do you recall that in your complaint?

A. I do recall that, because I'm not the spokesperson for all of black America nor black people at Liberty. And I had my own trauma around George Floyd, and I shared that.

Like I don't want to be here talking about my personal feelings or how I feel about black people being murdered. That's not what I come to work for. She didn't like that, either.

Q. Did she tell you she didn't like it?
A. Yeah. She said, Stacie, well, you know, we do feel -- you know, we gotta try on -- but DEI isn't just about black and white. That's where -- like I know it was the George Ford -- Floyd, you know, trauma, but DEI is bigger than that.
Q. How -- oh, pardon me.
A. Thank you.
Q. How frequently did Jen Ughetta ask you to share your experiences ---
A. --- Quite often.
Q. --- As a black person?
A. And it wasn't just Jen. It was Parker, it was Matt.
I remember they had these people from, umm, Central Park Five. They waited the whole meeting. I was in another meeting. They waited the whole meeting. And when I came into the meeting, Stacie, could you share your lens on what you think about the -- like I'm not the spokesperson for blacks and nor do I want to be. That's not what DEI is about.
And it was insulting to me as well. Like everybody just wanted -- like I was a shiny little black toy. Everybody wanted to hear Stacie's black

perspective, and that is insulting to me.

Q. Do you recall having some Instant Messages or Teams messages with Jen Ughetta where Jen invited you to share your experience joining Liberty Mutual through the lens of a black woman?

A. Yes.

Q. Do you recall responding that it was deeply personal ---

A. --- Yes.

Q. --- And you might share at some point?

A. Yes.

Q. And did you ever share your experiences with Jen?

A. Absolutely not. Not about that. But about overall, the bias, the lack of support, the insulting microaggressions, me feeling discriminated against and being held to a different standard. I shared all of that with Jen and Kathy.

Q. Okay.

A. And Tiffany and Anthony and Charlotte and Tim Vigue, and the list goes on.

Q. We've talked about the microaggressions.

You mentioned that Parker made a comment about your hair.

A. Yeah, she did. And it was -- my face just

-- I just like kind of froze, like really.

Q. And do you recall when that occurred?

A. It was in a one-on-one for Parker and I. I don't recall the specific date.

Q. Okay. And then, in terms of other microaggressions you've mentioned Kathy and Jen reflecting on how intelligent and articulate you were during the interview process.

A. No. Calling me angry.

Q. Did they ever call you angry?

A. Kathy, yes.

Q. Kathy called you angry?

A. Uh-huh.

Q. In what context?

A. I think this is like the third time you've asked me that.

Q. Well, I'm just -- I want to sure ---

A. --- She -- yeah. She used the word, angry, in several meetings with me. And I told her I'm not angry, I'm frustrated.

Q. And during those conversations, she was not using the -- referring to your race or your status as a black woman. Right?

A. No. She did not say you're and angry black woman.

But a black woman, telling them they're angry is a stereotype. We can be frustrated, too.

Q. Okay. And did -- Jen Ughetta never made any comment to you that was derogatory about your race or your status as a black woman, did she?

A. Not directly. But indirectly, like crazy -- just crazy stuff, like mentioning that she has a -- everything black had to like lead back to Stacie.

She mentioned she has like a crack head black nephew that she had to take in. I think she assume -- that the nephew like grew up in the hood or something and I think she thought there was a kinship.

Like, Jen, I'm not from the hood, and nobody I know is on crack, and I don't know why you're telling me this story. But just insulting little things like that really bothered me, because why are you telling me this.

Or, umm, Julie having a first meeting with me, and then, the only other black person on the call was her EA. And then she texted the EA after and said why don't you reach out to Stacie. And me and the EA, Beatrice, are like, well, we don't all know each other. We don't have to reach out, like, hi, Stacie, you're okay. Like just these little micro,

opinion, yes.

Q. Okay, let's put aside what you described as microaggressions.

Did anybody ever use a racial slur towards you?

A. Like nigger or something, no.

Q. Did anybody ever use a slur related to the fact that you're a black woman or say anything directly derogatory about black women?

A. I think calling me angry is directly derogatory. It's a stereotype.

Q. Okay, other than that, anything else?

A. I just listed a whole plethora of them, and we can agree to disagree that they are not direct.

Q. Well, and I'm not trying to disagree with you.

What I'm trying to do is give you a chance to testify fully about any comments or statements that might have been made to you that reflected racial bias by the leaders at ---

A. --- And I think I just described some of them.

Q. And I want to be -- so would it be fair to say that you -- you've fully described all of those

comments?

A. I don't think it's fully. But right here in this moment these are what I remember, and these are top of mind.

Q. Okay. Can you remember anything else?

This is the time to ---

A. --- Right here in this moment, these are top of mind. This is what I shared.

Q. Well, right here in this moment do you remember anything else? Yes or no.

A. Not -- nothing else in this moment.

Q. Okay. Thank you.

THE WITNESS: Oh, I'm so sorry.

MS. STRICKLIN: Are you okay?

THE WITNESS: Yeah. He keeps telling me that I'm covering the -- my hair with my head....

MS. STRICKLIN: Oh, okay.

THE WITNESS: Yeah. Sorry.

Q. (Ms. Stricklin) I'd like to show you a document that I'm not going to mark as an exhibit.

A. Okay.

Q. It's your complaint in this case. And I brought an extra one. It might come in handy.

A. Thank you.

Q. Please take a look at the complaint that

was filed in this action against Liberty Mutual.

A. Okay.

Q. I can get my copy as well.

A. Excuse me.

Q. And this was a complaint filed on your behalf by your lawyer. Right?

A. Correct.

Q. And in the complaint there are allegations about racial bias and bias against you as a black woman. And some of them are the ones that we've been discussing.

A. Yes.

Q. And my question for you is, you know, between the EEOC charge and your complaint, did you thoroughly describe all of the allegations of racial bias or bias against you because of your status as a black woman?

A. You're asking the same question in a different way, and I asked -- answered it already. It's the same.

In this moment, or what I shared on this paper at that moment, that's what I have to share to you today.

Q. When did you first conclude that you were being subjected to discrimination or bias because of

your race or your status as a black woman?

A. I think early in July, I would think, when I recognized that they were gaslighting me.

Q. What do you mean by gaslighting you?

A. This is the third time you've asked that as well.

It is when somebody tries to make you think that you're experience isn't valid.

It's when they do one thing in front of people and then do another thing under the radar, and they make you think like something is wrong with you, like this is not going on.

When in fact, looking through all the discovery stuff, all the stuff that I felt between Parker and Julie, like the mean girls, laughing at me in meetings. By sending little texts and IMs to each other. Grow up. You're executives making a million dollars and you have time to send texts every day about me.

Yeah. I stumped it. I didn't have to read all this stuff to not know that it was existing. So it was early on.

Q. That you felt that there was racial bias in ---

A. --- Yes.

Q. --- Or bias against you as a black woman?

A. Absolutely. Because they weren't treating any of the other candidates that way.

Before I even started -- before I even started, Parker sent an email to Julie, saying, uh, seriously, ask me, what am I -- what do we do to bond as a leadership team, uh, duh.

Like -- yeah, that's insulting to me, and I don't think I saw anywhere in the texts where any of the other seven internal candidates were there any of that exchange about me.

I'm someone with over 20 years of experience in my field, and they're talking about I'm -- using surface words and, yeah, like it's insulting to me. But they weren't talking about any other candidates like that.

And they did not want me. They said my boss wanted me, for whatever reason. You'll have to ask her.

But the business drives decisions. So at the end of the day, I think, yeah, Jen got the message and then had to like quickly, you know, fix it. Because she thought I was a shrinking violet and wasn't going to be vocal about my experience.

MS. STRICKLIN: Okay. Well, let's go

off the record for just a few minutes.

THE WITNESS: Sure.

MS. STRICKLIN: We're close to being done.

THE WITNESS: Great.

VIDEOGRAPHER: We're going off the record.

It is 6:42.

(6:42-7:03 p.m. - recess)

VIDEOGRAPHER: We are back on the record.

It is 7:03.

Q. (Ms. Stricklin) Okay, I wanted to touch base and nail down a couple of dates if we can.

Please take a look at Exhibit Number 32, which is your EEOC charge.

A. Uh-huh.

Q. And I'm looking at paragraph eight at the bottom of the first page.

Do you see where it says on September 15th, 2021 ---

A. --- Uh-huh.

Q. --- Ms. Ughetta and Ms. Jonas summoned me to a call and told me I should be thinking of an exit strategy.

Do you see that?

A. I do.

Q. Does that refresh your recollection about when that meeting with Ms. Ughetta and Ms. Jonas occurred?

A. It's on this document. I don't remember specifically.

I will defer to this document that's my EEOC charge. I can't remember every single thing that happened three years ago.

Q. Okay.

A. Sorry. I don't have the capacity for that.

Q. You don't have any reason to doubt that it was September 15th, 2021?

A. It could have been. I -- I know it was in September, because I was terminated not too long after, so yeah.

Q. Okay. And that same paragraph says on September 22nd, I attended another meeting with Ms. Jonas and Latichia Fleming in human resources.

And that's when the termination occurred. Right?

A. That sounds about right. It was around the same time, late September.

Q. Okay, and then your -- the company -- they notified you that the company was terminating your employment effective September 24th, 2021. Right?

A. That sounds about right.

Q. And then Exhibit 33 is the email on September 16, 2021.

And I think you indicated you weren't sure if this was sent to Jen Ughetta, but it was something that you wrote to put your thoughts together.

Is that fair?

A. No. You said -- you asked me if I sent it and was I sure if I sent it, and I believe that I did.

But I do know that I wrote notes to myself, umm, and you can see throughout discovery, to keep track of my thoughts and instances and behaviors that were happening.

Q. Okay. And just to be clear, do you believe that this Exhibit 33 is an example of the notes that you were keeping for yourself or an example of an email that you actually sent?

A. It's an example of an email I actually sent with some handwritten notes that I printed out after.

Q. If Liberty Mutual's system, email system

Q. Okay.

A. Yeah. So there -- I'm sure there are other things. I just culled out a high level of the things that were concerning me and on my mind in that moment.

There's lots of things that happened in four months, as evidenced by your over 10,000 pages of discovery. I can't possibly track to all of it.

Q. Okay. And again, the statement that Parker made about your hair ---

A. --- Uh-huh.

Q. --- What specifically did she say?

I want to be sure it's clear on the record.

A. Okay. She asked me about my hair and asked what is that. Were those braids.

Like why do you care. You don't have the same type of hair as me. What do you need to know that for. Has nothing to do with work.

Q. Was this in a one-on-one ---

A. --- It was.

Q. --- I believe you testified to.

Okay, so there was nobody else present?

A. Most of my meetings were one-on-ones, except for the huddle and muddles, chit-chats and

whatever else.

Q. Okay. Do you know how the termination decisions are made at Liberty Mutual?

A. I mean, I know how the termination decision was made with me, or I experienced that.

Q. Okay, who do you believe made the decision to terminate your employment?

A. It was a mixture of Jen, Kathy, and I'm sure Melanie had to sign off on it, and the business had input into it as well, the people I supported.

Q. What basis do you have for believing that Kathy had any input in the decision to terminate your employment?

A. Kathy is in everything. There is not anything that I've been involved in at Liberty that Kathy hasn't been involved. Everything.

Q. Did anybody ever tell you that Kathy took part in the decision to terminate your employment?

A. Tiffany and Anthony and Donald and Charlotte all told me that Jen and Kathy were setting me up for failure.

Q. And that's based on their perceptions.

But did -- did Kathy ever tell you that she took part in the decision to terminate your employment?

Q. Do you know whether Micah ever told her manager that she was likely not the right person for ---

A. --- I don't know that.

Q. --- For Liberty Mutual, the way things get done?

A. I don't know that.

Q. Is Micah a white woman?

A. I'm not sure. Because she speaks Spanish fluently. I believe so. I'm not certain. But she presents as one.

Q. Okay.

A. Oh, here's one more. Cassie. I forget her last name.

Q. Cassie McKiernan?

A. Yes. She told me she had a rough time, too, when she started.

Q. And please remind me. What is Cassie's race?

A. I believe she's a white woman, but I mean, I'm not a hundred percent certain of that.

Q. And she was hired externally as an STA?

A. Yeah. She came from the outside. But she had been there for a minute. But she was just sharing with me that she had a difficult time.

Everybody shared. Jen Ughetta shared that she had a difficult time. But they're all still there, aren't they, and I'm not.

Q. Do you know anybody else who was hired as an STA and was given two different opportunities to step back from the business and complete onboarding?

A. I don't know those details, no. I mean, it's possible. I -- I don't know.

Q. Do you know anybody else who was hired as an STA and -- in an individual contributor role and were given a designated contact within the talent delivery team to provide support?

A. I have no idea.

Q. Do you know anybody else who was hired as an STA who -- in an individual contributor role, who was given a designated TA to provide support on tactical matters?

A. I don't know. And they didn't provide any support.

Q. And are you aware that Brian Prozeller was formerly a manager over TDT, and was considered a go-to person in terms of Liberty Mutual's systems and how work gets done there?

A. I think something like that was shared with me along the way.

Q. And he was somebody that Jen worked with Kara Oliveto in order to select ---

A. --- I think I heard that, yeah.

Q. Do you have any other facts, other than what you've shared today -- and again, I'm not asking you to repeat anything. I'm not suggesting that you need to do that.

But do you have any other facts in support of your claim that you were subjected to discrimi- nation based on your race or based on your status as a black woman?

A. I've shared what I'm prepared to share for today.

Q. Well, now is day -- the time to do it, if you've got anything else.

A. I don't -- I don't have anything else to share with you in this moment.

Q. Okay. Do you have any basis -- factual basis for alleging that your termination was caused by or resulted from any complaint that you made about racial bias or bias against black women?

A. Absolutely. I mean, when I started bringing up, umm, telling them I felt that I was being held to a different standard, bringing up examples of microaggressions, you know, all of a

sudden, as I've read here, actually in discovery, they started forwarding all these things to my -- a file for Stacie.

It's clear, like retaliation, to like make a claim that, umm -- I don't know what their claim was going to be, but many of them.

Me asking for DEI statistics and given the run-around from the head of DEI to her -- you know, direct reports. Nobody would give me that information, umm, except Tim Vigue gave me the headline that blacks were the highest employee population that was making the exit. That was the headline.

Q. And that was from Liberty Mutual as a whole, as entity-wide?

A. As a whole, yes.

Nobody would give me the data. Me making comments around that it's ridiculous, you have the data, why aren't you doing anything with it. Why are you -- why are continuing to dig.

Them constantly forwarding stuff to my file, and then gaslighting me and not inviting me to meetings any longer, taking me off meeting invites, canceling meetings.

I mean, the new person that I was supposed

to support in the very end, her name was San Calcutt, she wouldn't even respond to any of my Instant Messages. Like she wouldn't even talk to me. And I believe that's because they all told her, well, she's on her way out anyway, let me get rid of her, so don't even bother.

I don't have any proof of that, but she would not connect with me on any level.

Q. The meetings that were canceled, that was after you had complained to Melanie Foley and Jen Ughetta and Kathy Jonas and others that there were too many meetings on the schedule, and you didn't have time to get work done.

Isn't that right?

A. No. This was more towards the end when I was starting to get a little bit more vocal about my concerns about bias and microaggressions and sharing examples and calling people out by names. That's when that retaliation really started, all the forwarding.

Q. That's why I want to know when you raised those concerns.

A. I have shared with you multiple times, and I don't have really anything else to say about it. I've shared that like four times already.

Q. What you've testified to is that you've ---

A. --- I don't remember the dates.

It started very early on in July and was straight through.

Q. So you don't remember any specific occasion that ---

A. --- I gave you the specific occasions. I just didn't give you specific dates and times, because I don't remember them. It was three years ago.

Q. Okay. Do you remember the first time you raised a concern?

A. I don't have any more to share on that. I don't.

Q. Is that -- is that a no, then, you don't remember the first time?

A. I don't remember.

Q. Okay. Do you remember the last time?

A. I don't. Not in this moment, I don't.

Q. Okay. In discovery we asked for certain documents and information about the emotional distress that you've experienced.

A. Yeah.

Q. And among other things we received

Instant Messages that I shared with Jen -- news around some of the changes.

Anthony said that there's no leaders that are black in GRM, that none of them were promoted. Funny, he got promoted after I left. But that black people in finance had a hard time as well.

So it's not just like black woman. Anthony felt he was like -- there was bias against him as well.

Q. We just a little bit ago started talking about the retaliation claim, so I just want to dive into that a little bit.

A. Yeah. Literally after I started asking for information around DEI, after I shared with Jen and Kathy my feelings about being singled out, being held to a different standard, umm, I just feel like they ratcheted up -- literally, it was like within days, it felt like, that I was terminated.

MR. HERRMANN: This will be Exhibit 34. Is that right?

Here you go.

(* Exhibit 34 was marked *)

A. Thank you.

Q. All right, you've mentioned Tim Vigue before.

A. Yes.
Q. Do you recognize this document I just handed you?
A. Yes. He was one of the people, umm, that I asked for, umm, DEI information around black employees, and black execs specifically.
Q. Why were you asking for that information?
A. Because I wanted to have a sense -- again, I felt like they were gaslighting me, so I wanted to have a sense of like is it just me, or -- I heard from other black people that they were experiencing it, but the data will like confirm all of that. And Tim did that for me. He gave me the headline.
Q. Did he ever give you the underlying data?
A. No. Nobody would.
Q. All right, and why did you want that data?
A. Because it's just confirmation.
I mean, Tim actually put in the email, which was surprising to me. Umm, but the head of DEI wouldn't -- Dawn. Charlotte wouldn't.
And that information should be readily available to me as a senior talent advisor.
Q. Is this Exhibit 34 -- what is this?
Is this an email or a Teams message?
A. It could be a Instant Message or a Teams

reporter has just handed you what's been marked as Exhibit 40.

Do you recognize this document?

A. Umm, I believe this is a document of notes that Kathy Jonas took during a meeting with me.

Q. And if you go to the last page ---

A. --- Okay.

Q. --- Defendant 0001544.

Does that further that belief it is from Kathy Jonas?

(Witness examined document)

Q. Just -- I'm talking about the email signature at the bottom.

A. Yes, it's from Kathy Jonas.

Q. All right, and the subject is meeting with Stacie 9/16/21. Right?

A. That's correct.

Q. Okay, and if you need a minute to go through it, you -- you -- you -- you can take all the time you need, but do you recall the meeting referenced in these notes?

A. I do.

Q. All right, and you see down the page, it says I truly feel like Liberty doesn't want my diverse perspective?

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:23-CV-897-LCB-JCW

C O P Y

STACIE McLEAN, Plaintiff,

vs.

LIBERTY MUTUAL GROUP, INC., Defendant.

V I D E O
D E P O S I T I O N
VOLUME II

STACIE DENISE McLEAN

One West Fourth Street, Suite 850
Charlotte, North Carolina

Wednesday, January 22, 2025
10:03 o'clock a.m.

Atlantic Professional Reporters, Ltd.
Winston-Salem, NC 27116-1672

of what we were conversing about, and it was around black women facing biases.

I mean, I don't even use that term, biases and microaggressions, because it's fancy words for racism. That's what it is.

So that's what we were discussing in this context. And I feel, answering your question, because you're using the term, microaggression, I feel that's what it is.

And he was telling me -- and I can't specifically recall his exact words, whether it was be ready for, get ready for or be prepared for, but it's along that vein.

Q. (Ms. Balson) Okay, is there a reason you think that that aspect of the conversation didn't get documented in your notes here?

A. I'm not a transcriptionist. I do the best I can.

Q. Was this statement that GRM is devoid of senior black people -- was that new information to you as of this conversation?

A. I don't know. I don't recall.

I remember not seeing a lot of black people originally when I started. And this was in -- it looks like August. I don't recall specifically.

relationships?
A. I think it's a request for support.
And having been there -- let's see -- I think I was there maybe three months by that time and I still don't have access to HR systems that I need to do my job effectively.
I don't have support in the way of talent advisors like the other STAs that had talent advisors that support them. Instead, she gave me very junior-level people in TDT to help support that kept me in circles, back to me on a merry-go-round.
So yeah, me asking for support, and being kind of very frustrated at that point. And not only that, Jen uses the same language in terms of our rapport, so I felt very comfortable asking her can you please get this shit fixed finally for me, yeah.
Q. Okay. What is the next page that you believe identifies microaggressions?
A. I want to go back. I skipped one, unfortunately. Sorry.
Q. What page?
A. And I don't know what page.
This looks like it's -- because it's not on this date, but the page before says August 16th.
Q. Okay.

A. And I'm going to -- this is the next page, next to it. So it's not August -- well, I believe this was on August 16th, but it starts with Kristy continued at the top.

MR. HERRMANN: Laura, I'm going to go ahead and say, just to accelerate, 3127, I believe, is where she's at.

And then ---

THE WITNESS: --- It's this page.

MR. HERRMANN: And then the next one is 3128 is the page she's pointing to. Yeah.

Don't want to step on your toes, but just to....

MS. BALSON: Thanks.

Q. (Ms. Balson) So 3127 is the one that has August 16th circled -- oh, I'm sorry. Yeah. And it says Kristy one-on-one.

That's the page or that's not the page you're pointing to?

A. It's the next page I'm pointing to.

Q. That page.

So the next page, which is 3128, does not have a date at the top, but says Kristy continued?

A. Correct.

Q. Okay. And so is it your understanding

that these two pages, 3127 and 3128, are both notes of the same conversation with Kristy?

A. I mean, I can't be sure, but it looks that way.

MS. BALSON: Okay, so let's go ahead and call those two pages Exhibit 2A.

So that's SM3127 through 3128.

(* Exhibit 2A was marked *)

Q. (Ms. Balson) Okay, what do you want to point to on 3128?

A. Okay, hang on one second.

So Kristy and I were having a conversation about the job, her prior -- her previous role, incumbent in the role. And she was sharing with me about, you know, Jen's unreasonable expectations of the role and how the leaders that she supported, they have a sense of urgency for every single thing.

Q. Where does it say that?

A. At the very top right-hand corner.

Q. Says unreasonable expectations and says urgency of everything.

A. Yes. She was referring to Julie and Parker and their direct reports.

Q. How do you know that?

A. Because that's the conversation we were

having.

Q. But those names aren't reflected on here anywhere?

A. Again, I'm not a transcriptionist. I am just taking notes.

Q. But to confirm, those names are not reflected on this page?

A. Correct.

Q. Or the page before?

A. I don't know. I didn't look at that. Would you like me to?

Q. Yes.

A. Okay.

(Witness examined document)

Q. Well, Julie's name and Parker's name are on this page.

Q. But not in reference to those notes at the top of the second page?

A. Oh, I don't know. I didn't read that. I was just going to reference this page.

But if you would like me to read this page, I can.

Q. Again, you had 30 minutes to review all of it.

A. Yeah.

Q. But if you need to take additional time, please go ahead and take whatever time ---

A. --- Do you want me to take additional time? Because I want to only reference this page. So....

Q. I want to make sure we're getting the honest testimony about what's reflected in these notes.

A. Yep. And everything I am saying is honest.

Q. So the question that you're trying to answer, and you decide what you need to answer it, is whether there's anything in these notes that tell you that those two things at the top of the page on 3128, where it says unreasonable expectations and urgency of everything, referred to specific people.

A. Okay, I'm going to take the time to read this page, because I don't know that it does.

Q. Go ahead.

A. I can remember what I remember.

(Witness examined document)

A. Yeah. I think it does tie in, actually, to the conversation of Julie ---

Q. --- Okay, so where on 3127 ---

A. --- Sure.

Q. --- Does it reflect who the notes a the top of 3128 are about?

A. So both of these pages are intertwined and tied together, and we're talking about Julie and about Parker. And in the middle of -- and I don't know, what is this other page called, just so I can say the right -- 30, whatever.

MR. HERRMANN: 3127.

THE WITNESS: 3127, where I was talking about coffee chat with Parker and Sam and telling them -- telling Kristy, rather, because this is a one-on-one with Kristy, that's we're talking in the top -- about how, you know, the role was to be consultative and strategic.

And, you know, in order to support these two orgs, that I needed, you know, a pair of hands in addition, like a talent advisor to help me support them and be successful -- right -- in this new organization.

And then, not only that, if you move up a little bit further -- hang on.

Q. Sorry. Before you move up.

A. Uh-huh.

Q. So you're looking at the words that say consultative, strategic.

A. Yep.
Q. And need pair of hands.
A. Need pair of hands, two pair of hands to be successful in this new organization.
And I -- in addition, it says consult with a lockstep all of this stuff, meaning just the work, the job that I'm doing.
Q. Okay.
A. Okay, and I'm referencing Parker and Sam here.
Q. It says last coffee chat with Parker and Sam.
A. Yeah.
Q. Okay.
A. Okay.
Q. What's a coffee chat?
A. One of the many names of like, you know, the ridiculous meetings they had. Another name for a meeting.
Any event, that's directly tied to Parker being unreasonable in her expectations and sense of urgency for everything. That's who we're talking about.
Q. Okay. I don't see any kind of notation of that. There's no like line or arrow or -- I know a

lot of stars and stuff appear on this. I don't see anything connecting those.

Am I missing it?

A. And? Does that suggest something?

Q. No. I'm just asking am I missing it on the page.

A. I mean, it's starred right here. Last coffee chat is starred right there.

I have dashes next to unreasonable expectations and urgency for everything. So is that what you're referencing?

Q. Just trying to understand how you're putting those two together. That's all.

A. I'm putting those two together, because my one-on-one is with Kristy, and it's dated August 16th, and it says on the second page Kristy continued, so it's a whole conversation that I'm having with Kristy about Jen and Parker.

And those are the two leaders that I supported, and those are the leaders that they have unreasonable expectations and a sense of urgency for everything.

Q. Okay. But it doesn't say leaders there, it doesn't point to the prior page where you reference Parker or Julie.

There's nothing on that page that tells you that. It's your memory of the conversation. Is that right?

A. I think it's on the page, too, is what I just said.

Q. The very bottom of 3127 has some language on it.

A. This?

Q. No. It's the first -- yeah.

A. Okay.

Q. It says need dedicated support.

And then what does it say beneath that?

A. Permanent, dedi -- well, it says I need -- I can't read the second part, but something -- I need something Priscilla. And I have no idea who that is or what that means.

And then it says what you're referencing, permanent dedicated TDT specialist, 18 months.

And we -- do you want me to tell you what that references?

Q. Sure.

A. Okay, that references that Kristy and I were -- Kristy was sharing with me that she had asked Jen for probably the better part of two years for a dedicated talent advisor. And the fact that Jen was

considering giving me a TDT specialist for 18 months was like insulting and a joke.

Q. You think that's what Kristy said or that was your impression?

A. That's what Kristy said.

MS. BALSON: So let's put a sticky note on that page, 3127, because that part is cut off on our copy, so we want to get a better copy of that page.

Q. (Ms. Balson) Okay, so on 3128, which is the page that says unreasonable expectations, urgency of everything.

A. Okay. Yeah.

Q. Kristy, I believe you said, was your predecessor and was sharing that that had been her experience with working with Julie and Parker. Is that right?

A. It wasn't just Julie and Parker, it was also Jen. Jen had unreasonable expectations and a sense of urgency around things as well.

Q. Okay, so for all three of those leaders, that was Kristy's statements about what it was like to work with them?

A. Correct. And she goes on to tell me, for the rest of the page, all about it.

A. It's September 9th.

I don't know if this is a microaggression, per se, because she's black, but it's just kind of -- what's the right way to say it.

You know, there's black people who drink the Kool-Aid and become part of the culture as well.

So this is Latichia Fleming telling me that she used to work there. I don't remember or recall why she left specifically.

But then she came back, and I was sharing with her all of the microaggressions and the experiences and how I was feeling, like being held to a different standard. And the things that were bothering me in my experience there.

And she agreed with what it was, how it was to be a black woman there, and she agreed with my assessment of all the dysfunction and the racism that exists.

And I asked her why did she come back if she knows this is the culture. I don't really remember what she responded.

But I remember I was just blown away, knowing that this was my meet-and-greet with a ER alignment that I had, and -- yeah.

Q. Okay, so I want to make sure our record is

and I'm experiencing those things. That's her role, compliance. Right?

Q. Did you provide any examples to Tichia about what you believe you had experienced?

A. I believe I did, and I think my notes reflect that here. I said being black here and the dysfunction.

Q. So that's not a specific example of something that occurred.

So I'm asking do you think you shared more than what's on the page here that was a specific example?

A. I may have. I don't remember every single thing I said.

But I did give her examples and she agreed with much of what I said.

Q. And you think -- and I want to be clear about it. Don't use my language, use whatever language you believe you used in the conversation.

A. Uh-huh.

Q. You think you said to Tichia in that meeting that you were being treated differently because you're black?

A. I absolutely said that, yes.

Q. With those words?

think is about any microaggression you experienced?

A. No.

Q. Okay. What's the next page?

A. Umm, it doesn't have a date on it, but it's after 9/15, and this is a meeting that I had with Jen and Kathy.

Q. Does it say Jen and Kathy at the top?

A. It does.

MS. BALSON: Okay, so I think probably 3196.

MR. HERRMANN: Yep.

MS. BALSON: So this will be Exhibit 7A.

(* Exhibit 7A was marked *)

THE WITNESS: Oh, thank you.

Q. (Ms. Balson) So Exhibit 7A, just to make it clear on the record, is Bates labeled SM3196.

And it is not dated, but you believe, based on where it appears in your notebook, that it was on or after September 15th?

A. Correct.

Q. Okay, and what on this page do you believe is a microaggression or reflects a microaggression?

A. This is -- the whole page is them having a conversation about terminating me. So I think it's

more than a microaggression. But at its least, it's a microaggression.

Q. The meeting itself?

A. The content of the meeting.

Q. Okay. Is there anything specifically in your notes here that you think is reflecting something that was a microaggression?

A. I feel like the statement that Kathy made, that she felt like it potentially isn't a fit.

Q. So that's in the middle of the page where there's a little asterisk and then it says feeling like potentially this isn't a fit?

A. Uh-huh.

Q. Sorry. Yes?

A. Yes. I'm sorry.

Q. And are all of the notes that you took things that Kathy said?

A. Umm, I said that I'm not set up for success, that I'm not feeling right.

Q. Okay, so that's the third asterisk towards the top of the page.

A. Correct.

Q. Anything else that you think were from your words?

A. I can't be sure, but I think most

everything else is from Kathy, because Jen never spoke a word for this meeting.

Q. And you don't think any of the rest of it reflects your comments during the meeting?

A. I think this last part on here, on the left, we had talked about it. I think that's me, and I can't fully recollect what that was about.

Q. We had talked about it appears to be pointing to exit plan.

Is that your interpretation as well?

A. I don't see it pointing to it.

Q. There's a line that goes from the asterisk ---

A. --- It's a bracket.

Q. Okay, so that's a bracket around exit plan and what might -- what that might mean?

A. Correct.

That's what Kathy had said, that I needed to start thinking about an exit plan, what that might mean so the business could move forward. Like that -- that was it.

But I don't really recall the we had talked about it, because we had never talked about anything on this page prior to that. So I take that to mean me saying something, but I can't be sure.

plan would look like for me. That's what they -- they were asking me and telling me that they were going to give me time to think about that, so yeah.

Q. Did you have an idea of what kind of exit plan might be something you would agree to?

A. No. I -- no.

Q. The bottom asterisk here that says timing on what that could look like for exit, do you think that's another question that was posed to you?

A. Yeah. It's an extension of what that might mean.

Excuse me. Uh-huh.

Q. And you don't think either of those questions were something you answered in the meeting?

A. I did not answer those questions in the meeting. It's not I think I did not answer that.

Q. Was there any discussion about when the next follow up would be?

A. Umm, I don't remember exactly. I just -- I think either ER or Kathy reached out to me after that to put something on the calendar where -- yeah. I -- I can't be sure.

I think we had a more in-depth conversation. I think she wanted me to walk away and think about it, and then I think I came back and --

yeah, if this is going to be my exit interview, I'm going to tell you all about really how things have been going. Even though I've been telling you all along and nobody took me seriously, or didn't care, so let me go ahead and just -- here's what you could have done better.

Q. Okay, so just to make sure I'm following right.

A. Sure.

Q. When this meeting ended, it sounds like at the very end of the conversation, maybe you didn't have a set meeting but they followed up. Someone followed up with you shortly thereafter.

The next meeting that you had, which I think was the one between you and Kathy, that one you thought of or treated as an exit interview and shared all of your, you know, thoughts with Kathy about it.

A. I didn't say I treated it as an exit interview.

I said if it was going to be my exit interview, then, hey, let me share my feelings of how I have experienced racism in this environment and have expressed it to you, Kathy, my boss.

Hell, Anthony, Latichia, Charlotte, Tim -- I mean, I can go on and on -- and your response is to

exit me. Okay.

Q. Okay, and so none of that kind of summary of what you're describing was discussed in this September 15th meeting, because you said, largely, you didn't do any talking.

It was in the next meeting, the September 16th meeting, that you made those comments.

A. I don't know what date it was. But it was another meeting where I had -- just Kathy taking notes.

Q. Okay. Is that the last flag in that book?

A. I think that's it for this one, yeah.

Q. Okay, so then you have some flags in the other notebook that reflect what you believe are microaggressions?

A. I just flagged them. I don't know that they all are microaggressions, but I will take a look right now.

Q. I don't think there's dates on many of these pages.

Is there a date on ---

A. --- Well, there is a date on this one. I don't know, but let me read through it.

This one is 6/28/21. But before you do your whole schtick, let me read through and make sure

perspective outside of anywhere else in life. You've spent 40 years at one company. Yeah.

Q. And just to make sure I understand ---

A. --- Sure.

Q. --- Why is it you think that that's a negative quality?

A. Because you have no perspective of anything outside the company. Like you've only been exposed to one way of doing things, one culture. That, to me, doesn't look like someone with a diverse perspective.

Q. Do you think that a company's ability to retain employees for decades reflects well or poorly on the company?

A. I think, back in my days as a recruiter, it probably would reflect poorly, because -- I mean, unless there's mobility within the organization, you had different roles, doing different things. But if you've had, you know, almost the same role in the same function, doing -- ah, you just want to be able to -- well, I'll share.

Jen hired me because I've had global perspective. And she could have promoted -- this is her words -- she could have promoted anybody in this company, promoted anybody on her team to this role,

but instead, she chose me.

So the value that you bring out -- you know, coming from the outside in, that's something that most hiring managers and recruiters look for.

Q. Okay, and then the comment about climber, and whether that -- I think you said that could be negative, it could be positive.

A. It could be.

Q. What you were just describing about if somebody is at a company for a long time, but there's mobility such that they're, you know, being promoted, you think that has a positive connotation or a negative connotation?

A. I think it could have both, depending on the context and what you're looking for.

But I think, without speaking for Charlotte, what I think she was inferring was like Jen is the type of person to like step on people. She wants to move up. She really wanted to be at the top and do whatever it takes to get there.

Versus like Kathy, who was basically -- I mean, I'll use my language for her. Like just a non-factor. She had been there since -- as long as I've been alive so yeah.

Q. Okay, so what part of this page reflects

Can you take a look and see if you think those are part of the same conversation.

A. Yes.

MS. BALSON: Okay, so we'll mark as Exhibit 10A, SM3355 through SM3356.

(* Exhibit 10A was marked *)

Q. (Ms. Balson) So what on the first page of Exhibit 10A do you think reflects a microaggression?

A. All the stuff at the bottom.

This is a conversation with Kristy, who was formerly in my role, just giving me some insight into why these leaders are -- you know, why they need to be babysat so much and why they, you know, need white-glove service so much.

And me sharing, you know, my frustration with her again, because I did earlier as well, that they are treating me like an admin and an order taker.

And Kristy was sharing with me, it's probably her fault to a degree, because she did do that stuff for them, even though she shouldn't have been doing it. So she said she did this for them, she shouldn't have. I again, you know, shared that I thought it was, you know, race related.

Q. And?

A. And she said again that she didn't believe it was because I was black.

Q. Okay, so at the bottom of that page where there's an asterisk and it says not because you're black, that was Kristy's statement?

A. Yes. Correct.

Q. And the asterisk above that, where it says treating me like admin order taker, that me in that sentence is you, yourself. Is that right?

A. That's me saying, yeah.

And then Kristy saying she did all of this like crazy stuff for their entire org, which she didn't support. She supported the leadership team. She was doing like, you know, a lot of stuff that she shouldn't have been doing.

She rec -- she acknowledged that, and said that was -- you know, it was part of her frustration in the role. But once you start doing this stuff, you get sucked in. You can't like back out is what she was saying.

And that if you continue on to the next page, she's telling me push back, don't be like her, do not give them white-glove service or treatment.

She said she hated that role. And I don't know what -- hated the role. And I just -- J and P

is Julie and Parker -- were nice but difficult.

I don't know what the thing next to end means. I don't know, it looks like senior. I probably was going to write STA, like the senior talent advisor role. But again, I'm not a transcriptionist, so I probably just shortened it.

And she said Julie and Parker were nice, but they were difficult to work for because they needed to be babysat at the level as -- that they were at.

Q. Okay, and Kristy was the one who held your position directly before you did. Right?

A. Correct.

Q. And Kristy is not black?

A. Not to my knowledge.

Q. Okay, but the fact that she had a similar experience in that role doesn't detract from your view that the reason you think you had difficulty was because of your race?

A. No. Kristy didn't feel like an order taker or like she was, you know, at Burger King. She just felt that dealing with Julie and Parker were difficult.

And all of the people lower in the organization who should be engaging the HR model that

A. I don't think so, no.
Q. What is the next page you have flagged? Is there a date on it?
A. It doesn't have a date on the top of this one, but the date -- the page before says 7/14.
Q. What are the words at the top of that page?
A. G-L-L-T and Jen on the right corner.
MR. HERRMANN: SM3376.
THE WITNESS: Yeah. This is a conversation with Jen Ughetta.
MR. HERRMANN: You want to take a break?
THE WITNESS: No. I just need to share something in your ear.
MR. HERRMANN: Okay.
(Witness conferred with)
Q. (Ms. Balson) Okay, so the 3376 ---
A. --- Yeah, that's it.
Q. --- And I believe the following page -- oh.
A. Yes.
Q. Sorry.
A. Yeah.
Q. Make sure I have the right one here.

So 3376 and 3377, are those part of the same conversation?

A. I mean, I can't be sure, but it seems to be. I didn't have tons of meetings with Jen.

MS. BALSON: Okay, so we'll call that Exhibit 11A, spans the two pages, 3376 through 77.

(* Exhibit 11A was marked *)

Q. (Ms. Balson) And although this page is not dated, the page before it is dated July 14th. Right?

A. (No response)

Q. Is that right?

A. Oh, I'm sorry. I thought you were talking to yourself.

What was that?

Q. The page before it is dated July 14th?

A. Yeah, I think that's what I said. It is. Correct.

Q. So what is it on this page that you think reflects a microaggression?

A. Well, this is a conversation with Jen about all the challenges that I was having and me sharing with her that I felt like I was a shiny black toy.

Q. Where does it ---
A. --- On the left-hand side in a -- it looks like a circle, like there's all these little circles around it.
Q. Me, black, shiny toy?
A. Yeah.
Q. Okay, and what did you mean by that?
A. There just were instances of people -- I felt like, you know, their DEI front spokesperson. Anything that had -- anything -- I mean, DEI is so bigger than black and white, but I just felt at Liberty it was all just about black and white.
And constantly like asking me questions around, you know, not my -- just constantly asking me questions around like blackness and my perspective on, you know, their DEI initiatives and -- I mean, DEI is a part of an STA's role, but -- I mean, there's a reason why we have a DEI organization. It's not the biggest piece of the role.
Just constantly putting me on -- I felt like a spectacle, like asking me questions around my black perspective and asking me questions around, you know, blackness, period. And, you know, me joining the organization as a -- you know, a black woman, you know, from external and, you know, just my

experiences there.

Just black, black, black, black, black. That's what I felt every day. Something black. And if it wasn't black about me, it was black about something else. You know, waiting to hear my opinion on anything with respect to something black, it just was constant.

And then it was ---

Q. --- There was more than one occasion that Jen Ughetta asked for your perspective as a black woman?

A. I don't know that Jen was the only one that asked for my perspective on it as a black woman. But I don't remember every single conversation.

I remember having -- I felt tired having conversations with people around black stuff. I don't think I've talked about being black as much as I talked about it here at Liberty. There's really no reason to do that in a corporate environ -- as much as it was done here.

Q. But as far as questions from Jen, can you remember anything more than one time?

A. I remember lots of conversations with Jen around stuff where blackness came up.

Q. And as you said, as a talent advisor, DEI

was part of your role?

A. A small part of my role.

But there was a large agenda at Liberty for DEI initiatives. But it -- it's not the primary reason for my role.

Q. Okay, so I'm asking specifically about can you remember anything more than one time where Jen Ughetta specifically asked you for your perspective as a black woman?

A. Not in this moment, I can't remember any others.

Q. Okay. What else on this page do you -- you think reflects a microaggression?

A. Telling her that I feel like I was being treated differently. That's where different -- t-a-x is, you know, shortened for treatment.

Q. Okay, so ---

A. --- Different treatment.

Q. --- The bottom third where it says different t-x?

A. Yeah. I'm being treated differently.

Q. And you think that's something that you told her?

A. I don't think. I did tell her.

Q. Okay, and did you give any examples of

ways in which you thought you were being treated differently?

A. I don't know that she asked. Jen didn't ask a lot of questions. Jen just -- you know.

Q. Okay, but did you volunteer them, whether asked or not?

A. I don't remember or recall in this specific moment.

Q. And there's nothing on this page that says?

A. Says what?

Q. Whether you gave any examples of ways in which you thought you were being treated differently.

A. Well, I think at the very bottom does.

I said I was uncomfortable, because now I'm in this organization for a couple of months and I still don't have access to stuff to do my job. Where all the other STAs have access to stuff to do their -- the systems that allow them to do their jobs effectively. Not just tech, but the HR systems.

Q. But it doesn't say anything about other STAs here. All it says is I don't have access.

So is that one of the ways that you specifically said you thought you were being treated differently?

A. That's how I answered your question. Correct.

This is a way that I am being treated different. Everybody else had -- I'm calling these other STAs to get the information that I need from these systems. They have it. I don't.

Q. But it doesn't say anything about other STAs on this page. Right?

A. I don't think that was your initial question, so can you rephrase it, because I'm confused why we're going down a different path. So....

Q. I had asked you whether there were examples that you gave Jen in this conversation of ways that you thought you were being treated differently.

A. And this is one example of that. I don't have access to stuff to do my job.

Q. Okay.

A. And that's how -- one of the ways I feel I'm being treated differently and not being set up for success.

Q. So I guess the distinction I'm making is, if what you said to Jen was I don't have access to do my job, that's one point. Versus I don't have access

to do my job, and I believe this person, who is in a similar position did get this access before I did.

A. Oh. No, I didn't mention STAs and who else has. I'm just making the statement.

First, I'm asking for her help. Get me access to these systems.

Q. Okay. Anything else on this page?

A. No.

Q. Okay, and then on the page that follows it says chat with Jen. And then under that it says first 90 days with Jen.

What's the significance of that?

A. Jen had -- I mean, she had been listening to some of the feedback that I was giving her about, you know, how I was feeling and things that were going on, or things that I was alarmed at, how the model works here. And Jen said -- you know, she agreed with a lot of the stuff that I said.

But instead of like doing like a brain dump in this particular chat, she wanted me to wait for 90 days, and like write everything down about all the things that I thought were like ridiculous, things that we could sunset, things that we could improve, you know, the whole nine, and give her feedback then, you know, about what are the things

for you?

A. If I had the right tools and the right support from my boss, sure. Why not. I could have made it work. I wasn't going to quit.

Q. What's the next page that you have flagged?

A. July 16th. Excuse me. It says Jen U at the top.

Excuse me.

MR. HERRMANN: 3389.

MS. BALSON: 3389. Okay, so this one we'll mark as 12A.

(* Exhibit 12A was marked *)

Q. (Ms. Balson) Okay, so the document we just marked as Exhibit 12A is the page that's been Bates labeled SM3389.

And what on this page do you think reflects microaggression?

A. I think it's the whole page again.

I think Jen reached out to me because she was going on vacation and wanted to have a quick meet-up -- because that's what I wrote at the top -- quick chat with me before she left, considering I had shared all this stuff with her, you know, a few days prior and just wanted to check in with me.

And we just kind of echoed some of the same stuff. You know, me being the weird black spokesperson for GRM TNS in finance and actuarial.

Again, she echoed the stuff about the 90 days, because it still was only July 16th, for me to give it time, you know, just write everything down.

She knows how it is to be somebody to come into this company from outside. She said she cried for like the first two years, hated it there. Melanie convinced her to, you know, stick it out.

And she was telling me that Liberty -- and I remember this because I knew she was gaslighting me at that point, because I had heard from other people that she was like setting me up for failure and to be careful. So I just listened, really. She had shared that, Stacie, this is your home, you're here now, you belong, as if I would feel any other way.

But in any event, reiterated my concerns of having no access to the HR center and parts of people at Liberty, which I needed to do my job. I'm there July 16th, I still don't have it.

She told me to make a list for her the first 90 days, same stuff. My concerns around being -- about, you know, how I felt like I was being treated differently. Like why don't I have my tools.

She told me she had my back a thousand percent. She was going on vacation. We'd talk when she got back.

Q. The note, has my back a thousand percent, that was something Jen said that you wrote down?

A. Jen -- correct.

Q. And you did not believe her at the time?

A. No. At that point I just had heard too much stuff.

And not only that, I didn't have to hear any of it. I felt it. I'm not a fool and I can feel when I'm being gaslit and people aren't telling me the truth.

Q. So you've mentioned a couple of times in these conversations with Jen that she asked you to make a list of things or your observations after 90 days with the organization.

A. Uh-huh.

Q. Did you end up making that list?

A. I don't recall whether I did or not. I think I put in like -- I don't recall. I don't recall if I made that list.

I think I had enough conversations with her around stuff that I didn't think was working.

I mean, Liberty wasn't all bad. It wasn't

like throw out the baby with the bath water. It was just these couple of like high-level things, you know, like discrimination, racism, those are -- yeah. So those are the things that I focused on.

But there are a couple other things, too. Like the ridiculous amount of meetings. The HR operating model from 1970 that wasn't really productive. Like too many hands in the pot, too many people touching like -- it just was outrageous.

She agreed with all that stuff. And I had shared with her that that was low-hanging fruit. Like that's something we could fix like literally overnight.

So I think I had socialized enough. I wasn't going to sit there and complain about all the other stuff -- because there was plenty -- but high-level.

Like I'm not going to be treated as your token or a black, shiny toy. Like that's not going to happen, so I'm going to address it head-on. And then the other small stuff. But that was big enough to overcast everything else.

Q. There's nothing in these notes that you use either the word, racism, or discrimination. Right?

A. I don't know that that's the case.

I think weird black spokesperson kind of is aligned to that very clearly. And all the other stuff that I just spent the last two hours sharing.

Q. Okay, but on that page ---

A. --- On this page, let's see, do I have anything that calls out racism specifically.

Like, again, I am not a transcriptionist. I would -- you know, I just take some notes and -- I don't know, my memory is pretty good on things that really matter, like racism, uh-huh.

Q. If you turn a few pages prior to that in that notebook ---

A. --- Uh-huh.

Q. --- It's Bates number SM3386.

A. Like two pages or....

Q. It's -- yeah. It's the page that has the large handwriting that says 90 days with an underline.

A. Yeah. This one?

Q. Uh-huh.

A. Yeah.

Q. All that's on that page is the words 90 days underlined, everyone hits reply all for everything, exclamation point.

Q. What were you referring to specifically?
A. Racism, institutionalized racism, shiny black toy, black spokesperson ---
Q. --- So any time you used the ---
A. --- I wasn't done.
Q. Okay, please go ahead.
A. Being held to a different standard, being treated differently, yeah.
Q. Are you done?
A. I may have more, but I think you get the picture. That sums it up.
Q. Okay, so any time throughout your employment you said any of those types of words, you think it should have been interpreted as I would like to raise an internal complaint of discrimination?
A. I think, when I say that I feel like there's a lot of racism that I'm feeling -- and I don't use the term -- and I think I shared this earlier -- bias. It's a light term. That's to make people who are not people of color or black feel comfortable. It's racism. Microaggressions, racism. Bias, it's racism.
So when I used that very strong word, yeah, you should be -- I don't know -- having a -- hell, even coming back to me, and saying, you know,

title. That's just the term I used for her -- support.

But she could have been an AA. I don't know. But it's a -- it's support.

Q. I just wanted to clarify, when you use the term EA, that's what you mean?

A. Yes. An executive assistant, correct.

Q. And she reported to you.

A. I don't know that she reported to me, because I didn't have any direct reports.

I was an individual contributor there, but she supported me along with two of my peers -- two or three of my peers. I don't remember how many.

Q. Okay. There is a -- maybe the second asterisk or star says has access to Power BI and can run reports.

Do you see that?

A. I do.

Q. Do you remember if you ever asked Kelsie to run Power BI reports for you?

A. I did. And she -- she couldn't. Kelsie was a challenging issue that I raised to both Jen and Kathy Jonas. She didn't have the skills to do some of the things that like most EAs would do. So she didn't -- she said she could, but then when I would

A. Yes.
Q. Okay. There's a line on here that looks like it says more Asians.
You see it says Parker org?
A. Yes.
Q. Okay, what does that mean?
A. I don't really recall.
I'm going to go out on a limb and say that Parker and I were having a conversation about the makeup of her organizations and her saying there's more Asians in her organization than -- as far as like people of color, it's basically Asians, no others.
But I can't be, you know, confident and for sure that that's what this conversation was about, because it looks like the conversation overall is DEI.
Q. Okay, and was the reason that you and Parker were discussing DEI related to anything you personally were experiencing at Liberty Mutual or just about kinds of support that you were providing to Parker and her team?
A. This meeting, if I'm scanning the page right now, looks like this is about Parker's 2022 priorities and strategic initiatives.

She's talking about a July 15th meeting that's coming up, because it's July 14th that I'm having this meeting on, and -- and the meeting is about an increased focus on DEI events and trying on different points of view.

And I don't know, other than, you know, Parker sharing that her org was made up of 200 people, and it looks like most -- if there are people of color in her org, they're Asians -- most of them are Asians. That's what it says here. And then she shares in the middle levels, DEI could be better.

That's what I take away from my notes that I wrote.

Q. Okay, so again, just to make sure I understand ---

A. --- Sure.

Q. --- This didn't have anything to do with your personal experience?

A. No. It doesn't look like it, no.

Q. Okay, so DEI conversations, it seems like, came up as part of your job even when it wasn't at all about you. Is that right?

A. There were DEI elements to my job, so yes.

I attended -- I mentioned the meeting that Charlotte Streat had where she talked about DEI. But

certain level. Do I want to see all the leaders who exited the company in this time frame.

Like I didn't have access to it yet, but my analytics person did. And spending my time running around trying to have either my EA or the talent delivery team do it just wasn't happening.

Q. Okay. You had testified in your earlier deposition about certain retention data that you had asked for that you think you weren't able to get.

Did you ever ask your designated analytics person to run you those reports?

A. I don't recall whether I did or not.

But I -- the people that I did ask, who would know better than me, because they've been at the company -- for instance, Kathy Jonas for 40-something years, she told me that it would be the analytics -- no, not the -- it wasn't even Kathy Jonas. No, I'm sorry. It is -- I forget her name. She was the head of -- Tim Vigue told me to speak to my boss, who I did. My boss -- this is the merry-go-round.

Tim told me to speak to my boss. I asked Tim, as the DEI person, he should have access to that stuff. He told me I should be talking to Jen Ughetta. And Jen Ughetta said no, you shouldn't be

talking to me, you should be talking to -- she was the head of the DEI org. I forget her name in this moment, but she was a black woman who was the head of the DEI org. She never gave it to me.

I asked Charlotte Streat for it, because she's in DEI as well. I never got it from her.

So they just kept sending me around in a circle to get this information and -- I mean, I could clearly see they didn't want me to have it.

And that type of information, I don't know that necessarily talent analytics would have, because they really guarded that information very closely. It's con -- it's highly confidential information so I don't know that they have it.

In any event, nobody -- the information that I would have talent analytics run for me would be for GRM only and I wanted it for the whole company. I wanted to have line of sight for me of how many black people in the last -- I don't remember specifically -- could have been three or five years, you know, exited the organization, how long they had been there and what level they -- like I was asking for that type of information.

So that -- I don't think talent analytics could have ran that report for me anyways.

Q. And why did you want it for the whole company?

A. I wanted to have a lens into all that I was feeling, and that would have validated some stuff for me.

Because people talk and people lie. Right? I've seen it here in this whole process.

So I couldn't really take everything that Jen was saying to me, because she was gaslighting me. Same with Parker, same with Julie.

I've already been warned not to trust Charlotte Streat and, you know, the whole lot of them.

So the data doesn't lie, so I just wanted to look at it for my own eyes to validate all that I was feeling the entire time I was there. Simply that.

Q. In the roughly four months that you worked at Liberty Mutual ---

A. --- Uh-huh.

Q. --- Did you ever lie to anyone?

A. I mean, I don't believe I have. I'm not a liar, so no, I don't think so.

Q. Do you think you did anything wrong in your employment at Liberty?

DEPOSITION EXHIBIT SM McLean 1 07/31/24
PENGAD 800-631-6989

# STACIE McLEAN

Charlotte, NC
(860) 578-3700
mcleanstacie20@gmail.com

## PROFESSIONAL SUMMARY

Business-minded HR executive with more than 20 years of experience and a proven track record of delivering significant financial and operational improvements. Leverages extensive business experience to translate executive-level objectives into strategic HR initiatives and position organizations for sustainable growth. Skilled in creating a shared vision, building strong teams, shaping ideas, and gaining trust across all organizational levels to influence change and guide large-scale transformations.

## CORE EXPERTISE

- Human Capital Management
- Business Consulting
- Executive Coaching
- Mergers & Acquisitions
- Change Management
- Culture Transformation
- Leadership Development
- Employee Relations
- Talent Acquisition
- P&L Management
  Organizational Development
  Talent Management
- Employment Law
- Program Development
- Performance Management

## EDUCATION

**University of Pennsylvania, The Wharton School**
*Advanced Certificate*
*Executive Development*
Philadelphia, PA

**American International College**
*Master of Science*
*Organizational Development*
*(Summa Cum Laude)*
Springfield, MA

**Central Connecticut State University**
*Bachelor of Arts*
*Political Science*
Britain, CT

## PROFESSIONAL EXPERIENCE

**Independent HR Consulting** — Charlotte, NC
*Principal Consultant* — 01/2020 - Present

Manage and scale an independent consulting practice drawing on an extensive global network and a strong return client base to deliver business and HR consulting.

- Partner with C-suite executives to build operating models, define organizational structures, and create highly productive cultures
- Analyze current processes to optimize efficiencies and enhance internal capabilities through leadership development, performance management, and talent acquisition
- Maximize business performance by creating targeted human capital strategies in alignment with business goals

**Aetna** — Charlotte, NC
*Senior Executive HR Partner* — 12/2014 - 11/2019

Advised executive leadership across the Clinical Services, Consumer Health, and Enterprise Marketing divisions to guide large-scale transformations and modernize the managed health care company through mergers and acquisitions and business development initiatives.

- Designed and executed the HR strategy with a strong focus on executive coaching, talent development, workforce planning, organizational design, and business growth
- Coached and developed top executives to successfully navigate change and address employee relations challenges while maintaining a strong, engaged workforce
- Partnered with the analytics team to synthesize and translate data into critical business insights and influence business strategy
- Served on the business leadership team and consulted with colleagues in the Centers of Excellence (COE) on risk analysis and mitigation
- Developed an Organization Design Tool Kit for senior leaders across multiple functions to successfully stand up a newly created Consumer Health organization
- Drove adoption of new initiatives through change management and communication
- Conducted due diligence to inform growth strategies, including mergers and acquisitions
- Integrated new SOPs to successfully redeploy top talent and allow for internal mobility during restructuring
- Embedded diversity, equity, and inclusion strategies into organizational practices and culture

  ✓ Directed the integration of Aetna and CVS employees during the $69B acquisition, making it the largest health insurance deal in history
  ✓ Spearheaded the $10M Vision 2020 strategy, an enterprise-wide workforce planning initiative designed to reskill and upskill nurses and doctors
  ✓ Led the $40M acquisition of bswift, a SaaS provider of HR and benefit administration solutions

# STACIE McLEAN

Charlotte, NC
(860) 578-3700
mcleanstacie20@gmail.com

## INDUSTRY EXPERIENCE

- Healthcare
- Insurance
- Financial Services
- Government
- Education
- Technology




## GLOBAL EXPERIENCE

- Asia
- North America
- Africa
- South America



## LET'S CONNECT

Scan to connect on LinkedIn!

## PROFESSIONAL EXPERIENCE *(continued)*

**MMC** — New York, NY
*Vice President, Consulting & Advisory Services* — 08/2012 - 12/2014

Consulted directly with senior leaders of Fortune 500 companies to identify and address business challenges through strategic HR initiatives. Accelerated revenue growth by maintaining exceptional client satisfaction ratings, resulting in repeat business and referrals.

- Facilitated calibration sessions, interviews, and focus groups to gather data and uncover underlying issues
- Delivered comprehensive executive coaching to build top-level consensus and define strategic visions
- Developed forward-looking human capital strategies to mitigate risk through organizational growth and create sound corporate policies
- Researched industry best practices to recommend total rewards programs, compensation structures, and benefits packages to acquire and retain top talent
- Served as an external change agent to secure buy-in for new initiatives and transform internal culture
- Designed internal communications plans and instituted sustainable business processes to support change

✓ Improved internal advancement by integrating learning and development programs and a competency framework to standardized roles and responsibilities
✓ Optimized the candidate experience to attract top talent through a repeatable and scalable end-to-end recruitment and selection process

**LL Global** — Windsor, CT
*Assistant Vice President, Leadership & Organization Development* — 08/2006 - 08/2012

Transformed an underperforming Executive Development Program into a world-class, revenue producing offering while building and launching a new consulting service division for a global financial services research and talent management firm.

- Shaped the strategic vision and managed P&L performance for both lines of business
- Conceptualized, developed, and launched the organizational design consulting practice and subsequently traveled internationally to deliver consulting services to top global executives
- Served as a trusted advisor to Fortune 50 C-suite executives, guiding complex executive development and workforce planning initiatives
- Improved profitability by creating new revenue streams and expanding global footprint to capture new clients while maintaining strict financial controls
- Negotiated and secured a key partnership with The Wharton School of the University of Pennsylvania to accelerate program participation and elevate industry recognition
- Led, developed, and trained a high-performing team which exceeded sales targets and operating plans for 4 consecutive years

✓ Delivered revenue of $2.5M in the first 3 years
✓ Achieved record program growth of 50% YOY

**7C Solutions Group,** *Senior Managing Director* — 06/2003 - 08/2006

**Town of West Hartford,** *Director, Senior HR Business Partner* — 08/1999 - 06/2003

**ExTerra Financial Services,** *Manager, Senior HR Generalist* — 06/1996 - 08/1999

Message

**From:** McLean, Stacie [Stacie.McLean@libertymutual.com]
**Sent:** 8/13/2021 3:31:40 PM
**To:** Ughetta, Jennifer [Jennifer.Ughetta@LibertyMutual.com]

And Jen...to be completely transparent....a former boss of mine reached out to see how it's going here for me...I was honest....he has asked me to consider a bigger role, next level up (an SVP, like maybe RTO's here) and come work for him again. I want to stay where I'm at and have the opportunity to potentially move up here in the future. I don't want my onboarding experience and observations to limit me or "mark" me here.

CONFIDENTIAL
McLean / Liberty Mutual

PENGAD 800-631-6989 SM DEPOSITION EXHIBIT MvLM 2 07/31/24

Message

**From:** Ughetta, Jennifer [Jennifer.Ughetta@LibertyMutual.com]
**Sent:** 8/13/2021 3:36:35 PM
**To:** McLean, Stacie [Stacie.McLean@libertymutual.com]

If you stay and make your mark here and build strong relationships and a strong reputation, this shaky start will not follow you. But obviously I cant guarantee a higher level like he is offering you now. I can just say that TES is a big organization and there is room to grow and make a mark.

CONFIDENTIAL
McLean / Liberty Mutual

Message

From: Ughetta, Jennifer [Jennifer.Ughetta@LibertyMutual.com]
Sent: 8/13/2021 3:21:51 PM
To: McLean, Stacie [Stacie.McLean@libertymutual.com]

there is an army behind you hear to help make this work - i absolutely believe we can figure this out together

CONFIDENTIAL
McLean / Liberty Mutual

Message

**From:** McLean, Stacie [Stacie.McLean@libertymutual.com]
**Sent:** 8/13/2021 3:39:51 PM
**To:** Ughetta, Jennifer [Jennifer.Ughetta@LibertyMutual.com]

I"m not looking for a higher level like he is offering me "today". Hence me looking for a VP-level role and joining Liberty. I want it to be a true VP-level role though....I understand that Liberty promotes their own from within and their "own" and your shaky start doesn't mean that my "shaky start" will net the same results....even if I do all of the things you mentioned.

CONFIDENTIAL
McLean / Liberty Mutual

JAN FEB MAR APR MAY JUN JUL (AUG) SEP OCT NOV DEC
1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 (16) 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31

Kristy 1:1

leaders compared to everything else

* new, build, partnership
ton's of benefits - but there are challenges
+ complexities

b/c pairs

Deffne w Kristy's leader

gear smooth engineering

Cate very different than Julie

helping me realize those

Step everything I thought:
- Sam assimilating her needs

* uniqueness of changes

- working thru comm's

- new team norms

need to be successful new org

consultative strategic

need parts of hands too

connect w/

lock self in

see profile

* last coffee chat w/ Parker and Sam

work w/

need dedicated support

SM3127

JAN FEB MAR APR MAY JUN JUL AUG SEP OCT NOV DEC

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31

Kristy continued: - unreasonable expectations
- urgency of everything
day to day
nice to say leverage TDT (prioritize
on paper looks good — am I using TDT properly)
in practice it cont
disconnect

me ask / tell gen ↗

* Save it for the 1:1 - add to the
list - bring it to me then,
extend it to hours ↗ me tell
leaders this
* not an order taker — to stop
receiving
emails
* huge oppty to onboard
and time to do it - process - growing in self
digest stuff
queue and team on FTO
* junior level role -
* being only Black
She doesn't see people

SM3128

Jen and Kathy

* all in positive be a part of the solution space

* relationships are super important in a pretty negative space

* not feeling right / not set up for success

temperament jump

* feeling like potentially this isn't a fit

* exit plan * move forward to get the business

* what that might mean??

* Timing on what that could look like for exit

He had talked about it

DEFENDANT'S DEPO EXHIBIT
SM 74 Mv.L
01/22/25

SM3196

Kristy Fauman 1:1 7.13.21
maternity leave June

* Jen Labadie
her chief of staff
reports for years
ran all of that
agenda, content
- take power back!!

* Deena her comms
Pinkham
person
maternity leave

* everything me
like admin order taker
- she did this for them
shouldn't have

* not being Black!

DEFENDANT'S DEPO EXHIBIT
SM M v. L
18A
01/23/25

SM3355

—/—/—

push back don't be like her - white gloves tx

hated the role and SV J+P
nice but difficult

GLT ?

supporting mental health tool kit

J.I.T.

1st 90 days

TDT — COMB

seating in a circle

- multiple in take

HR Model

Hub + Spoke

very clear and works in matrix environments

me back

shint to

- order take different tx

lots of production

Cadence of comms

uncomfortable

- I don't have access to stuff or a month

chat w/ gen

1st 90 Days w/ gen

lack of support from some of COEs - dumping PPT @ me w/ no context

camp Josh Knudsen sweet guy

TDT

HK analytics lousy email

The B12 Training knowledge

onboarding where time

need training / b/s head / overview of the leaders depts

Liberty site - where things are

Andrea's Bookmarks - no access to things

Kristy's profile

- Julie work night + weekends

Jennifer U. quick meet up 7/16/21

Jen off all week next

Ann Marie going to need support! HR Talent analytics will still be aligned back GRM happy 2007.

* my concerns - Black - TX, Standards

make a cust partner

90 day sweep Back to Sponsor person

no access

concern HR center and parts of people at large

DEFENDANT'S DEPO EXHIBIT SM 12A MV, L 01/22/25

SM3389

Message

| | |
|---|---|
| **From:** | McLean, Stacie [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4FDC4B3A4EDB41B58EE3A2A5571A7091-MCLEAN, STA] |
| **Sent:** | 7/28/2021 4:55:47 PM |
| **To:** | Soucek, Jennifer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2b4986b0572d46cd94f1bb2656eca5a0-Soucek, Jen]; Jonas, Kathy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7ad239962c9e4b878608069e43bcef86-Jonas, Kath] |
| **Subject:** | Re: Systems Support/Training |

Hi Jen – Yes, Danielle scheduled a meeting originally when I started that I asked Kelsie to reschedule as I can only meet with so many people at once . Thereafter two additional meetings scheduled with Danielle had to be rescheduled as my calendar got filled up with double and triple bookings that were more of a priority. I asked to be rescheduled for the end of July/early August and Danielle asked if I still saw value in meeting and I indicated yes.

I am able to access the HR Center now.

Thanks for your assistance and support!

~ Stacie

---

**From:** Soucek, Jennifer <Jennifer.Soucek@LibertyMutual.com>
**Date:** Thursday, July 22, 2021 at 10:15 AM
**To:** Jonas, Kathy <KATHY.JONAS@LibertyMutual.com>, McLean, Stacie <Stacie.McLean@libertymutual.com>
**Subject:** RE: Systems Support/Training

Hi Stacie,

Yes, we'll make sure you get the support that you need for the systems. I am working on that as Kathy mentioned. I know that Danielle Pita from Talent Analytics said she was going to set something up to demo PowerBI with you back when you first started. I thought you had mentioned you had it on your calendar, but it sounds like that has not taken place. I can follow up with her. I will also find out about the messages you are getting from TDT that you are unable to access.

Also, are you able to access the HR Center now? I was told you are now set up.

Meanwhile, please let me know if there is anything else you need. ☺

Thanks!

McLean Liberty Mutual

---

**From:** Jonas, Kathy <KATHY.JONAS@LibertyMutual.com>
**Sent:** Thursday, July 22, 2021 6:28 AM
**To:** McLean, Stacie <Stacie.McLean@libertymutual.com>; Soucek, Jennifer <Jennifer.Soucek@LibertyMutual.com>
**Subject:** RE: Systems Support/Training

Stacie,
It is absolutely our intent for you to get some demo's and briefings on the systems you are using. Jen and I talked about it last week and she will be making sure that those connection points get set up.

Jen – please work with someone in TDT about the messages Stacie is getting when they send her things.

PENGAD 800-631-6989 DEPOSITION EXHIBIT McLean 22 07/31/24

Stacie – I am always here if you want to walk through anything because we do not expect you to "self teach" regarding systems and technology. I apologize that it might be feeling like that for you.

Have a good day!
Kathy

---

**From:** McLean, Stacie <Stacie.McLean@libertymutual.com>
**Sent:** Thursday, July 22, 2021 8:22 AM
**To:** Soucek, Jennifer <Jennifer.Soucek@LibertyMutual.com>; Jonas, Kathy <KATHY.JONAS@LibertyMutual.com>
**Subject:** Systems Support/Training

Hi Jenn – I hope all is well. It would be helpful for me to have some sort of quick walk thru of the important pieces of the software/systems that I'll have to use daily (People at Liberty, Power BI, JIRA etc...I've certainly been able to navigate my way through each to a degree and I'm technologically savvy enough to do so, but there's definitely a lag. Some are intuitive and some aren't. Is this something in onboarding that'll be coming?

Kathy, If the expectation is that I learn these things myself that's fine, and I'll need to make an adjustment for that and others should too.

I get the attached message every time someone from TDT sends me an invite to have an intake meeting with me...I can't access what they are talking about and trust there are multiple cases that are sent weekly for me to track to. For example, I've never used JIRA, my former teams in my prior roles did....so I'm not familiar with inputting cases.

Thanks for your assistance.

Stacie

McLean/Liberty Mutual

Appointment.

**From:** Soucek, Jennifer [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2B4986B0572D46CD94F1BB2656ECA5A0-SOUCEK, JEN]
**Sent:** 5/20/2021 7:54:51 PM
**To:** McLean, Stacie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4fdc4b3a4edb41b58ee3a2a5571a7091-McLean, Sta]

**Subject:** Onboarding Meeting
**Location:** Microsoft Teams Meeting

**Start:** 5/24/2021 3:00:00 PM
**End:** 5/24/2021 3:45:00 PM
**Show Time As:** Tentative

**Required Attendees:** Jonas, Kathy; McLean, Stacie

Welcome, Stacie!

Kathy and I wanted to set up this time to review your onboarding plan and answer any initial questions you may have.

We look forward to speaking with you!

**Jennifer Soucek**
Associate Talent Delivery Specialist
Global Talent Practices & Services

Liberty Mutual Insurance
17771 Cowan, Suite 100
Irvine, CA 92614
Office: 949-316-1848

McLean/Liberty Mutual

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Or call in (audio only)**
+1 469-480-3855,,908301491# United States, Dallas
(844) 883-4661,,908301491# United States (Toll-free)
Phone Conference ID: 908 301 491#
Find a local number | Reset PIN

This conversation, including any comments you offer, could be recorded for training or other permitted business use. By participating, you consent to being recorded. For more information, please click on the Legal link.

Learn More | Help | Meeting options | Legal

---

DEPOSITION EXHIBIT SM McLean v LM 25 01/31/24 PENGAD 800-631-6989

Appointment

| | |
|---|---|
| **From:** | Sullivan, Kelsie [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F5EA30DB97F9494DA0FA1F3F8F4A1492-THAMES, KEL] |
| on behalf of | McLean, Stacie [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4FDC4B3A4EDB41B58EE3A2A5571A7091-MCLEAN, STA] |
| **Sent:** | 5/26/2021 6:14:01 PM |
| **To:** | Soucek, Jennifer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2b4986b0572d46cd94f1bb2656eca5a0-Soucek, Jen] |
| **Subject:** | Accepted: onboarding check in |
| **Location:** | Microsoft Teams Meeting |
| **Start:** | 5/27/2021 3:00:00 PM |
| **End:** | 5/27/2021 3:30:00 PM |
| **Show Time As:** | Busy |

McLean/Liberty Mutual

Appointment

**From:** Soucek, Jennifer [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2B4986B0572D46CD94F1BB2656ECA5A0-SOUCEK, JEN]
**Sent:** 5/28/2021 6:05:00 PM
**To:** McLean, Stacie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4fdc4b3a4edb41b58ee3a2a5571a7091-McLean, Sta]

**Subject:** Week 2 check in
**Location:** Microsoft Teams Meeting

**Start:** 6/3/2021 3:30:00 PM
**End:** 6/3/2021 4:00:00 PM
**Show Time As:** Tentative

**Required Attendees:** McLean, Stacie

Hi Stacie,

Setting up this time to check in and see how your onboarding is going for week 2.

Thanks!

**Jennifer Soucek**
Associate Talent Delivery Specialist
Global Talent Practices & Services

Liberty Mutual Insurance
17771 Cowan, Suite 100
Irvine, CA 92614
Office: 949-316-1848

---

Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Or call in (audio only)**
+1 469-480-3855,,65276889# United States, Dallas
(844) 883-4661,,65276889# United States (Toll-free)
Phone Conference ID: 652 768 89#
Find a local number | Reset PIN

This conversation, including any comments you offer, could be recorded for training or other permitted business use. By participating, you consent to being recorded. For more information, please click on the Legal link.

Learn More | Help | Meeting options | Legal

---

McLean/Liberty Mutual

Message

**Sent:** 6/2/2021 4:22:40 PM
**To:** McLean, Stacie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4fdc4b3a4edb41b58ee3a2a5571a7091-McLean, Sta]
**CC:** Sullivan, Kelsie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f5ea30db97f9494da0fa1f3f8f4a1492-Thames, Kel]
**Subject:** RE: Onboarding check-in

I am so sorry about all of the technical issues you are having, Stacie! I have submitted a ticket on your behalf to have someone assigned to your case and work on resolving all of your tech issues. The ticket # is INC000010247010.

We have a check in scheduled for tomorrow as well so we'll see how things are going by then, hopefully better! ☺

**From:** McLean, Stacie <Stacie.McLean@libertymutual.com>
**Sent:** Wednesday, June 2, 2021 8:53 AM
**To:** Soucek, Jennifer <Jennifer.Soucek@LibertyMutual.com>
**Cc:** Sullivan, Kelsie <Kelsie.Sullivan@libertymutual.com>
**Subject:** RE: Onboarding check-in

Hey Jennifer – Thanks for setting up time. The support I need really right now is to have my tools working so that I'm effective...I still don't have my printer cable to be able to print, I'm spending an inordinate amount of time with Tech Support on quirky issues with my laptop, and Tech Support couldn't get my work iPhone to synch to Outlook after two hours with them late last night...so I have no access on my phone to calendar or email ☺. Sparing you why these things are really helpful as I onboard, but yes I need some help getting these things up and running correctly so when I come back from vacation next Friday I'm not spending hours still with Tech Support and the tools still not working properly.

I appreciate any assistance you can provide. ☺

~Stacie

-----Original Appointment-----
**From:** Soucek, Jennifer <Jennifer.Soucek@LibertyMutual.com>
**Sent:** Wednesday, June 2, 2021 11:30 AM
**To:** McLean, Stacie
**Subject:** Onboarding check-in
**When:** Thursday, June 17, 2021 11:00 AM-11:30 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

Hi Stacie,

Setting up this time to see how everything is going and offer my support in anything you may still need for your onboarding.

Thanks!

**Jennifer Soucek**
Associate Talent Delivery Specialist
Global Talent Practices & Services

Liberty Mutual Insurance
17771 Cowan, Suite 100
Irvine, CA 92614
Office: 949-316-1848

Message

**From:** Soucek, Jennifer [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2B498680572D46CD94F1BB2656ECA5A0-SOUCEK, JEN]
**Sent:** 6/16/2021 4:05:37 PM
**To:** McLean, Stacie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4fdc4b3a4edb41b58ee3a2a5571a7091-McLean, Sta]
**Subject:** RE: Onboarding check-in

Hi Stacie,

So glad things are going well!

The various teams are working on your People at Liberty access and My Career and Development Center (MCDC) access right now. Can you tell me if you have access to the HR Center....please try this link HR Center ?

No worries about meeting this week. I will actually be on FTO next week. I was looking to see if we could meet 6/28 or 6/30 but you look pretty booked. Do you have any time that you could squeeze me in for a quick check in (even 15 mins)?

Have a wonderful rest of your week too!! ☺

-----Original Appointment-----
**From:** McLean, Stacie <Stacie.McLean@libertymutual.com>
**Sent:** Wednesday, June 16, 2021 8:50 AM
**To:** Soucek, Jennifer
**Subject:** Declined: Onboarding check-in
**When:** Thursday, June 17, 2021 11:00 AM-11:30 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

Hey Jen – I hope you're doing well! I'm running crazy but wanted to tell you I'm doing good...slowly but surely getting things ☺. I have a calibration session during this time so I'll have to connect with you next week. Have an amazing rest of your week and chat soon!

McLean Liberty Mutual

Message

**Sent:** 6/17/2021 2:58:23 PM
**To:** McLean, Stacie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4fdc4b3a4edb41b58ee3a2a5571a7091-McLean, Sta]
**Subject:** RE: Onboarding check-in

Hi Stacie,

Wow, it sure sounds like you have a lot going on! I do hope you will have time to review the onboarding materials so that you can get the full picture and feel supported by the resources. I can imagine how hard it is to balance a busy new job with a busy family! You definitely have the right attitude about it though ☺

I can definitely meet 6/28 at 11 PT, not sure if you meant PT or ET. I will send the invite and feel free to propose another time if it doesn't work.

Also, if you have not already, please make sure you enroll in your benefits before the deadline.

Can you please try this link HR Center and see if you have access? If not, I will need to request it for you.

I agree with you that it will all work out. Please let me know if there is anything else that I can do to support you.

Thanks!
Jen

**From:** McLean, Stacie <Stacie.McLean@libertymutual.com>
**Sent:** Wednesday, June 16, 2021 5:42 PM
**To:** Soucek, Jennifer <Jennifer.Soucek@LibertyMutual.com>
**Subject:** RE: Onboarding check-in

Hey Jen – Thanks for checking in and absolutely we can meet...does 6/28 at 11am work for you? I should've stuck to whatever the onboarding plan is (a quick glance day one and haven't seen it really again) as I have yet to do any of it...being eager to get started and meet with the business/key stakeholders and them doing the same has set me back. It's quite enough just to keep up with, whew, the volume of lengthy meetings and emails. All I can do is my personal best and with a smile ☺. I am concerned about what I'm missing though and am trying my best to manage my calendar and carve out time to get that onboarding stuff done...and manage my busy family and life at the same time. It'll all work out and be fine.

~Stacie

**Stacie McLean**
VP, Senior Talent Advisor | GRM Finance & Actuarial
Talent & Enterprise Services
Liberty Mutual Insurance | Charlotte, NC
Office: 980.337.5783

**From:** Soucek, Jennifer <Jennifer.Soucek@LibertyMutual.com>
**Sent:** Wednesday, June 16, 2021 12:06 PM
**To:** McLean, Stacie <Stacie.McLean@libertymutual.com>
**Subject:** RE: Onboarding check-in

Hi Stacie,

So glad things are going well!

The various teams are working on your People at Liberty access and My Career and Development Center (MCDC) access right now. Can you tell me if you have access to the HR Center....please try this link HR Center ?

No worries about meeting this week. I will actually be on FTO next week. I was looking to see if we could meet 6/28 or 6/30 but you look pretty booked. Do you have any time that you could squeeze me in for a quick check in (even 15 mins)?

Have a wonderful rest of your week too!! 😉

-----Original Appointment-----
**From:** McLean, Stacie <Stacie.McLean@libertymutual.com>
**Sent:** Wednesday, June 16, 2021 8:50 AM
**To:** Soucek, Jennifer
**Subject:** Declined: Onboarding check-in
**When:** Thursday, June 17, 2021 11:00 AM-11:30 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

Hey Jen – I hope you're doing well! I'm running crazy but wanted to tell you I'm doing good...slowly but surely getting things 😉. I have a calibration session during this time so I'll have to connect with you next week. Have an amazing rest of your week and chat soon!

McLean/Liberty Mutual

Appointment

| | |
|---|---|
| **From:** | McLean, Stacie [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4FDC4B3A4EDB41B58EE3A2A5571A7091-MCLEAN, STA] |
| **Sent:** | 6/25/2021 8:45:26 PM |
| **To:** | Soucek, Jennifer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2b4986b0572d46cd94f1bb2656eca5a0-Soucek, Jen] |
| **Subject:** | Accepted: onboarding check-in |
| **Location:** | Microsoft Teams Meeting |
| **Start:** | 6/28/2021 1:30:00 PM |
| **End:** | 6/28/2021 1:45:00 PM |
| **Show Time As:** | Busy |

McLean/Liberty Mutual

Appointment

**From:** Soucek, Jennifer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2b4986b0572d46cd94f1bb2656eca5a0-Soucek, Jen]
**Sent:** 6/2/2021 3:30:21 PM
**To:** Soucek, Jennifer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2b4986b0572d46cd94f1bb2656eca5a0-Soucek, Jen]; McLean, Stacie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4fdc4b3a4edb41b58ee3a2a5571a7091-McLean, Sta]

**Subject:** Onboarding check-in
**Location:** Microsoft Teams Meeting

**Start:** 6/30/2021 3:30:00 PM
**End:** 6/30/2021 4:00:00 PM
**Show Time As:** Busy

**Required Attendees:** McLean, Stacie

Hi Stacie,

Setting up this time to see how everything is going and offer my support in anything you may still need for your onboarding.

Thanks!

**Jennifer Soucek**
Associate Talent Delivery Specialist
Global Talent Practices & Services

Liberty Mutual Insurance
17771 Cowan, Suite 100
Irvine, CA 92614
Office: 949-316-1848

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Or call in (audio only)**
+1 469-480-3855,,436833279# United States, Dallas
(844) 883-4661,,436833279# United States (Toll-free)
Phone Conference ID: 436 833 279#
Find a local number | Reset PIN

This conversation, including any comments you offer, could be recorded for training or other permitted business use. By participating, you consent to being recorded. For more information, please click on the Legal link.

Learn More | Help | Meeting options | Legal

McLean/Liberty Mutual

Appointment

**Sent:** 7/1/2021 8:35:02 PM
**To:** Soucek, Jennifer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2b4986b0572d46cd94f1bb2656eca5a0-Soucek, Jen]; McLean, Stacie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4fdc4b3a4edb41b58ee3a2a5571a7091-McLean, Sta]

**Subject:** Onboarding Check-In
**Location:** Microsoft Teams Meeting

**Start:** 7/19/2021 2:45:00 PM
**End:** 7/19/2021 3:00:00 PM
**Show Time As:** Busy

Hi Stacie,

Setting up time to see how everything is going, if you have any questions and if there is anything I can do to help with your onboarding.

Thanks!

**Jennifer Soucek, SHRM-CP**
she/her/hers
Associate Talent Delivery Specialist
Global Talent Practices & Services

Liberty Mutual Insurance
Aliso Viejo, CA
Office: 949-316-1848

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Join with a video conferencing device**
896641881@t.plcm.vc
Video Conference ID: 112 594 139 5
Alternate VTC dialing instructions

**Or call in (audio only)**
+1 469-480-3855,,632131871# United States, Dallas
(844) 883-4661,,632131871# United States (Toll-free)
Phone Conference ID: 632 131 871#
Find a local number | Reset PIN

This conversation, including any comments you offer, could be recorded for training or other permitted business use. By participating, you consent to being recorded. For more information, please click on the Legal link.

McLean/Liberty Mutual

Message

**From:** McLean, Stacie [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4FDC4B3A4EDB41B58EE3A2A5571A7091-MCLEAN, STA]
**Sent:** 8/5/2021 8:02:08 PM
**To:** Soucek, Jennifer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2b4986b0572d46cd94f1bb2656eca5a0-Soucek, Jen]
**Subject:** Re: onboarding check in

Hey Jen – Yes, I'm moving my calendar around and trying to make more time for me to process and get work done. Yes, we can do a check in on 8/16 no problem! Thanks so much!

~ Stacie

---

**From:** Soucek, Jennifer <Jennifer.Soucek@LibertyMutual.com>
**Date:** Thursday, August 5, 2021 at 1:23 PM
**To:** McLean, Stacie <Stacie.McLean@libertymutual.com>
**Subject:** onboarding check in

Hi Stacie,

How has the rest of your week been? I just wanted to follow up as I understand that you needed to cancel our check in for next week. I wanted to use this time to see how things were going with the onboarding guide and see if there is any additional assistance I can provide to you. We do have a meeting on 8/16 to discuss Talent Forums. If it works for you, we can also use this time for an onboarding check in. Meanwhile, I will continue to check in with you. Please reach out if there is anything that I can assist you with.

Thanks!

**Jennifer Soucek, SHRM-CP**
she/her/hers
Associate Talent Delivery Specialist
Global Talent Practices & Services

Liberty Mutual Insurance
Aliso Viejo, CA
Office: 949-316-1848

McLean/Liberty Mutual

Message

**From:** Ughetta, Jennifer [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4882D7026EAA43D1B9780171C403AB8E-UGHETTA, JE]
**Sent:** 7/26/2021 12:45:28 AM
**To:** McLean, Stacie [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4fdc4b3a4edb41b58ee3a2a5571a7091-McLean, Sta]
**Subject:** Re: Onboarding

Oh no- I will help however I can! Let's chat tomorrow...

Sent from my iPhone

On Jul 25, 2021, at 7:39 PM, McLean, Stacie <Stacie.McLean@libertymutual.com> wrote:

Hey Jen -

I hope you had an amazing vacation and spent lots of quality time with your family...soooo important. Gave some thought to the question what you can do to help me as I'm feeling like I need to reset...I'd like to take a step back from the business and onboard in a way that I feel will be meaningful for me...and therefore the business. I'm having a difficult time acclimating to the level of "production" and volume of marathon meetings...I feel like I can't gain any traction, as most people seem to have forgotten that I'm new and talk in non-stop acronymns, to first names only like Madonna ☺ etc. The culture is definetly a lot different than what I'm used to. I want to be successful at Liberty. I need time to gain a solid foundation and I feel like I'm in Groundhog Day... Please let me know your thoughts.

Confidential McLean/Liberty

PENGAD 800-631-6989
SM DEPOSITION EXHIBIT McL v. LM
27
07/31/24

Message

| | |
|---|---|
| **From:** | Ughetta, Jennifer [Jennifer.Ughetta@LibertyMutual.com] |
| **Sent:** | 8/10/2021 1:13:19 AM |
| **To:** | McLean, Stacie [Stacie.McLean@libertymutual.com] |

hey there - Julie mentioned today that you shared that you havent been on boarding. Help me help you prioritize...skip ELM tomorrow morning and take that time to focus on on boarding. Show me what else you have on your plate so I can move things for you...

CONFIDENTIAL
McLean / Liberty Mutual

PENGAD 800-631-6989
DEPOSITION EXHIBIT SM 30 M v. LM 01/31/24

Message

| | |
|---|---|
| From: | McLean, Stacie [Stacie.McLean@libertymutual.com] |
| Sent: | 8/10/2021 2:07:40 PM |
| To: | Ughetta, Jennifer [Jennifer.Ughetta@LibertyMutual.com] |

Good morning....It's ok Jen. Today, in this moment, there's nothing you can do really beyond indicating I have your support. I'm taking it one day at a time. I don't want to focus on what's not working, I'm trying my best to find solutions and what makes most sense for me......and Liberty.

CONFIDENTIAL
McLean/Liberty Mutual

Message

**From:** McLean, Stacie [Stacie.McLean@libertymutual.com]
**Sent:** 8/10/2021 2:39:26 PM
**To:** Ughetta, Jennifer [Jennifer.Ughetta@LibertyMutual.com]

meaning they don't operate strategically for the most part....lots of "swirl" and it feels like being on a merry go round

Message

**From:** McLean, Stacie [Stacie.McLean@libertymutual.com]
**Sent:** 8/10/2021 2:46:09 PM
**To:** Ughetta, Jennifer [Jennifer.Ughetta@LibertyMutual.com]

it's exhausting

Message

| | |
|---|---|
| **From:** | Ughetta, Jennifer [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4882D7026EAA43D1B9780171C403AB8E-UGHETTA, JE] |
| **Sent:** | 9/16/2021 9:17:38 PM |
| **To:** | Jonas, Kathy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7ad239962c9e4b878608069e43bcef86-Jonas, Kath] |
| **Subject:** | Stacie - for file |

[8/31 9:44 AM] McLean, Stacie
Good morning! Thanks for letting me know about Cate! I will reach out to her today. It's going and it's good to have the opportunity to sort through stuff and feel more organizedsmile.

[9/7 11:15 AM] Ughetta, Jennifer
Are you feeling energized and ready to go?

[9/7 11:15 AM] McLean, Stacie
I am energized and ready to go! smile

[9/7 11:15 AM] Ughetta, Jennifer
woooohoooo!

[9/7 11:15 AM] McLean, Stacie
(GIF)

[9/7 11:15 AM] Ughetta, Jennifer
We need to connect so I can bring you up to speed on stuff
(1 liked)

[9/7 11:16 AM] McLean, Stacie
that would be great! let me know

[9/7 12:25 PM] Ughetta, Jennifer
btw -that Leader that took a personal risk and pushed back on Jim (and Julie) was Cate...I was so proud of her and helped her through it

[9/7 12:27 PM] McLean, Stacie
good to hear it as I talked to her for a long time last week about her learning into her own leadership style and being courageous around pushing back, and asking for what she needs, even if it's not in alignment with what others may want or say smile
(1 liked)

[9/7 12:27 PM] McLean, Stacie
that makes me happy!

[9/8 9:17 AM] McLean, Stacie
GM luv!

[9/8 9:17 AM] Ughetta, Jennifer
Hi!

DEPOSITION EXHIBIT 31
PENGAD 800-631-6989

[9/8 9:18 AM] McLean, Stacie
Had my first 1:1 with Sam the other day....and also did her first staff meeting today....love her vibe and energy! smile

McLean/Liberty Mutual

[9/8 9:19 AM] McLean, Stacie
Just saying....

[9/8 9:19 AM] Ughetta, Jennifer
awesome! I dont know her really well - so that is great to hear!
(1 liked)

[9/8 9:20 AM] McLean, Stacie
she seems....really chill and talks my language...

[9/8 9:23 AM] Ughetta, Jennifer
And how are things going with Cate?

[9/8 9:36 AM] McLean, Stacie
I think Cate and I have a great rapport.....I will tell you I've heard mixed things about her.....I take that in but what's more important to me is how we partner and engage with each other....I'm hopeful we can work closely together to bring a ne, exciting and improved culture to Finance....I believe it needs a breath of fresh air smile.

[9/8 9:36 AM] McLean, Stacie
new^*

[9/8 3:15 PM] Ughetta, Jennifer
yes that is how I feel too and part of what i wanted to get you up to speed on because she has received some tough feedback

[Tuesday 9:50 AM] Ughetta, Jennifer
Hey - how did yesterday announcements go? Noisy?

[Tuesday 9:56 AM] McLean, Stacie
Good morning...doesn't seem noisy to me......maybe everyone is taking it in. Or maybe it's not a big deal smile.

[Tuesday 10:02 AM] Ughetta, Jennifer
That's good news!

[Tuesday 10:10 AM] McLean, Stacie
Jen. I have my internet provider here this morning. Three guys. I've been having issues doing teams meetings where people can't hear me or see me. It is not my internet. It is my Liberty equipment. I never had an issue with any other employer or companies I've worked for being able to do meetings virtually....not with my own personal equipment or their company provided equipment. I need this to be fixed and I'm just tired and frustrated. Can you please help and get someone to fix this shit for me once and for all?

[Tuesday 10:12 AM] McLean, Stacie
If you're going to ask Kathy to help that's fine..I'll cut and paste this to her so she has it too.

[Tuesday 10:14 AM] Ughetta, Jennifer
Reach out to Chris Moore in IT (he is a lead tech support consultant)- he has been my best resource to help with any issues. I IM him and he usually responds ASAP

[Tuesday 10:15 AM] McLean, Stacie
Yes I've worked with him too.
[Tuesday 10:15 AM] McLean, Stacie

McLean/Liberty Mutual

He blew me off the last time I reached out smile.

[Tuesday 10:15 AM] Ughetta, Jennifer
Ugh- tell him I sent you
(1 liked)

[Tuesday 10:15 AM] Ughetta, Jennifer
And have him get online with the guys you have there

[Tuesday 10:20 AM] McLean, Stacie
it actually was Chris Moore's boss that I worked with.....his name is Chris Moon smile

[Tuesday 10:21 AM] McLean, Stacie
I literally am at my limit this morning with these tech guys here....I'm not built for this day in and day out Jen...I shared with Kathy all of the stuff with TDT and the merry go round I'm still on there...it's too much for me.
[Tuesday 10:25 AM] Ughetta, Jennifer
I am in a GRM ELT offsite meeting so I can't jump on a call - but I don't know the detail of your challenges to really be able to help. Would you like me to connect with Chris and ask him to please prioritize getting you fully set up?

[Tuesday 10:26 AM] Ughetta, Jennifer
And I'd also like to better understand what the TDT challenges still are...

[Tuesday 10:26 AM] McLean, Stacie
Chris Moore doesn't know Mac...his boss Chris Moon does

[Tuesday 10:26 AM] McLean, Stacie
I'm on with Chris Moon but he's multi tasking

[Tuesday 10:26 AM] Ughetta, Jennifer
Ah - we are really a PC org. ..

[Tuesday 10:26 AM] McLean, Stacie
Id appreciate if you could ask that he make this a priority

[Tuesday 10:27 AM] McLean, Stacie
Yea there's only 3 people here that know macs in IT..go figure

[Tuesday 10:27 AM] Ughetta, Jennifer
You want me to ping him now? Chris moon?

[Tuesday 10:27 AM] McLean, Stacie
But it was my PC that was giving me issues every day...hence why I switched to a mac...lesser issues but now this issue

[Tuesday 10:30 AM] Ughetta, Jennifer
Ok I just sent him a note
[Tuesday 10:32 AM] McLean, Stacie
when I ask Bree something in TDT...just like before, it basically is rerouted to me to do myself

[Tuesday 10:33 AM] McLean, Stacie
I'm good on just doing me and I understand that if my best isn't good enough it just isn't and we'll deal accordingly

McLean/Liberty Mutual

[Tuesday 10:34 AM] Ughetta, Jennifer
Have you spoken with Brian Prozeller about the challenges with TDT - he was a supervisor over there so should be able to help you get that set up the way you need it

[Tuesday 10:35 AM] McLean, Stacie
Brian wants to be an STA, he wants his own people to support and not be a point person.

[Tuesday 10:36 AM] McLean, Stacie
It's ok Jen, really. It is. I'm likely not the right person for Liberty and the way things get done here. I don't have the temperament for it.

[Tuesday 10:37 AM] McLean, Stacie
I spent yesterday going around and around for a simple ask on EOS. And literally 5 people on an email trail couldn't get me what I needed. It's too much for me.

[Tuesday 10:38 AM] McLean, Stacie
I'll forward you the email trails...this isn't in my head.

[Tuesday 10:39 AM] McLean, Stacie
Anywho...I'll chat with you another time...focus on your meeting and have a great day. smile

[Tuesday 4:12 PM] McLean, Stacie
Hey there: here's some noise for you on Finance.org changes:

[Tuesday 4:14 PM] McLean, Stacie
It's taking away career progression, no pipeline, no POC on FELT, none of their directs are POC either, how SVP's and VP's can jump to EVP's and be slotted, but lower grades jump through hoops and build biz cases to promo their people...
[Tuesday 4:15 PM] McLean, Stacie
have a good evening smile

[Tuesday 4:15 PM] McLean, Stacie
Chris didn't fix my issues btw...my afternoon meetings were all glitchy too

Jennifer Ughetta
she/her/hers
Chief Talent Officer, Global Retail Markets
Liberty Mutual Insurance
157 Berkeley Street,
Boston, MA 02116

McLean/Liberty Mutual