**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**CIVIL ACTION NO.: 1:23-cv-897-LCB-JLW**

| | | |
|---|---|---|
| STACIE MCLEAN,<br><br>Plaintiff,<br>v.<br><br>LIBERTY MUTUAL GROUP, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

The Court should deny Defendant Liberty Mutual Group, Inc.'s ("Liberty") Motion for Summary Judgment. A reasonable jury could find Liberty fired Plaintiff Stacie McLean ("Stacie") because of her race and protected activity.

## FACTS

## I. Stacie Confronts Racism at Liberty.

### A. Stacie Immediately Encounters Discrimination.

On May 24, 2021, Stacie started at Liberty as a Senior Talent Advisor ("STA") supporting the Global Retail Market ("GRM"). (McLean 28:25–29:7, 193:2–8, 194:5–8, 198:7–15, 203:13–17, 210:17–19, 220:1–16.) She supported Finance Leader Julie Haase and Chief Actuary Parker Koppelman. (*Id.* 206:16–21; Haase 18:5–9; Koppelman 18:25–19:2.)

Chief Talent Officer Jennifer Ughetta hired Stacie with input from Koppelman, Haase, and HR Business Partner Kathy Jonas. (Ughetta 24:1–25:18, 83:24–84:23; Koppelman 40:24–41:4; Foley 21:13–14.)

Stacie was the only black STA reporting to Ughetta. (Jonas 136:12–14.) Jonas told Stacie she would face hate at Liberty because of her race. (McLean 232:10–25, 355:7–12.) Liberty immediately focused on Stacie's race. (Exs. 13 & 14; Vigue 16:9–23; Ughetta 88:24–89:22, 90:23–91:2.)

On May 20, Business Advisor Tim Vigue outlined factors that positively impact minority employees' onboarding, including connecting them with employees from their same background and briefing them on "unwritten rules" that others are already familiar with. (Ex. 13.)

Liberty did not use his input with Stacie, but did adopt his suggestions for Alice Lin (Asian). (McLean 290:14–291:23, 425:15–426:4; Jonas 126:2–20; Vigue 18:1–21, 24:1–3; Koppelman 53:25–54:3; McLean Dec. ¶ 11.)

Stacie could not complete onboarding because Liberty executives kept taking over her calendar. (McLean 274:13–276:13, 303:21–305:3, 306:11–22, 309:11–310:2, 331:16–332:7.) As a result, Ughetta said to complete onboarding at her leisure. (*Id.* 294:8–23.) Liberty also delayed giving Stacie access to critical HR systems. (*Id.* 267:8–12.) Even through August, Stacie still didn't have proper training or access to most Liberty systems. (*Id.* 268:1–272:2, 334:2–6.)

Stacie expressed frustration with Ughetta, Jonas, and Chief Administrative Officer Melanie Foley. (*Id.* 305:15–306:5.) They agreed that the way Liberty operated was broken. (*Id.*) They told Stacie to push back. (*Id.* 306:6–8, 310:3–7, 320:3–25; Foley 87:4–15.) Ughetta shared in an expletive-laden rant that her own first year with Liberty was hell. (McLean 307:13–308:6.)

### B. <u>Stacie Engages in Protected Activity.</u>

Stacie started making race discrimination complaints to Jonas and Ughetta in July. (*Id.* 354:3–355:12, 357:19–25, 366:2–18, 614:12–615:11, 617:4–12.) Stacie complained Liberty was

holding her to a different standard because she was black. (*Id.* 352:11–16, 353:20–354:2, 355:1–16, 356:4–9, 356:23–357:11.) Stacie gave Jonas examples. (*Id.* 355:17–21, 357:10–11.)

Ughetta regularly asked Stacie to share her perspective as a black woman, but did not like Stacie's input. (*Id.* 366:10–25, 367:9–14.) Ughetta told Stacie she had a "crackhead black nephew." (*Id.* 370:3–13.) Employees at Liberty constantly called out Stacie's race and asked for her black perspective. (*Id.* 364:6–20, 596:7–597:7.) Ughetta told Stacie to turn on her camera and repeatedly questioned her time off, but didn't do this with Stacie's white peers. (*Id.* 557:7–559:23, 561:12–24; ex. 15 at 3194.) Stacie told Ughetta she felt like "a shiny black toy." (McLean 595:20–596:6, 597:21–24.)

Koppelman commented on Stacie's hair. (*Id.* 358:9–17, 368:23–369:4, 381:9–19.) Stacie complained to Ughetta. (McLean Dec. ¶ 13.) Jonas regularly called Stacie "angry." (McLean 313:11–314:13, 369:10–13.) Stacie complained to Ughetta about being stereotyped as an angry black woman and that she was more closely scrutinized than white peers. (McLean Dec. ¶ 14-15.) She complained Liberty wasn't giving her access and training. (McLean 598:12–24, 599:12–600:22, 603:9–23.)

CFO Cate Stevenson and others talked about Stacie behind her back. (Exs. 16 & 17; Stevenson 7:3–4.) Stevenson belittled Stacie and Liberty excluded her from chats. (*Id.*, ex. 18; Stevenson 25:11–30:22.)

On August 24, Donna Andujo offered to help with Stacie, saying, "there are so many things that come up as an outsider/newbie, as a woman and as a person of color at [Liberty] (in particular)." (Ex. 19; Jonas 177:9–21.) Ughetta did not accept Andujo's offer. (Ughetta 185:15–186:25.)

### C. Stacie Seeks Race Discrimination Data.

In July, Liberty's black turnover was the highest of all groups. (Ex. 20; Vigue 27:4–10.) Stacie complained to Ughetta. (McLean 406:7–19.) Most black employees did not make it to the highest levels at Liberty and were woefully underrepresented, especially at the executive level. (Ex. 20; Jonas 141:1–6; Vigue 25:24–26:10.) Ughetta warned Stacie about pushing back on Liberty's DEI efforts. (McLean 311:19–312:16.)

Charlotte Streat told Stacie there were many issues with black people at Liberty. (*Id.* 399:5–400:1.) On July 22, Stacie asked for Liberty's black employee data to confirm her racial bias concerns as it related to herself and other black workers. (*Id.* 403:22–404:22, 407:10–22.) Vigue understood Stacie was seeking the information for herself. (Vigue 41:24–42:1; Ex. 21 at 16334.) On August 12, Stacie stated, "Because trust that if most of my black peers haven't made it here . . . the likelihood of me making it is pretty low[.]" (Ex. 21 at 16343.) Vigue agreed being black made it even harder to assimilate at Liberty. (Ex. 20 at 16293, 16276.)

Vigue was hesitant to help, questioned Stacie, and viewed it as a distraction. (Vigue 42:2–17, 44:22–46:6, 47:9–20; ex. 21.) On August 12, Vigue alerted Ughetta that Stacie was digging into details on discrimination. (Vigue 51:10–52:14; ex. 22.) Ughetta viewed this as outside Stacie's job. (Ughetta 165:15–166:15.) Even Jonas and Latichia Fleming in Employee Relations (HR) were alerted. (Fleming 41:2–42:7, 44:11–17, 75:2–22; Jonas 171:22–173:18.)

Liberty gave Stacie the runaround to avoid providing her with this damning data. (McLean 666:7–668:17; Vigue 56:1–5, 63:23–64:18, 65:2–23; Ughetta 159:16–160:4; ex. 21.)

### D. Stacie Continues Opposing Discrimination.

Around August 30, Stacie met with management-level employee Donald Roach. He told her black women faced challenges at Liberty and, because Stacie was black, she would face those challenges. (McLean 486:3–496:2, 488:14–21, 489:5–490:6; ex. 15 at SM3151–54.) They discussed the lack of senior black employees in Stacie's department. (McLean 490:10–24.) Roach told Stacie to prepare to face racism, and warned of Koppelman's and Haase's bias. (*Id.* 494:2–495:13, 513:2–514:10.)

Roach told Stacie to watch her back for Stevenson, Ughetta, and Jonas. (*Id.* 517:8–518:7; Stevenson 7:3–4.) Others warned Stacie that Ughetta and Jonas were setting her up for failure. (McLean 358:18–359:10, 382:17–21, 399:16–400:7.) Streat told Stacie they did not like black women. (*Id.* 399:16–400:10.)

On September 9, Stacie met with Fleming, complained about race discrimination, told her she was being held to a different standard, and provided discrimination examples. (*Id.* 531:25–532:24, 535:5–18, 536:3–537:7; ex. 15 at 3175.) Fleming agreed racism and challenges for black women existed at Liberty. (McLean 531:25–32:24, 536:3–16; Fleming 51:4–22; ex. 15 at 3175.) Stacie told Fleming she was being treated like a black spokesperson and gave a specific illustration of how Liberty made her speak for all black people. (Fleming 50:23–51:3; McLean 535:10–536:2, 614:12–615:11; McLean Dec. ¶¶ 16–17.)

## II. <u>Defendant Fires Stacie and Scrambles to Justify Its Decision.</u>

### A. <u>September 14.</u>

On September 14, 2021, at 10:29 a.m., Ughetta told IT she needed Stacie's tech issues fixed. (Ex. 23 at 360.) IT responded, and Ughetta thanked him at 12:02 p.m. (Ex. 23 at 360.)

Ughetta genuinely wanted Stacie's issues fixed and had not yet decided to fire Stacie. (Ughetta 129:11–23, 129:24–130:6.)

Prior to this, Stacie complained about her continued tech issues and used the word "shit." Fleming and others like Ughetta and Stevenson used the word "shit" and other curse words at work. (Fleming 67:6–18; Ughetta 135:13–136:3; Stevenson 31:7–21; ex. 16 at 18902.)

Also on September 14, Stacie spoke with Anthony Lewis about institutionalized racism at Liberty. (McLean 541:20–543:11, 543:21–23; Ex. 15 at SM3187.) He told Stacie black employees have to jump through hoops for promotions their white counterparts did not. (McLean 541:20–543:7, 542:23–543:4.) Lewis told Stacie about the lack of people of color on the finance team. (*Id.* 543:12–22.) Lewis told Stacie there were no black leaders in GRM, none that were promoted, and black people in finance had a hard time at Liberty. (*Id.* 402:18–403:9; ex. 15 at 3187.) Lewis complained to Stacie that, as a black man, he was not afforded the same opportunities as his white peers, and what was happening on Liberty's Finance Executive Leadership Team ("FELT") was part of the same discriminatory environment. (McLean 544:19–550:11; Vigue 80:22–81:8; ex.15 at SM 3187.)

After the conversation with Lewis, at 4:14 p.m., Stacie complained to Ughetta that black people were treated differently than their white peers and denied advancement. (Ex. 23 at 359; McLean 541:20–543:7.)

**B. <u>September 15.</u>**

The next day, Jonas and Ughetta called Stacie into a meeting. Jonas told Stacie she was not aligned to the way work got done. (McLean 341:3–342:8.) Jonas pointed to Stacie saying "shit." (*Id.* 342:15–24; Jonas 189:20–190:1, 199:5–200:13.) Jonas raised a mutual exit. (Exs. 24

& 25.) Jonas repeatedly told Stacie she was angry. (McLean 565:23–566:17.) Jonas raised performance issues in this meeting "[s]o that we could align on how we might be able to make it better." (Jonas 187:18–23.) Jonas wanted to tell Stacie the way she engaged would need to change. (*Id.* 187:24–188:11; ex. 24.) Stacie said she was surprised, confused, and upset Liberty raised an exit after only 90 days. (McLean 343:12–23, 345:21–25, 565:9–22; Jonas 189:20–190:1, 199:5–200:13; ex. 25.)

Stacie did not answer questions about an exit package. (McLean 569:7–16.) Stacie didn't tell anyone at Liberty she was unhappy there. (*Id.* 605:4–10.) Stacie had not previously considered leaving and was not going to quit. (*Id.* 340:5–8, 607:25–608:4.) Jonas's talking points for this meeting said nothing about terminating Stacie and, instead, said, "***If you want to leave*** we can figure out an exit plan." (Ex.24 (emphasis added).)

### C. September 16 and the End.

#### 1. Stacie Again Opposes Discrimination.

On September 16, Jonas and Stacie had a follow-up meeting. Before the September 16 meeting, IT emailed about fixing Stacie's tech issues. Jonas responded that they should see what the September 16 meeting brought. (Jonas 211:21–214:5; ex. 26.)

Jonas typed notes during the meeting. (Jonas 201:20–202:3, 202:16–18; ex. 27.) Stacie told Jonas she was "the only black female at this level that faces off with the business[.]" (Ex. 27.) Stacie complained, "I truly feel like Liberty doesn't want my diverse perspective[.]" (*Id.*) Regarding Foley being discouraging and bringing up a severance, Stacie said, "[I]f I were not a black [woman] would she be saying the same things[.]" (*Id.*) Stacie told Jonas she was treated differently based on her race—"I know there are white people who have the exact thoughts about

onboarding with Liberty but they have gotten mentoring and help[;] [t]hat feels a little off to me[.]" (*Id.*) She said others were set up for success, but for her, a black female executive, Liberty's response was to exit her. (*Id.*) Stacie complained about being unfairly viewed as being negative as it relates to the angry black woman stereotype. (*Id.*; McLean Dec. ¶ 19.)

Jonas gave Stacie coaching on how to do better in her role at Liberty. (Jonas 211:5–20.) Stacie did not want a mutual exit and instead continued working. Jonas testified that Stacie might actually have been able to save her job with some specific steps. (*Id.* 248:5–23.) But then she backtracked. (*Id.* 249:1–5.)

Jonas never relayed Stacie's racial discrimination comments to Fleming in HR. (Fleming 39:24–40:13, 86:14–87:3.) Fleming agreed that if, what was in Jonas's notes was said, it may have been a report of race discrimination. (*Id.* 94:18–96:18.) Ughetta said Stacie's complaints were not worthy of investigating. (Ughetta 180:13–17, 182:4–13.)

### 2. Liberty Decides to Fire Stacie.

Liberty **<u>then</u>** decided to fire Stacie. Three years ago, Liberty told the Equal Employment Opportunity Commission ("EEOC") it decided to fire Stacie only after the September 16 meeting:

> ***<u>It wasn't until</u>*** *[Stacie] made clear in the September Meeting that she was not going to work within the Talent model, work on building a positive rapport with her clients or perform the job duties that she was hired to perform* ***<u>that the Company decided to separate [Stacie's] employment</u>****.*

(Ex. 28 at 12 (emphasis added).) Liberty twice identified the "September Meeting" as the tipping point:

> *In the meeting, [Stacie] again expressed her dissatisfaction with the Company's operating model.* ***<u>By the end of the meeting</u>*** *it was clear that [Stacie] had*

> *disengaged and was no longer interested in finding a path forward with Liberty Mutual.* ***<u>As a result, her employment was separated</u>***.

(*Id.* at 2 (emphasis added).)

We know Liberty was referring to the September 16 meeting as the thing that "resulted" in her termination because Liberty acknowledged Stacie raised discrimination concerns at the meeting. (*Id.* at 11.) Liberty claimed, "It wasn't until the Company scheduled a meeting in September 2021 (the 'September Meeting') with Complainant . . . that [she] first mentioned, ***<u>in that same meeting</u>*****<u>, that</u>** ***<u>being a Black female played a factor in the way she believed she was being treated by the Company</u>***." (*Id.*)

Liberty said Ughetta was shocked by this discrimination complaint. (*Id.*) But in support of summary judgment, Ughetta now claims she was never aware of any discrimination complaints. (Ughetta Decl. ¶ 38) Liberty claimed its "decision had nothing to do with [Stacie's] ***<u>mention of allegations of race and sex discrimination in the September Meeting</u>***" while acknowledging that the same meeting led to her termination. (Ex. 28 at 12.)

On the night of September 16, Jonas and Ughetta collected documentation to justify Liberty's decision. (Jonas 214:18–215:22, 220:7–23, 223:11–5; ex. 23.) They went back and amassed emails for the termination file, labeling them things like "Stacie - for file." (Ex. 23.)

The September 16 collection included Stacie asking for data on black turnover. (*Id.* at 338; Ughetta 161:17–162:5.) On September 21, Fleming emailed Jonas, "Do you have the email where she used the expletive"? (Ex. 29.)

Stacie continued working at Liberty. (Exs. 30 & 15 at 3196–3203.) Meanwhile, Fleming drafted the termination meeting talking points. (Fleming 53:12–54:12.) Jonas is the only person

who helped her draft the talking points. (*Id.* 54:23–55:4.) Fleming never discussed Stacie's performance with Ughetta. (Fleming 41:21–24.) But in response to an Interrogatory, Liberty characterized the termination as a joint decision between Ughetta, Jonas, and Fleming. (Ex. 34.)

On September 22, Jonas told Fleming, "I see we still have the 'if you do not accept you will be held accountable to the expectations of the role' in there. . . . I am still not comfortable with that as it indicates she will stay and we will performance mange her. **She may not get there** . . ." (Ex. 31 (emphasis added).)

In the September 24, termination meeting, Jonas told Stacie that Liberty was firing her because of complaints from leaders Stacie supported; Stacie's inappropriateness; Stacie was not aligned with how work got done; and there was no path forward. (McLean 347:6–20.)

Stevan Chase, a white man, replaced Stacie. (Catcott 22:1–7.)

## III. Defendant's Story Doesn't Add Up.

### A. Liberty Changes the Narrative.

Liberty now claims it decided to fire Stacie on September 14. On November 11, 2024, Liberty produced screenshots of alleged text messages between Jonas and Foley. (Jonas 190:15–191:16; ex. 32.) In the production, Jonas said she was going to discuss exiting Stacie with ER (Fleming). (Ex. 33.) She mentioned Stacie's "negative attitude and behavior" and claimed that Stacie's "new stakeholders"—Catcott and Stevenson—gave the same feedback. (*Id.*) Stevenson did not recall giving any input whatsoever about Stacie. (Stevenson 7:23–25, 9:13–16, 16:13–22.) Similarly, Catcott did not recall anyone asking for her input in the termination decision. (Catcott 11:10–12.) Other than once relaying Stacie seemed unhappy, Catcott did not convey any

other information about Stacie. (*Id.* 17:5–10, 19:8–25, 21:20–25, 23:6–9, 29:10–15.) Foley directed Jonas to "approach it as a mutual separation[.]" (Jonas 193:19–15; Ex. 33.)

### B. <u>Liberty's Explanations are Pretext.</u>

Liberty can manage ineffective performance through coaching and corrective action. (Jonas 90:3–12.) Jonas consulted with Fleming on written warnings for employees perhaps 15 times. (Jonas 119:6–120:7.) Stacie never received one. (McLean Dec. ¶¶ 2–4.) Ughetta couldn't remember discussing with Foley putting Stacie on a performance plan or giving her a written warning. (Ughetta 145:18–25.) Liberty did not document poor performance with Stacie. It never discussed any discipline, written warning, or performance plan.

Stacie specifically asked for meetings to get feedback from Haase and Koppelman, but those meetings didn't happen. (Koppelman 88:2–89:13; Haase 77:9–78:4; ex. 35.)

Beike Van Den Broek was a similarly situated white peer who reported to Ughetta. (Jonas 127:18–22, 129:1–2; Foley 60:20–22; Vigue 61:14–23, 62:15–16; McLean Dec. ¶ 10.) Liberty worked with Beike on performance issues: "professionally she could speak out, express herself, and people didn't always understand what—what she was expressing. So we were helping her to be clear and professional in her communications." (Jonas 127:7–17; Vigue 61:24–4.) Beike didn't always read the room and had interpersonal issues. (Ughetta 70:25–71:10; Vigue 62:12–14.) Beike viewed Liberty's operating model as broken and relayed this to Stacie, Ughetta, and others in management. (McLean Dec. ¶¶ 7–8.) Beike was very blunt and direct. (*Id.* ¶ 7.) Jonas and Ughetta coached Beike on this. (Jonas 127:23–25; Vigue 62:12–14; Ughetta 71:11–16.) Ughetta didn't recall ever considering terminating Beike (*Id.* 73:3–13.)

## ARGUMENT

Viewing the evidence in the light most favorable to Plaintiff, the Court should deny Defendant's Motion. A reasonable jury could return a verdict for Plaintiff.

### I. Standard.

Courts should deny summary judgment unless "the movant shows that there is not genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022). Genuine disputes exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[C]ourts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

### II. Plaintiff's Claims Should Go to a Jury.

A jury should decide Plaintiff's Title VII, 1981, and wrongful discharge claims because Defendant gave the federal government and this Court different stories of when, how, and why it fired Plaintiff. A jury could infer illegal discrimination and retaliation from that change alone. Plaintiff's Title VII, 1981, and state law claims all use the same burden shifting framework. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) & *N. Carolina Dep't of Correction v. Gibson*, 308 N.C. 131, 137 (1983). The Title VII and 1981 retaliation claims similarly share a burden shifting framework. *Guessous*, 828 F.3d at 216.

## A. Plaintiff Establishes Her Prima Facie Discrimination and Retaliation <u>Claims.</u>

### 1. Discrimination.

Plaintiff can establish a prima facie case by showing: (1) she is in a protected class; (2) Liberty fired her; (3) she met Liberty's legitimate expectations; and (4) circumstances around the termination raise a reasonable inference of discrimination. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021). Stacie is a black woman. Liberty fired her.

As to factor three, "a plaintiff need not 'show that [s]he was a perfect or model employee. Rather, a plaintiff must show only that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations.'" *Id.*

Defendant never considered issuing Stacie a written warning, other progressive discipline, or an improvement plan—even though decisionmakers issued them for others. Prior to September 15, Liberty did not raise any performance issues with Stacie. Stacie even pleaded for feedback, and got nothing.

Beike was similarly situated. *Laing v. Federal Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013); *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381–82 (4th Cir. 2022). Her issues mirrored Stacie's alleged issues, and Liberty did not consider firing her.

It was common for outside hires to confront challenges—Ughetta's own first year was hell. Vigue acknowledged this was even harder for black outsiders. Plaintiff meets this low threshold.

Plaintiff readily establishes the fourth factor. Defendant replaced Plaintiff with a white man. *E.E.O.C. v. W. Elec. Co.*, 713 F.2d 1011, 1014 (4th Cir. 1983) (finding this alone sufficient

to satisfy prong 4). Defendant also coached Plaintiff's white comparator (Beike) who, as Defendant alleges about Plaintiff, had communication and interpersonal challenges and strongly pushed back on how Liberty did things. Defendant did not coach Plaintiff and quickly fired her instead; something it never even considered for Beike. *Parker v. Children's Nat'l Med. Ctr., Inc.*, No. CV ELH-20-3523, 2021 WL 5840949, at *9 (D. Md. Dec. 9, 2021) (finding such comparator evidence alone sufficient to satisfy prong 4). Defendant also gave Lin (who is not black) a DEI-tailored onboarding plan and ample guidance, but did not do so for Plaintiff.

Moreover, Jonas repeatedly called Plaintiff "angry," including as part of her reasoning to pursue a "mutual exit." In *Curry v. Devereux Found.*, 541 F. Supp. 3d 555 (E.D. Pa. 2021) the court found this stereotype to be evidence of race discrimination. *Id.* at 561. The court explained:

> Angry and its synonyms are, standing alone, innocent words with no racial connotation. They are words, however, with a long history as part of a stereotypical depiction of black women that can trace its roots to the institution of slavery. Although the parties offer limited evidence on this point, there appears to be an academic consensus regarding both the resilience of this stereotype within American society and its continued detrimental impact upon black women. When a word or concept is so pervasively and enduringly linked to a derogatory stereotype, its use to reference individuals traditionally subject to the stereotype inherently raises the specter of motivation or bias.

*Id.* (citation omitted). Jonas's stereotyping is other evidence of discrimination.

Koppelman commented on Stacie's hair. Ughetta constantly raised blackness with Stacie, asked for her diverse opinion, tried to relate with her by talking about her black "crackhead" nephew, and treated Stacie differently than her white peers by telling her to turn on her camera and questioning her time off.

The statistics also present other evidence of discrimination. The data showed black executives, like Stacie, did not last at Liberty and had trouble advancing. Black and white

employees warned Stacie about racism, including from decisionmakers in her ultimate firing. Andujo offered Ughetta help, and noted specific challenges for people of color at Liberty.

Finally, Defendant gave an entirely different explanation to the EEOC than it is giving this Court. Such an egregious shift amounts to evidence of discrimination. *See Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013) (holding the jury was entitled to view this as discrimination evidence); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 237 (5th Cir. 2015) ("We have also found an employer's rationale 'suspect' where it had 'not remained the same' between the time of the EEOC's investigation and the ultimate litigation.")

Defendant does not get the same actor inference. In *Probst v. Innocor Foam Techs., LLC*, No. 3:19CV237, 2021 WL 343023 (N.D. Miss. Jan. 4, 2021), the Court held:

> Where, as here, a hiring decision was made by a group of people, a defendant would need to produce more evidence than the alleged discriminator's involvement in the hiring process before it could create an inference against age discrimination. . . . [Regardless,] the rationale behind the same-actor inference would be weaker. **A person working with others to make a hiring decision has incentives to hire a member of a group they dislike that a person making a hiring decision alone does not have**. For example, the person may want to appear to be a team player, or the person may not want his fellow decisionmakers to notice his discriminatory preferences.

*Id.* at 7 (emphasis added); *see also Haughton v. Orchid Automation Sys., Inc.*, No. 3-03-0768, 2005 WL 1798624, at *8 (M.D. Tenn. July 27, 2005) (finding against same-actor inference because an additional decisionmaker participated in the decision to terminate plaintiff than the group that hired him and the reporting relationship between these decisionmakers mattered).

Defendant narrows the decisions to only Ughetta, but that's not what happened. Others had input into the hiring and termination decisions.

The late-produced alleged texts dated September 15 between Jonas and Foley do not include Ughetta. Defendant did not tell the EEOC that Ughetta fired Stacie. In its interrogatory response, Defendant claims a collaborative effort with Ughetta, Jonas, and Fleming, culminating in a September 24 separation. The Court should not credit Defendant's new claim to Ughetta as the sole decisionmaker. The Court should not give Defendant the same-actor inference at this stage.

The decisive inference Defendant seeks also cannot be squared with the rule that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573–74 (6th Cir. 2003); *see also Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476, 483 (6th Cir. 2012). For this reason, the Sixth Circuit holds that "[a]lthough the factfinder is permitted to draw this inference, it is by no means a mandatory one, and it may be weakened by other evidence. . . where . . . the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." *Id.*

Plaintiff makes this showing. Ughetta was part of Stacie's hiring, but when Stacie began complaining about race discrimination and resisting Ughetta's race-based actions, Ughetta's view of her obviously changed and evidence of bias began accumulating. Plaintiff established a prima facie discrimination case.

### 2. Retaliation

On retaliation, Plaintiff "must first make a prima facie showing 'that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity." *Yashenko v. Harrah's NC Casino Co.*, LLC, 446 F.3d 541, 551 (4th Cir. 2006). Plaintiff's *prima facie* burden is not onerous. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

"[A]n employee is protected when she opposes not only employment actions actually unlawful under Title VII but also employment actions she reasonably believes to be unlawful. . . . The Title VII violation may be complete, or it may be in progress. In other words, an employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (internal citations omitted).

Plaintiffs are not required to use magic words. *Dea v. Washington Suburban Sanitary Comm'n*, 11 F.App'x 352, 357–58 (4th Cir. 2001). "[T]he threshold for oppositional conduct is not onerous." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015); *see*, *e.g.*, *Simpson v. Adam McCoy's Hauling and Grading, Inc.*, No. 3:23-CV-00322-KDB-SCR, 2024 WL 4957579, at *3 (W.D.N.C. Dec. 3, 2024). Federal courts have "articulated an expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015).

Temporal proximity alone suffices for cause. Plaintiffs establish cause "simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee *soon after* becoming aware of such activity." *Sempowich*, 19 F.4th at 654; *see also Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015) ("Foster's evidence of temporal proximity also *tends to show causation*").

Here, Plaintiff engaged in protected activity on behalf of herself and others, culminating in her September complaints to Fleming, Ughetta, and Jonas. Plaintiff called out the promotion and retention issues for black employees and a hostile work environment. Defendant itself told the EEOC it decided to fire Plaintiff only after she alleged discrimination in the September 16 meeting.

In *Curry*, the Court held the plaintiff's "rejection of the 'angry Black woman' stereotype sufficiently conveyed her opposition to a discriminatory practice." 541 F. Supp. 3d at 562. The court identified the "unique dilemma faced by Black women subjected to this trope. Defendant contends that Plaintiff's protest was legally insufficient, but had Plaintiff objected more virulently to the comments alleged, describing them as 'racist' or 'discriminatory,' she would run the risk of confirming the stereotype she wished to disavow." *Id.* at 562–63.

In *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 481 (7th Cir. 2004), the court held that employees engage in protected activity where they seek to collect information about a possible violation even before "they have put all the pieces of the puzzle together." (analyzing protected activity under the False Claims Act). Though analyzed under another statute, this is in line with the Court's reasoning in *Fontainebleau.* Defendant's heightened protected activity

standard "would deter harassment victims from speaking up by depriving them of their statutory entitlement to protection from retaliation. Such a lack of protection is no inconsequential matter, for fear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination." *Fontainebleau*, 786 F.3d at 283.

Here, Stacie asked for data on black employee turnover, advancement, and retention and Liberty got mad. Finding Stacie's conduct unprotected would deter other black women in her position from speaking up or investigating apparent discrimination. In the lead-up to her termination, Plaintiff regularly complained she was being treated differently because she was black. She tied the discrimination she was facing to systemic racism at Liberty. Management became upset and fired her. Plaintiff engaged in protected activity.

At this stage, the Court cannot accept Defendant's timeline. A reasonable jury can instead credit what Defendant told the EEOC—it fired Stacie after the September 16 meeting in which it agrees she complained about discrimination. The September 15 text messages do not include Ughetta and do not prove Defendant decided to fire Stacie. Less than 24 hours prior, Ughetta was still trying to fix Stacie's IT issues and had not decided to fire her. After the alleged September 15 messages: (1) Ughetta and Jonas wanted to see what the September 16 meeting brought before further addressing the tech issues, (2) Jonas coached Stacie on ways to improve her performance and believed Stacie could still have saved her job, (3) Ughetta and Jonas did not begin collecting documents for a termination file until after the September 16 meeting, and (4) Jonas didn't eliminate the performance management possibility until September 22.

Regardless, on September 9, Plaintiff told Fleming that Liberty treated her differently because she was black and gave examples. This was protected.

Even under Defendant's new timeline, Defendant first decided to fire Stacie hours after Stacie's September 14 message to Ughetta about discrimination in finance.

Under any of these timelines, a reasonable juror could find a causal connection.

**B. Pretext.**

Defendant's explanations are pretext for discrimination and retaliation. Stacie need only present evidence that a reasonable jury could disbelieve Defendant's termination explanation—additional evidence is not required. *See Wilson v. Phoenix Speciality Mfg. Co.*, 513 F.3d 378, 387 (4th Cir. 2008); *EEOC v. Sears Roebuck & Co.,* 243 F.3d 846, 852 (4th Cir. 2001); *Blair v. Young Phillips Corp.*, 235 F. Supp. 2d 465, 475–76 (M.D.N.C. 2002). A plaintiff can establish pretext by "show[ing] that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time." *Sempowich*, 19 F.4th 643 at 652.

Courts consider temporal proximity when deciding if there is a pretext jury question. *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1983)); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Under any timeline, temporal proximity here shows pretext.

Defendant's shifting explanations also evidence pretext. Defendant's explanation went from having *everything* to do with Stacie's September 16 comments to having nothing to do with them now. Shifting explanations establish pretext. *See Haynes v. Waste Connections*, *Inc.*, 922 F.3d 219, 226 (4th Cir. 2019); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002).

Similarly, Defendant tried to first point to Stacie's use of profanity as the reason for her "mutual exit." While papering the termination file, Fleming pleaded for "the email where she used the expletive." But Fleming, Ughetta, Stevenson, and others used the same curse words at

work without consequence and Ughetta was still trying to fix her IT issues after this issue. Beike's communication was so inappropriate Ughetta coached (but did not fire) her.

Defendant's clear papering of the file after-the-fact is also classic pretext evidence. *See Burton*, 798 F.3d at 237 ("Here, there is direct evidence that, after deciding to fire [plaintiff], [defendant] acted to create an exculpatory paper trail. . . . [defendant] solicited [plaintiff's] supervisors to provide documentation . . . to justify [the] predetermined decision to terminate [plaintiff].") A jury could view Ughetta, Fleming, and Jonas's after-the-fact hunt—one that began only after the "September Meeting"—as another reason to disbelieve Defendant's most recent explanation.

Defendant bucked its own disciplinary policies. "[P]retext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices." *Kouvchinov v. Parametric Tech. Corp.,* 537 F.3d 62, 68–69 (1st Cir. 2008); *see also Boyajian v. Starbucks Corp.*, 587 F. Supp. 2d 295, 306 (D. Me. 2008) ("Deviation from established policy or practice may constitute evidence of pretext").

Defendant could have offered progressive discipline, a written warning, or a performance improvement plan for Stacie, but did not. Early Liberty struggles are normal, including for Ughetta, whose first year was hell. Liberty used its policies for others, but not Stacie, and this evidences pretext.

Defendant's inaction in the face of Stacie's September 16 complaints also shows bias. *See Jarvis v. Chimes, Inc.*, No. CIV.A. RDB-06-1197, 2008 WL 623402, at *14 (D. Md. Mar. 4, 2008) (finding pretext for retaliation where defendant made no effort to investigate plaintiff's protected race discrimination complaint).

Finally, the Court must consider the prima facie discrimination evidence discussed above in Section II.A at this stage of analysis as well. *Reeves*, 530 U.S. at 143; *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 727 (4th Cir. 2019).

## **CONCLUSION**

The Court should deny Defendant's Motion.

This the 18th day of April, 2025.


*/s/ Sean F. Herrmann*
Sean F. Herrmann
North Carolina Bar No. 44453
Kevin P. Murphy
North Carolina Bar No. 41467
Herrmann & Murphy, PLLC
400 Clarice Ave, Suite 100
Charlotte, North Carolina 28204
Phone: 704-940-6399
Fax: 704-940-6407
Email: sean@herrmannmurphy.com
Email: kevin@herrmannmurphy.com

*Attorneys for Plaintiff*

**CERTIFICATE OF WORD COUNT**

I hereby certify that this brief complies with the requirements of LR 7.3(d)(1) and the word count is 6,218.

This the 18th day of April, 2025.

*/s/ Sean F. Herrmann*
Sean F. Herrmann
North Carolina Bar No. 44453
Kevin P. Murphy
North Carolina Bar No. 41467
Herrmann & Murphy, PLLC
400 Clarice Ave, Suite 100
Charlotte, North Carolina 28204
Phone: 704-940-6399
Fax: 704-940-6407
Email: kevin@herrmannmurphy.com
Email: sean@herrmannmurphy.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Court's CM/ECF system, which will send electronic notice to Defendant's counsel of record as follows:

Jill Stricklin
Nia Doaks
CONSTANGY, BROOKS,
SMITH & PROPHETE, LLP One
West Fourth Street, Suite 850
Winston-Salem, NC 27101
jstricklin@constangy.com
ndoaks@constangy.com

Laura Balson
CONSTANGY, BROOKS,
SMITH & PROPHETE, LLP
20 North Wacker, Suite 4120
Chicago, IL 60606
lbalson@constangy.com

*Attorneys for Defendant*

This the 18th day of April, 2025.

*/s/ Sean F. Herrmann*
Sean F. Herrmann
North Carolina Bar No. 44453
Kevin P. Murphy
North Carolina Bar No. 41467
Herrmann & Murphy, PLLC
400 Clarice Ave, Suite 100
Charlotte, North Carolina 28204
Phone: 704-940-6399
Fax: 704-940-6407
Email: kevin@herrmannmurphy.com
Email: sean@herrmannmurphy.com

*Attorneys for Plaintiff*