IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:23-CV-897-LCB-JCW

C O P Y

STACIE McLEAN, )
Plaintiff, )
vs. )
LIBERTY MUTUAL GROUP, INC., )
Defendant. )

V I D E O
D E P O S I T I O N

STACIE DENISE McLEAN

400 Clarice Avenue, Suite 100
Charlotte, North Carolina

Wednesday, July 31, 2024
9:40 o'clock a.m.

Atlantic Professional Reporters, Ltd.
Winston-Salem, NC 27116-1672

Q. But none since you've been to North Carolina?

A. Umm, no, not to my recollection.

Q. So while you were employed at Liberty Mutual you were not a member of a professional organization of any type relating to human resources?

A. Not that I can remember.

Q. Okay. At the top of your resume there's a professional summary on the first page, and it says business-minded HR executive with more than 20 years of experience.

Do you see that?

A. I do.

Q. Okay, and in this lawsuit you've also alleged that you've got more than 20 years of experience in working with global clients. Is that right?

A. That's right.

Q. Okay, and do you have more than 20 years of experience in human resources?

A. Yes.

Q. And do you have more than 28 years of experience in working with global clients?

A. Umm, I have around about that, yes.

Q. Okay, and the job that you were hired into

at Liberty Mutual involved supporting the global retail market.

Is that correct?

A. Yes, that sounds right.

Q. And at Liberty Mutual that's known at GRM? Is that right?

A. Yes.

Q. Okay. I may use the term, GRM, today. I wanted to be sure that we both were on the same page as to what that meant.

Would you agree that when you were hired at Liberty Mutual you would expect Liberty Mutual to favorably view your previous work with global clients?

A. Yes.

Q. And would you expect Liberty Mutual to perceive your previous work with global clients as a way in which you met job qualifications or were well-qualified for the position that you held?

A. Yes.

Q. Let's take a look at your professional experience, and I've given you your resume to use as -- as a guide here.

You show that you were an independent HR consultant from January 2020 until the time that you

look.

Q. Okay, and do you recall that when you first applied for Liberty it was the November 2020 timeframe?

A. That sounds about accurate. Probably, yeah.

Q. That sounds right?

A. Yes.

Q. And do you remember that the first recruiter that you dealt with at Liberty was named Shane Cox?

A. I do.

Q. Shane Cox.

A. I do, yeah.

Q. What do you remember about Shane?

A. I liked her. Yeah.

Q. Did you ever have any problems or issues with her?

A. Umm, no.

Q. And do you know whether -- do you know what Shane's race was?

A. She was black.

Q. She black?

A. Yeah.

Q. And when you applied for employment at

Liberty did you initially apply for a senior talent advisor position within the global retail services business division, if you remember?

A. I don't believe it was in GRM.

Q. Okay. What do you -- was it a senior talent advisor position?

A. It was the same exact job, just, umm, supporting a different leader.

Q. Do you remember who the leader was that it would support?

A. I want to say her name was Monica. I don't really remember.

It was either Monica or Loralie, one of them. I don't really -- I just remember the first names.

Q. Loralie Thostenson? Does that sound right?

A. That sounds about right.

Q. Do you recall whether it was a senior talent advisor that would support a tech role?

A. It was, yeah. Because Monica was the tech leader, and Loralie was the HR, umm, leader that I would report into. Yeah.

Q. Okay, and do you know whether you were considered for that position?

A. Yes.
Q. How did you learn that and what did you learn?
A. Umm, I don't remember exactly how I learned, but -- umm, I know I learned it somehow. I don't remember how.
Q. Did you reach a -- did you receive a communication from another recruiter at Liberty Mutual named Jennifer Dangora?
A. Yes.
Q. Do you recall Jennifer telling you that Shane had left Liberty and that Jennifer would like to see if you were interested in being considered for another STA role that had become available?
A. I think that's how -- yes.
Q. After Shane Cox left Liberty in, I guess early -- the first half of 2021, let's say -- did you ever have any ongoing commissions with Ms. Cox?
A. I believe we connected another time or two after that.
Q. When you say connected, what do you mean? Talked?
A. Talked on the phone.
Q. Okay, and what did -- what were the conversations with Shane about after -- after Shane

A. Correct.
Q. Okay. And then with Jen, is Jen a white woman?
A. To the best of my knowledge.
Q. Same with Kathy?
A. Correct.
Q. Okay. So Jen and Kathy both separately communicated to you that they were interested in having you join Liberty Mutual and they were going to see what they could work out.
Is that right?
A. Uh-huh.
Q. At some point did anyone tell you about the potential for you joining the company in a senior talent advisor position for global functions, for GRM, the role that you ultimately received?
A. Yes. Yeah.
Q. What do you recall about those communications?
A. I was just sent the, umm, job specified, the recruiter, Jen Vangora, and she added me to the requisition.
Q. Do you recall interviewing for this role?
A. Yes.
Q. And you interviewed with?

A. From the looks of him, he's a white male, but I'm not certain.
Q. Same question for Kate Stevenson.
A. White female.
Q. Kara Oliveto?
A. Umm, white female.
Q. Stevan Chase?
A. White male.
Q. And Kristen Goodrich?
A. White female.
Q. How about Cassandra McKiernan?
A. White female.
Q. Okay. After going through this interview process you were interested in the role. Right?
A. Yes.
Q. And this role would support two leaders. One over the actuarial business and one over the finance business, both of which were in global retail markets, or GRM.
Is that right?
A. Correct. And their leadership teams.
Q. And their leadership teams. Okay.
And the businesses and the leaders that this role supported, were those the same businesses and leaders that you understand Kristy Fairman also

of the word, talent, as being equivalent, or the same, as human resources, or is it different?

A. It's different.

Q. How do you view it different? How -- what's your thought ---

A. --- It depends on the context.

Q. Let me ask you a better question.

A. Yeah.

Q. Tell me, please, how -- what the difference is between talent and human resources.

A. I mean, talent is everybody in the company. It's all the people who work in the company.

Human resources could just be the function. It depends on the context that you're using it in.

Q. Okay. Well, in the function as senior talent advisor, was that a human resources role?

A. Yes. I worked in human resources.

Q. Okay. And do you -- do you know what Jen's job title was when she hired you?

A. Jen Ughetta's job title?

Q. Yes.

A. Off the top of my head, I do not.

Q. And Jen Ughetta reported to Melanie Foley?

Q. And your start date with Liberty Mutual is May 24th, 2021. Right?
A. That sounds accurate.
Q. Do you have concerns that taking the two vacations after you started might disrupt your onboarding process with Liberty Mutual?
A. Not at all.
Q. Okay. Why did you -- who -- who picked your start date?
Who picked May 24th, 2021, as your start date?
A. Umm, Jen and Kathy did. They did, not me.
Q. Did you propose that date?
A. I don't believe so, no, huh-uh.
They wanted me to start as soon as possible.
Q. When you started working remotely for the company, what company-issued equipment did you receive at that time?
A. I mean, a PC, a monitor or -- I think two monitors, if I remember correctly.
Q. Do you remember getting a printer?
A. Not right away, but that came.
Umm, of course, the phone came eventually, too. Some little speaker thing for meetings. And I

Q. --- That I'm reading correctly.
In that same section, where it's got the question marks on the left-hand side ---
A. --- Yes.
Q. --- It says make sure -- is that well experienced candidate?
Will you please just kind of read out loud to me ---
A. --- Sure.
Q. --- From the beginning what your notes say here, because I'm -- I get -- I'm not sure I'm following your notes all the way through and reading the handwriting correctly.
A. Where do you want me to start?
Q. Where the two question marks are, where it says no, not at all.
A. Umm, so it started with asking -- me asking a question, is there somehow a concern about my background, etcetera. And Kathy says no, not at all. It's not this at all.
Umm, they need to be tight with the process. I'm an outsider. I'm a diverse candidate. Make sure everything is legit. Umm, I'm going to experience some hate, candidate hate.
That's basically it in a nutshell.

A. I don't recall.

Q. You don't remember whether you had access to that Team page?

A. I didn't have access to so many things, so I don't recall.

Q. Okay. Well, let's talk about that.

A. Uh-huh.

Q. When you say you don't have access to so many things, what are you referring to?

A. There were a lot of HR systems that I did not have access to for a long time. Like end of July, August, still not having access to them.

Q. And was one of those HR systems Power BI?

A. Umm, I don't think Power BI was one of those, no.

Q. So you had access to Power BI?

A. I don't remember. There was a good three or four systems that I didn't have access to. And that I kept getting errors every time I tried to log in, so....

Q. Okay.

A. I can't remember off the top of my head what they were, but they were, you know, important to my job and my role.

Q. Please take a look at Exhibit Number 22.

(* Exhibit 22 was marked *)

A. Okay.

(Witness examined document)

Q. And I'd like to ask you first about the email at the bottom of this chain.

On the second page of Exhibit 22, which is numbered 12662.

A. Uh-huh.

Q. Does that look like it's an email from you to Jennifer Soucek ---

A. --- Uh-huh.

Q. --- Your onboarding specialist, on July 22nd, 2021?

A. Uh-huh.

Q. And in this email you're saying all -- I hope all is well.

It would be helpful for me to have some sort of quick walk-through of the important pieces of my software systems that I'll have to use daily.

A. Uh-huh.

Q. People at Liberty Power BI Jira, J-i-r-a, etcetera.

A. Uh-huh.

Q. I've certainly been able to navigate my way through each to a degree, and I'm technologically

savvy enough to do so, but there's definitely a lag. Some are intuitive and some aren't. Is this something in onboarding that will be coming.

And that's -- that's part of the message. Right?

A. Is that a question?

Q. Yes.

A. Yes.

Q. So the people at Liberty System, is that a system that contains confidential and sensitive information regarding employees at Liberty Mutual and the businesses that you support?

A. Umm, I believe so, yes.

Q. And is the same true of Power BI?

A. No. Power BI -- well, it does have confidential information. It's an analytics tool.

Q. And so it's got some confidential information ---

A. --- Sure.

Q. --- And some that's not confidential?

Is that fair?

A. Sure. That's fair.

Q. And then, Jira, J-i-r-a, is that the system through which you would make requests for support from the talent delivery team?

A. I don't remember, but I believe so.
Q. Okay. And do you see Jennifer's -- or excuse me -- Kathy Jonas' response, which begins on the first page of the exhibit at 12661?
A. Oh.
Q. And Kathy is saying, Stacie, it is absolutely our intent to get you some demos and briefing on the systems you are using. Jen and I talked about it last week and she'll be making sure these connection points are set up.
A. Uh-huh.
Q. Jen, please work with someone in TDT about the messages Stacie is getting when I send her things.
Stacie, I am always here if you want to walk through anything, because we do not expect you to self-teach regarding systems and technology. I apologize that it might be feeling like that to you.
A. Uh-huh.
Q. Do you see that?
A. I see it.
Q. Okay, and she copies on the email Jennifer Soucek.
So is that the Jen that she's referring to there?

A. You'd have to ask her. I don't know who she's referring to.

Q. Okay. Well, if she's directing Jen, please work with somebody in TDT.

A. Okay.

Q. And Jen -- Jennifer Soucek is copied on the email. Wouldn't it appear that way?

A. I guess it's her, then. Yeah, it appears that way.

Q. Okay, and Jennifer Soucek responds that same day, that same morning.

A. Uh-huh.

Q. And says, Stacie, yes, we'll make sure you get the support you need for the systems. I am working on that, as Kathy mentioned.

I know that Danielle Pita from talent analytics said she was going to get something set up to demo Power BI with you back when you first started. I thought you had mentioned you had it on your calendar, but it sounds like that's not taken place. I'll follow up with her.

I'll also find out about the messages you're getting from TDT that you're unable to access.

Then she asks are you able to access the HR center now.

A. I was told that I should have the exact same access that my predecessor had and that all should have been set and handled before I started.

Q. Okay, who told you that?

A. I think Kathy and Soucek told me that.

Q. Was it your understanding that the company expected you to go through the onboarding process and the meetings that were set up for you during the onboarding program?

A. And I did.

Q. You did?

A. I did.

Q. Did you complete the onboarding process at the time you started?

A. You can't complete all onboarding in one day. It's over the course of time.

As you just showed me that -- the first part of onboarding was for two weeks.

Q. Okay.

A. And I completed all of those.

Q. Do you recall talking with Kathy Jonas about, you know, needing to jump right into the business demands and not having time for the onboarding earlier in ---

A. --- I remember talking with Kathy Jonas

about needing the business leaders who kept reaching out to me and putting time on my calendar, and that I made it a priority to meet with them, because in fact, they were part of my onboarding and these are the people that I would be supporting.

So yes, I did have that conversation, but not the way you just presented it.

Q. Okay, what do you remember about the conversation?

A. I just stated it.

Q. Do you remember anything else about it?

A. Not much, other than my frustration.

Q. Do you recall when that conversation with Kathy Jonas took place?

A. I don't. I've had dozens of conversations with Kathy Jonas. I don't remember a specific date or time.

Q. In your complaint you've alleged that on June 21st, 2021, you met with Kathy Jonas to discuss your IT issues and concerns about being pulled in so many directions and lack of support from executive -- your executive assistant.

A. Uh-huh.

Q. And that Ms. Jonas stated that you needed to take control of your time and not get sucked in,

and offered no real help.

That's one of your complaint allegations. Do you recall that?

A. Yes.

Q. Do you recall Kathy Jonas advising you not to take the business partners' requests before you finish your onboarding or else you get sucked into the role without an understanding of the Liberty Mutual processes and systems?

A. I don't remember her telling me that.

Q. Is it possible that Kathy Jonas told you that and you just don't recall?

A. Anything is possible.

Q. Please take a look at Exhibit Number 23.

(* Exhibit 23 was marked *)

Q. This is an email from Jennifer Soucek to you on May 24th, 2021, which is your first day at work.

A. Yeah.

Q. Saying it was great meeting you today. I'm glad to hear it was good first day, and here are the links that we discussed.

Jennifer is forwarding you the onboarding portal with new hire tags, the onboarding Teams page and the onboarding guide.

hope she can get Stacie -- help Stacie get everything resolved.

Do you recall whether Jennifer Soucek communicated with Priscilla Brown about her providing you with extra IT support beyond what's available through the help desk?

A. I think she might have. I really don't remember. I'm sure she did.

Q. Do you know anyone else at Liberty Mutual who came on board as a senior talent advisor externally?

A. I mean, I don't really know anybody there. So no, I don't know.

Q. Okay, do you know what the onboarding experiences of any other employees at Liberty Mutual look like?

A. Well, I believe -- I think her name is Alice Lin, the one who got the job that I interviewed for first, with Loralie, who supported technology. She was a diverse hire. And they had a whole different set of DEI.

That was Tim Vigue, I believe his last name was, made a suggestion that they do a whole different onboarding for her to make sure she knew the unspoken norms, to make sure they introduced her

to, you know, certain people.

Like just stuff that's a little bit different than if it's a white hire. Like a diverse hire, they would do extra stuff for Alice.

And I think Tim actually recommended that they do that same type of diverse stuff for me. But it doesn't appear that -- none of that stuff was done.

Q. What do you believe was done to Alice Lin that wasn't done for you specifically?

A. I don't know specifically what was done for her. But in our discovery I read one of the emails where Tim Vigue said let's incorporate some of the things that we did for Alice for Stacie as well.

Q. And do you know whether those things were incorporated into your onboarding plan?

A. Well, there was no unspoken -- unspoken norms or anything that was shared with me. I know that for a fact. And that was one thing that was listed in this email.

Q. Okay, what do you mean by unspoken norms?

A. How do you succeed in this environment as a diverse hire, as a black woman, as an Asian woman.

Q. Did Tim Vigue have one-on-one meetings during your onboarding process with you?

Kathy Jonas to do literally.

Q. Do you have any basis for knowing what other hiring managers did with regard to the onboarding programs of other hires?

A. At Liberty?

Q. Yes.

A. No.

Q. Did anybody at Liberty ever tell you to complete the onboarding program at your leisure?

A. Umm, Jen did. And the only thing she said that I needed to make sure was done was my compliance related stuff, which I was really ongoing, to make sure to get that stuff done.

Q. When did she tell you to do the onboarding at your leisure?

A. When she got a notice that said Stacie's compliance stuff isn't done.

I don't remember the specific date, but yeah. I don't remember the specific date, but ---

Q. --- Did she tell you that in writing or on the phone?

A. I don't remember what it was. I know she told me that.

Q. Did you know how important it was to complete the onboarding program at Liberty Mutual in

advisor role at Liberty Mutual?

A. And black, yes.

Q. Okay. Well, just -- let's just think about you as an external hire.

That alone was unusual. Right?

A. That alone, yeah.

Q. Okay. Please take a look at what we'll mark -- I believe we're on 27.

Thank you. I appreciate the prompts.

(* Exhibit 27 was marked *)

Q. (Ms. Stricklin) Does this appear to be an email exchange between you and Jen Ughetta on July 26, 2021?

A. Uh-huh.

Q. And in your email, at the bottom you emailed Jen on July 25th, 2021, and sent her a message about what it was going to take for you to reset.

Do you see that?

A. I do see that.

Q. Okay, and basically, what you're saying to Jen is I would like to step back from the business and onboard in a way that I feel will be meaningful for me and, therefore, the business.

I'm having a difficult time acclimating to

the level of production and the volume of marathon meetings. I feel like I can't gain any traction, as most people seem to have forgotten that I'm new and talk in nonstop acronyms and first-name-only, like Madonna, etcetera.

The culture is definitely a lot different than what I'm used to. I want to be successful at Liberty. I need time to gain a solid foundation and feel like I'm in -- I feel like I'm in Groundhog Day.

Please let me know your thoughts.

Do you see that?

A. I do.

Q. Okay. So basically you were expressing to her that you wanted to step away from the business, meaning step away from your role in supporting and advising the business while you completed your onboarding?

A. This, I mean, I think is taken out of context.

This was not the first time Jen and I had talked about this. Jen, in fact, was the person who suggested this to me. I just put it in an email to outline what we had talked about, and agreed with her that I should take some time to focus on onboarding.

Not necessarily not have anything to do

with my leaders, but instead, have a focus on onboarding and not be at all these huddles and muddles and chats and fireside whatevers.

Q. Okay. When you talk about huddles and muddles and chats ---

A. --- Yeah.

Q. --- Those were business meetings ---

A. --- If you want to ---

Q. --- Organized at Liberty Mutual?

A. Yeah.

Q. In terms of the Liberty Mutual culture, would it be fair to say that Liberty Mutual tends to be a meeting-heavy organization?

A. I think that's an understatement.

Q. Okay. How did it compare in terms of the level -- or the number of meetings or the amount of time spent in meetings with other jobs you'd had?

A. It didn't compare at all. It was outrageous. Like when do these people get any work done. They just all day sit in meetings, and with the same people over and over. Like nothing changed between the last meeting and today.

Why do we meet again with the same people, and just call it a different name of the meeting.

Constantly, 10-hour days, 10-hour

meetings. It just was ridiculous. Like work needs to get done.

And I shared that with Jen. Jen agreed. Melanie agreed. Kathy agreed. Everybody agreed, but no one was prepared to do anything about it.

Q. Well, they did tell you you could push back and prioritize. Right?

A. That's exactly what they told me to do.

Q. Okay.

A. And I did.

Q. And I believe you mentioned that Jen also at some point indicated that she would allow you to step back from meetings?

A. It was her idea. This was Jen's idea.

This was me just following up to clarify that, yes, this is what I'm going to do, and I cosigned with it. I agreed to it.

Q. Okay. And when did Jen propose this idea of you stepping away from the business to complete the onboarding?

A. It would have been somewhere around July 26th, somewhere in that range.

Q. Was it on a Teams call that she suggested this or in writing?

A. No, this was a conversation that Jen and I

had.

Q. Was it at one of your one-on-one meetings?

A. I don't remember. I might have reached out to her, like an IM, say, hey, can we connect. I don't remember.

Q. Okay. And did you share with Jen all the concerns that you just stated on the record about how does anybody get any work done with all these meetings?

A. I did. Jen agreed and said she's not too far removed from that, being fairly new and outsider herself. She agreed with everything that I said.

Q. Did Jen share with you that she had had some difficulties acclimating to the Liberty Mutual culture herself when she joined?

A. She did. She did.

Q. What did Jen tell you about that?

A. Using her words?

Q. Yes.

A. Okay. She said something the effect that these fucking people -- those were her words -- umm, she had to prove herself, umm, and she cried for the first -- I don't know, I forget -- months that she was there.

And she finally came to a place where she

all these tactical -- hey, could you tell me what my employee -- what their -- like that's not the work that I should have been doing as a strategic consultant.

Like can you go look up in compensation what this -- like that's not the work that I do. That's not a strategic consultant. That is an order-taker. That's a tactician. That's the HR specialist that I was almost 20 years ago. That's not the job that I signed up for.

Q. And these were orders, as you describe it, that were coming from the business that ---

A. --- Not even leadership. The people underneath them. So all of their staff, now they have a new person onboard. This is the stuff that Kristy, my predecessor used to do that Jen told me absolutely not to do. To not -- her words -- white glove these leaders, who needed babysitters, who were lifers, who had been at Liberty their entire life and don't know how to operate strategically.

You are an EVP and you're down in the weeds tactically. That's not your role. And this is Jen talking, verbatim. So, Stacie, go back to the business.

And Jen's boss, Melanie, whatever

outrageous things they ask you to do, push back, be bold.

Q. That's what Jen Ughetta said to you?

A. This is what her manager said to me, and Jen echoed.

Q. What Melanie Foley said?

A. That's right.

Q. Okay, we'll get to that in a moment.

A. No problem.

Q. Had you -- did you have the understanding that Kristy Fairman, your predecessor in the role, had done a lot of hand-holding of the businesses, and the leaders within the businesses she supported?

A. That's what Jen Ughetta and Kathy told me.

Q. Okay, and so it was your understanding that that hand-holding was really what you just said, getting in the weeds, doing the tactical work that the businesses asked her to do?

A. More than that. It's like everything is urgent. Drop what you're doing, I have a request. Do it now. That's what I mean by order-taking.

Umm, you can't have priority over your calendar if every time you start to do something, you get one of these hundreds of leaders sending you emails to -- can you -- like that's just not --

that's not the operating model for a hub-and-spoke model, which is what Liberty has. That's -- which is a traditional HR model.

Umm, but -- I mean, Melanie doesn't have an HR background, so I don't expect any less. It was her model that she put in place, which Jen told me to shut up about, because she didn't want to make her manager mad, because she agreed that it was a dumb model.

Q. Okay, and this was the model that applied to all the STAs. Right?

A. That's right. It's the HR operating model.

Q. And it was an HR operating model that you understood Melanie Foley devised?

A. Yes. That's what Jen and Kathy told me. And to be careful about mentioned it, because she is the CHRO and it was her model.

Q. In your complaint you've alleged that Jen Ughetta told you to be careful about communicating your concerns.

Is that what you mean there?

A. That's just one instance of it.

Umm, she mentioned around -- she basically said to me words matter and be careful of the

language that you use.

It was around DEI stuff. Me pushing back and saying you guys have been in the learning mode for, you know, 10, 15 years around DEI. You have the data. Why don't you act on it. Like what else do you need to dig for. You can see visually, you have all of your black people exiting. What more do you need.

She didn't like me pushing back and saying that, but it's common sense stuff.

Q. What do you mean she didn't like you pushing back and saying things?

A. Well, she said, you know, Stacie, you've got to be careful of what you're saying to people. You've got to use your words. I'm like I'm just talking plain language like they should be.

Q. This is Jen Ughetta?

A. Jen Ughetta, Kathy, the whole lot of them. Like everybody would just sit in these meetings, looking, oh, what is this three percent for me, like it -- just constantly looking and re-looking at the data. I'm like, guys, here's the headline.

Kathy sent me an email that said, you know what, I agree with you. Well, we're just like churning the data.

That's what I mean by gaslighting. You agree with me, but then you make it out to seem like I'm saying something that's wrong and trying for me to like think about, like am I -- is there something wrong with me, is this my -- like that's what gaslighting is. Like, Stacie, you're wrong.

You know, I have a wealth of experience in DEI, believe it or not, and I'm -- well, never mind that

So that's just part of it.

Q. Okay. Do you recall Jen and Kathy communicating to you that your feedback was welcome, but you needed to share it appropriately with others?

A. Yes. The angry black woman syndrome.

Like Kathy called me angry I don't know how many times. And Kathy, she doesn't -- you know, she doesn't see color, but she just would make these comments to me that were very insulting and very biased.

I am not an angry black woman. I'm pretty smart and I know what I'm talking about. And that's why you hired me. So I can add value and bring a different perspective to the table.

But you want me at the table for this, but you don't want me to share. You just want me to sit

there. That's not me. And I shared that.

Q. In communicating with you about being angry, did Kathy use the word angry black woman?

A. Angry, yeah.

Q. Did she say black?

A. No, she didn't say angry black woman.

Q. Okay.

A. She said angry. And I said I'm frustrated. There's difference.

Q. Okay. I need to -- I want to be sure that it's clear on the record what was said.

A. Yeah. She said angry, she didn't say black woman. I am a black woman, so....

Q. Okay, I'd like to show you Exhibit Number 28, please.

A. Okay.

(* Exhibit 28 was marked *)

Q. Please take a look.

A. Thank you.

Q. This is a series of Teams messages that -- that process page by page. Okay?

A. Okay.

Q. So the first page of this exhibit is 2727. And these are Teams messages between -- this first one, at least, is a Teams message between you and Jen

That was the ask of my boss to me.

Q. Uh-huh.

A. And I shared -- Melanie asked to hear some of them and I shared some of them with her. I don't know what specifics.

I definitely know the huddle, muddles, chats, fireside, all that stuff, I definitely shared. Umm, all the production that goes into meetings that are not valuable. Stuff like that.

Umm, I mean, at a high level, that's -- that's what I remember the conversation being like.

And I remember her telling me, yeah, you know, Stacie, all these things are true. I can't like knock you. Everything you said here is true.

But Liberty like moves slow. And to turn the ship will take a lot longer -- she said both of us would be dead before the ship was turned.

And that, you know, I can go back to the business, be courageous, be bold, push back, umm, and likely either -- or I could, you know, quit and go on about my business, or I would get termed eventually by, you know, the company.

And she had nothing -- she said I have nothing encouraging to tell you, because everything you said is correct.

A. I don't know that. I'm not aware.

Q. And at the time leading up to Labor Day that you stepped away from the business a second time to focus on the onboarding, do you recall that the company was in the middle of a leadership reorganization ---

A. --- Yes.

Q. --- In the financial group?

A. I don't know that I was made aware of that prior to Jen making the suggestion of me stepping away during that holiday period. I don't know for certain.

But I -- I do know of the leadership changes, org changes. I just don't know when I was made aware of them.

Q. Okay, and while you stepped away from the business, do you recall that Kristy Fairman stepped in and worked with Stevan Chase to support the businesses during that reorganization?

A. It's possible. But I supported the changes as well.

Q. Did you do work during this late August 2021 time period relating to the reorganization?

A. I did work every day there, yes.

Q. Even during the time that you stepped away

from the business?

A. That's -- was part of the challenge. It was hard to step away. I couldn't, because all the org changes were happening and they needed help and support doing that.

Not necessarily the -- I'll leave it there.

Q. Okay. After meeting with Jen Ughetta in August 2021 about the support that you needed, you've alleged in your complaint that Jen Ughetta began canceling meetings with you and stopped speaking with you directly.

A. Yes.

Q. What meetings do you specifically recall were canceled?

A. She had one-on-ones scheduled with me that were canceled.

Umm, if I -- schedule got on her calendar with her EA, they would be canceled, they would go away. And she stopped responding to any of my -- like a bunch of people stopped responding to me.

Q. Did you ask Jen why she canceled the meetings?

A. I don't remember if I did or not.

I don't believe Jen talked to me again

with it.

Q. Did you do the work an Liberty systems?

A. I didn't have access to most of the systems still, even in August.

Q. Even in August?

A. Yeah.

Q. Okay, so I guess the answer is no?

A. You can infer that.

Q. Okay, would it be reasonable to infer that?

A. I think it's reasonable.

Q. Okay, please take a look at Exhibit Number 31.

A. Uh-huh.

(* Exhibit 31 was marked *)

MS. STRICKLIN: And let's go off the record for a second and let you look it over.

THE WITNESS: Okay.

MR. HERRMANN: I'm going to object to going off the record while she looks over an exhibit.

We'll go after that.

Q. (Ms. Stricklin) Well, I'll ask you some specific questions about the document.

A. Okay.

Q. Does this look like a document that

meeting with you?

A. Umm, I don't remember. It could have been their EA. I just don't remember who scheduled it, but I know it was going to be the two of them.

Q. Okay, and do you recall going into that meeting expecting that you're going to leave Liberty Mutual?

A. Not at all, no.

Q. Had you sent emails or sent messages to any other colleagues at Liberty Mutual indicating that you might not be at Liberty Mutual for long because Jen and Kathy had scheduled this meeting with you?

A. I don't remember. That could have happened.

Q. Do you remember coming in to that meeting pretty hot in terms of your demeanor?

A. No, I don't. I came into the meeting very frustrated.

Q. Okay, did you express that frustration?

A. I had been expressing it all along, yes.

Q. Were you initially defensive during the meeting because you thought that you were going to get reprimanded for using profanity in your text messages?

A. I don't specifically remember that, but okay.

Q. What do you recall being said during that meeting with Jen and Kathy in September of 2021?

A. I recall a meeting where I met with Jen and Kathy where Jen said not one word. It was all Kathy talking.

And Kathy told me that I was not aligned with the way the work gets done here. That I was disruptive.

Umm, kind of like inferred like angry. And like you said, came in hot. Umm, and I need to think about an exit strategy.

That's all I really remember from that conversation.

Q. You said inferred angry.

Did Kathy actually say that you were angry?

A. You just inferred that. You said I came in hot.

Q. Well, I asked you if you came in hot.

A. I told you I came in frustrated.

Q. Right.

A. And Kathy inferred that I was angry somehow. I don't remember her specific language that

she used.

But I didn't really say much in that meeting. I just listened.

Q. Okay. Do you recall Kathy telling you that -- in the meeting that you were -- that you consistently have said that you're not aligned with the way work got done at Liberty Mutual?

A. Yeah, I did share that.

Q. And do you recall Kathy telling you that yesterday you had said in Instant Messaging that you were not likely the right person for the job at Liberty and the way things got done there?

A. Sure. That was my frustration speaking. Absolutely.

Q. Okay, and did Kathy reference your Instant Message where you indicated to Jen Ughetta that you didn't have the temperament for the job?

A. I just remember her focused on the word, shit, and I was like aghast. Like -- yeah, she said I was like inappropriate or something. And I was like of all people to say that to me, the way both her and Jen talk. But I just let it go.

I just -- my boss was quiet, so I was quiet. I just let Kathy talk.

Q. Okay, was this a video conference, a Teams

conference?

A. No. It was -- oh, it might have been. It was a dial-in, so yes.

Q. Okay.

A. Yeah. We were on the phone. There was no video.

Q. Do you recall Kathy Jonas saying to you that you don't like the way things get done here and that's not changing overnight?

A. I don't remember her saying that, but she could have.

Q. Do you remember Kathy saying that she needed to understand where you were at and how you were seeing it, because it didn't seem like this is working?

A. She might have said that. I don't really remember her exact words.

I think I was shocked from the start, where she opened with you need to be thinking about a exit plan.

Q. Is that how Kathy opened up the meeting?

A. Not right in the beginning, but it was in the beginning. It was pretty early.

Q. Okay, what -- what did Kathy say during the meeting about an exit plan?

on day one, or since day one, you had constant technology issues and that made you not feel confident and stable enough to do the work?

A. Yeah.

Q. Do you remember telling them in that September 14th meeting that you had camera issues, tech issues and that you looked stupid when the calls dropped?

A. Yeah.

Q. Do you remember telling Kathy and Jen during the September 14th meeting that you sometimes felt blown off by tech support?

A. I don't remember saying that, but I definitely was blown off by tech support here and there.

Q. Okay, and when Kathy mentioned an exit plan, how did you respond to it?

A. I just listened. I didn't say much of anything. I don't remember saying anything. I just listened to what she was saying.

Q. Do you remember saying, you know, exit plan, that's fine.

You gave up quickly, with only 90 days in?

A. Oh, I did say that. Like, yeah. Like, yeah, I did say that. Something to that effect.

A. It was pretty quick.
Q. Okay. What happened next with regard to your employment at Liberty Mutual?
A. I mean, not too long after that I was terminated.
Q. Tell me what happened when you were notified of your termination.
A. I had a meet -- Kathy and -- what's her name?
Q. Latichia Fleming.
A. Thank you.
Set up a meeting. We went back and back on the time, then we met.
Kathy told me that she -- they decided, umm, that I was going to be termination based on my -- I had complaints from my leaders that I supported. I was inappropriate. Umm, I wasn't in alignment with the way work was done there. They didn't see like a path forward, and they were effectively terming -- terminating my position.
Q. Do you remember anything else that was said by either Kathy or Latichia during that meeting?
A. I think Latichia said some stuff about like following up with me to like benefits information or like a separate agreement. Something.

concerns about the way I was being treated by Ms. Ughetta and others, which I believed was related to my race.

For example, in meetings, Ms. Ughetta and Ms. Jonas would mention how articulate and intelligent I was.

Comments like this from those women, who are white, show racial bias.

Do you see that?

A. I do.

Q. What type of concerns did you raise about the way you were being treated by Ms. Ughetta and others?

A. I shared with Jen and Kathy that I felt I was being held to a different standard than others in the organization. I felt like they were constantly talking about my black lens that they wanted me to share.

Kathy mentioning on occasion that she did not see, umm, color to me was absolutely ridiculous, when I was the only black person on the team. Kathy mentioning on occasion that I was angry when it was just frustration. That leads to like stereotypes about black women.

Parker asking me about my hair, and like

what type of hair was that and, you know, fetishizing me, kind of. I'm certain she wouldn't ask anybody else that type of question. I mean, like lots of things like that.

Microagressions that I felt like I experienced over time. And just not having the support that I needed that other people got.

Like Alice Lin. She's -- I don't know if she's still there, but from what I understand like they did wrap their arms around her to help her be successful, even though she did have challenges in the beginning. Not, perhaps, the exact same challenges, but she had challenges nevertheless.

I didn't get the support that I needed, and it just seems like what other reason could there be. And then with the anecdotal comments about not seeing color, umm, fetishizing my hair, umm, talking to me about me being angry instead of me just being frustrated. Things of that nature.

I had mentioned both of these things to Jen and Kathy. And Jen -- I mean, Jen just listened more than anything. She never really said anything, other than, you know, I'm here to help support you. And she kept putting that in writing every day.

Kathy said she didn't understand what it

was like to be a black person at Liberty, but she felt sorry for me.
Q. Okay, lets -- I want to understand just very, very clearly what you said when you raised these concerns about your treatment.
First of all, when did you raise a concern about your treatment to either Jen or Kathy or anyone else?
A. I don't know specific dates for Jen and Kathy, or really anybody else.
But really, I -- this probably started back in July at some point, having these conversations with -- I mean, I put it in writing as well -- I'm sure you've seen that in discovery -- to Kathy and Jen.
My conversations with black execs at Liberty like Tiffany Dotson and Charlotte Streat and ---
Q. --- Well, hold on. I need to know about -- what I want to know about -- and I don't mean to interrupt you ---
A. --- Okay.
Q. --- But I need you to respond to my question.
A. I was trying to.

Q. I want to know what you said specifically when you raised concerns to Kathy and Jen about the way you were treated at Liberty Mutual.

A. I -- I said that. I said I was being held to a different standard and I thought it was because I was black.

Q. Did you tell them that you thought it was because you were black?

A. I absolutely did. Because Kathy mentioned that in the beginning, that, hey, you're going to get some hate because you're black. You're diverse. So yes.

Q. Okay. And you don't remember the date on which you raised this to Kathy or Jen?

A. I know I -- they weren't together. I know I had conversations separately with them.

Q. Okay, and did you give examples to them of how you felt you were being treated differently?

A. I believe I gave it to Kathy, because Kathy asked. Jen didn't. Jen just listened most of the time.

Q. And what did you tell Kathy when you gave her examples?

A. I -- I shared some of the same examples that I just gave you.

And Kathy said she did not understand really any of what I was sharing, but she felt sorry for me -- was really her response.

Q. And do you remember anything else about these -- it sounds like you had two separate conversations.

One with Jen and one with ---

A. --- It wasn't just two. It was multiple conversations.

There was -- over the course of -- remember, she started blowing me off, so there wasn't like a ton of conversations, but -- because she was blowing me off. That's why I put it in writing.

So, hey, I'm following up with you and -- you know, about these things that I talked to you about. The lack of support, umm....

Q. The concerns that you raised to Jen and Kathy, were they surrounding the lack of support and your concerns about the Liberty Mutual operating model or systems?

A. That was one piece of it. That was one piece.

Q. What I want to know is any point in time in which you raised concerns about bias because of your race or because you're a black woman.

That's what I want to focus on and make sure I understand what -- what was said and when.

A. I just answered. I mean, I feel like I asked -- you asked and I answered that three times just now.

I shared with them that I felt they were biased against me because I was black. I said that in several meetings with both Kathy and Jen. Jen never really said anything.

Kathy would say she didn't understand it, she didn't see color and she felt sorry for me.

Q. Okay. And you indicated, I think, these were separate conversations.

Did you ever have a meeting with both Kathy and Jen, when you said this, together?

A. I don't recall.

Jen really relegated Kathy to do all her dirty work. She kind of like just disappeared.

Q. Okay, and it sounds like you don't have any sense of the dates on which any of these concerns were made.

A. It's in July. I mean, my head was spinning having all these conversations, umm, with Kathy, then Latichia and whoever else. Like yeah, in July and August.

Q. Can you point to anywhere in the documents, either the ones you produced or Liberty Mutual, where you raised a complaint in writing about racial bias or racial discrimination, or bias or discrimination against you as a black woman?

A. I mean, I don't have them, but they are in discovery. I know I shared that at some point through this process, yeah.

Q. But you can't recall any specific ones right now?

A. I can. I wrote Jen a whole long letter about it. I actually wrote not just Jen, but I wrote Parker and Julie letters. It was our contracting conversation when I shared with them.

Like, for instance, Parker asking me about my hair at one time. I told her how I felt that that was insulting during our contracting conversation.

Q. When did this contracting conversation occur?

A. I don't know the specific date. You'd have to look in the discovery when -- what the email says I said.

Q. And you talked about an email that you sent.

A. Not only that. Jen reached out to Tiffany

Dotson and Charlotte Streat to have conversations with me, to like dig to find out where my head was at. And I shared all of this with them during those conversations. And they were separate ---

Q. --- Okay.

A. --- With Tiffany Dotson and Charlotte Streat.

And those are the conversations where Tiffany and Charlotte separately both told me that Jen and Kathy were setting me up for failure.

Q. Please take a look at what we'll mark Exhibit Number 33, I believe.

A. Okay.

(* Exhibit 33 was marked *)

Q. Is this a copy of the letter that you're talking about where you say you shared concerns about racial bias with Jen Ughetta?

A. This looks familiar.

Q. There's no subject line here, and it shows it's from Stacie McLean.

Did you ever send this email or letter to Jen?

A. I had a conversation with Jen around this.

Q. Okay, but you did not send this to her?

A. I don't remember if I sent it to her or

Q. Okay.

A. I just know we had -- it -- it was on the phone.

Q. Do you remember if she just listened or if she responded?

A. She does a lot of that. I don't remember her saying much of anything.

Q. Okay.

A. Other than, you know, I'm here to support you.

Q. You mentioned the term, microaggressions.

What does microaggressions mean to you? What is your definition around microaggressions?

A. It's low-key insults to people of color. Like you -- oh, look at your hair. What is that. Are they braids or locks. Like these little insults. Or, oh, Stacie, you're so intelligent and you speak so -- yeah, those are microaggressions.

Q. Okay.

A. Like I couldn't be just an intelligent person. It's shocking to have a black person speak intelligently.

Q. Okay, on how many occasions did Kathy or Jen talk about you being intelligent and articulate?

A. There wasn't a ton of them, and it was

actually early on where everything was nice. So they thought that maybe I wouldn't think anything of it.

Q. So early on in your employment at Liberty Mutual, Jen Ughetta and Kathy Jonas commented that you were articulate and intelligent?

A. Correct.

Q. And there was no mention of your race or your status as a black woman during those comments. Right?

A. No.

Q. Do you recall when that occurred?

A. I just said early on.

Q. Early on.

Do you recall whether those comments were made in a single meeting or a discussion?

In other words, was there one incident in which those comments were made?

A. Umm, yeah, I'm -- I don't remember.

Q. Okay, do you remember if Kathy and Jen were together when these comments were made about you being articulate or intelligent?

A. Umm, I don't believe they were together, but I can't be a hundred percent certain.

I didn't have a lot of meetings with Kathy and Jen together until the end.

performance during the interview process or application process at Liberty Mutual?

A. For the positions that I applied for?

Q. For any position.

A. I don't know anybody there. No.

Q. Okay. You allege in your complaint that Jen Ughetta embarrassed you in front of your peers and senior leadership by discussing how difficult it was for you to join a financial services company as a black woman.

A. Yeah. That was -- yeah.

Q. And when did that occur?

A. That was during some type of -- I don't know if it was a huddle, muddle, chat or whatever. It was one of those meetings.

And after that meeting -- well, first of all, I was embarrassed. And then Ashleigh called me after to say I can't believe she just said that. Everybody knew it's you. You're the only black one here. Yeah.

Q. So Jen Ughetta didn't call you out by name ---

A. --- She did.

Q. --- When she was talking about how difficult it was for a black woman?

Q. And do you recall that at Liberty Mutual if there was discussion with -- about white allies putting themselves in the shoes of ---
A. --- Yeah. Trying on ---
Q. --- Black people, and trying on different lenses?
A. Uh-huh.
Q. Do you recall that?
A. I do.
Q. Okay, and do you recall -- excuse me.
There's an allegation in your complaint that Jen Ughetta routinely asked you to share your experiences and black perspective.
Do you see that?
A. Umm, I ---
Q. --- Or do you recall that in your complaint?
A. I do recall that, because I'm not the spokesperson for all of black America nor black people at Liberty. And I had my own trauma around George Floyd, and I shared that.
Like I don't want to be here talking about my personal feelings or how I feel about black people being murdered. That's not what I come to work for. She didn't like that, either.

Q. Did she tell you she didn't like it?

A. Yeah. She said, Stacie, well, you know, we do feel -- you know, we gotta try on -- but DEI isn't just about black and white. That's where -- like I know it was the George Ford -- Floyd, you know, trauma, but DEI is bigger than that.

Q. How -- oh, pardon me.

A. Thank you.

Q. How frequently did Jen Ughetta ask you to share your experiences ---

A. --- Quite often.

Q. --- As a black person?

A. And it wasn't just Jen. It was Parker, it was Matt.

I remember they had these people from, umm, Central Park Five. They waited the whole meeting. I was in another meeting. They waited the whole meeting. And when I came into the meeting, Stacie, could you share your lens on what you think about the -- like I'm not the spokesperson for blacks and nor do I want to be. That's not what DEI is about.

And it was insulting to me as well. Like everybody just wanted -- like I was a shiny little black toy. Everybody wanted to hear Stacie's black

perspective, and that is insulting to me.

Q. Do you recall having some Instant Messages or Teams messages with Jen Ughetta where Jen invited you to share your experience joining Liberty Mutual through the lens of a black woman?

A. Yes.

Q. Do you recall responding that it was deeply personal ---

A. --- Yes.

Q. --- And you might share at some point?

A. Yes.

Q. And did you ever share your experiences with Jen?

A. Absolutely not. Not about that. But about overall, the bias, the lack of support, the insulting microaggressions, me feeling discriminated against and being held to a different standard. I shared all of that with Jen and Kathy.

Q. Okay.

A. And Tiffany and Anthony and Charlotte and Tim Vigue, and the list goes on.

Q. We've talked about the microaggressions.

You mentioned that Parker made a comment about your hair.

A. Yeah, she did. And it was -- my face just

-- I just like kind of froze, like really.

Q. And do you recall when that occurred?

A. It was in a one-on-one for Parker and I. I don't recall the specific date.

Q. Okay. And then, in terms of other microaggressions you've mentioned Kathy and Jen reflecting on how intelligent and articulate you were during the interview process.

A. No. Calling me angry.

Q. Did they ever call you angry?

A. Kathy, yes.

Q. Kathy called you angry?

A. Uh-huh.

Q. In what context?

A. I think this is like the third time you've asked me that.

Q. Well, I'm just -- I want to sure ---

A. --- She -- yeah. She used the word, angry, in several meetings with me. And I told her I'm not angry, I'm frustrated.

Q. And during those conversations, she was not using the -- referring to your race or your status as a black woman. Right?

A. No. She did not say you're and angry black woman.

But a black woman, telling them they're angry is a stereotype. We can be frustrated, too.

Q. Okay. And did -- Jen Ughetta never made any comment to you that was derogatory about your race or your status as a black woman, did she?

A. Not directly. But indirectly, like crazy -- just crazy stuff, like mentioning that she has a -- everything black had to like lead back to Stacie.

She mentioned she has like a crack head black nephew that she had to take in. I think she assume -- that the nephew like grew up in the hood or something and I think she thought there was a kinship.

Like, Jen, I'm not from the hood, and nobody I know is on crack, and I don't know why you're telling me this story. But just insulting little things like that really bothered me, because why are you telling me this.

Or, umm, Julie having a first meeting with me, and then, the only other black person on the call was her EA. And then she texted the EA after and said why don't you reach out to Stacie. And me and the EA, Beatrice, are like, well, we don't all know each other. We don't have to reach out, like, hi, Stacie, you're okay. Like just these little micro,

Q. Okay.

A. Yeah. So there -- I'm sure there are other things. I just culled out a high level of the things that were concerning me and on my mind in that moment.

There's lots of things that happened in four months, as evidenced by your over 10,000 pages of discovery. I can't possibly track to all of it.

Q. Okay. And again, the statement that Parker made about your hair ---

A. --- Uh-huh.

Q. --- What specifically did she say?

I want to be sure it's clear on the record.

A. Okay. She asked me about my hair and asked what is that. Were those braids.

Like why do you care. You don't have the same type of hair as me. What do you need to know that for. Has nothing to do with work.

Q. Was this in a one-on-one ---

A. --- It was.

Q. --- I believe you testified to.

Okay, so there was nobody else present?

A. Most of my meetings were one-on-ones, except for the huddle and muddles, chit-chats and

whatever else.

Q. Okay. Do you know how the termination decisions are made at Liberty Mutual?

A. I mean, I know how the termination decision was made with me, or I experienced that.

Q. Okay, who do you believe made the decision to terminate your employment?

A. It was a mixture of Jen, Kathy, and I'm sure Melanie had to sign off on it, and the business had input into it as well, the people I supported.

Q. What basis do you have for believing that Kathy had any input in the decision to terminate your employment?

A. Kathy is in everything. There is not anything that I've been involved in at Liberty that Kathy hasn't been involved. Everything.

Q. Did anybody ever tell you that Kathy took part in the decision to terminate your employment?

A. Tiffany and Anthony and Donald and Charlotte all told me that Jen and Kathy were setting me up for failure.

Q. And that's based on their perceptions.

But did -- did Kathy ever tell you that she took part in the decision to terminate your employment?

MR. HERRMANN: I have some.

MS. STRICKLIN: Okay.

EXAMINATION

BY MR. HERRMANN:

Q. Earlier we talked about post-termination conversations with Charlotte Streat.

Do you remember testifying about that?

A. Vaguely. I'm sorry.

Q. All right. That's all right. Just want to make sure we get it all out there.

Because I think we said we said we were going to come back to discussions you had with her about race while you were employed by Liberty Mutual.

Do you recall that?

A. Yeah.

Q. And did you talk with her or communicate with her about race issues at Liberty Mutual?

A. Yeah. And then she would tell me all the time about -- and it wasn't just Charlotte. Tim Vigue, too, on occasion would just share kind of like, umm, the headlines. Nobody would share the actual data of the -- of the DEI, but the high-level, like agenda.

And she would tell me that, you know, she -- there's lots of issues with black people at

Liberty, and that's one of the reasons why she was appointed to work with the leadership team to address those things.

Like I said, I mentioned that she told me that she believed that Jen and Kathy were setting me up, and they didn't like black women. That's one of the things that Charlotte said.

She also -- I mean, it's a little bit like it's blended. Charlotte and Tiffany Dotson kind of mirrored and said a lot of the same things.

Q. What did you talk about with Tiffany Dotson related to the same ---

A. --- Tiffany Dotson hated Liberty when she first started.

But she told me how she felt, like some of the biases there as well. She didn't go into any specifics, but she said she like understood and identified with me, and to like hang in there multiple times.

In fact, she said she was going to quit before I left, because she was building a house in Charlotte or -- or South Carolina, somewhere close by, and she wanted to link up with me after she moved here.

Umm, you know, they were encouraging, but

of, like racially biased stuff that goes on there. Umm, and he told me specifically not to trust Charlotte, and that Charlotte is not -- has like screwed other black women at Liberty.

I didn't trust none of them. I didn't trust Donald. I didn't trust any of them.

But, umm, just the politics like that goes on there. I don't know why they hired me when they really didn't want me. But it was clear to me that -- after I got there that my leaders that I supported didn't like me. I think that's evidenced in the back and forths in their Instant Messages and emails.

They didn't want to hire me. They wanted to hire somebody named Erin. They acquiesced to Jen. And I can't tell you what was in their minds after that. And all I know is that I was terminated very shortly thereafter.

Q. What about conversations with Anthony about ---

A. --- With who? Oh, Anthony Lewis.

Q. Yeah.

A. Yeah. Anthony, umm, shared some of the same stuff. Like he had a hard time there.

Anthony shared that there was -- umm, actually, it was in one of the emails that I --

Instant Messages that I shared with Jen -- news around some of the changes.

Anthony said that there's no leaders that are black in GRM, that none of them were promoted. Funny, he got promoted after I left. But that black people in finance had a hard time as well.

So it's not just like black woman. Anthony felt he was like -- there was bias against him as well.

Q. We just a little bit ago started talking about the retaliation claim, so I just want to dive into that a little bit.

A. Yeah. Literally after I started asking for information around DEI, after I shared with Jen and Kathy my feelings about being singled out, being held to a different standard, umm, I just feel like they ratcheted up -- literally, it was like within days, it felt like, that I was terminated.

MR. HERRMANN: This will be Exhibit 34. Is that right?

Here you go.

(* Exhibit 34 was marked *)

A. Thank you.

Q. All right, you've mentioned Tim Vigue before.

A. Yes.
Q. Do you recognize this document I just handed you?
A. Yes. He was one of the people, umm, that I asked for, umm, DEI information around black employees, and black execs specifically.
Q. Why were you asking for that information?
A. Because I wanted to have a sense -- again, I felt like they were gaslighting me, so I wanted to have a sense of like is it just me, or -- I heard from other black people that they were experiencing it, but the data will like confirm all of that. And Tim did that for me. He gave me the headline.
Q. Did he ever give you the underlying data?
A. No. Nobody would.
Q. All right, and why did you want that data?
A. Because it's just confirmation.
I mean, Tim actually put in the email, which was surprising to me. Umm, but the head of DEI wouldn't -- Dawn. Charlotte wouldn't.
And that information should be readily available to me as a senior talent advisor.
Q. Is this Exhibit 34 -- what is this?
Is this an email or a Teams message?
A. It could be a Instant Message or a Teams

message or an email.

Q. It's from you to Timothy Vigue ---

A. --- Tim, yeah.

Q. --- On July 22nd, 2021. Is that right?

A. Right. And so ---

Q. --- And what are you saying?

A. When people of color, specifically black employees, are brought on board, do they tend to stay. And if yes, how long.

Q. All right, this will be Exhibit 35.

(* Exhibit 35 was marked *)

A. Thank you.

Q. All right, the court reporter just handed you Exhibit 35.

Do you recognize this document?

A. I do.

Q. And what is this?

A. This is, umm, Timothy's response to my questions.

Q. All right, and what does -- and this is from what date?

A. July 22, 2021.

Q. All right, and if you look at Exhibit 34, it looks like that was sent at 5:14 p.m.

Is that right?

A. Correct.
Q. And Exhibit 35 is a 5:17 response from Timothy Vigue?
A. He says our turnover in our black population is the highest of all racial ethnic groups.
Q. And did you view that as a problem at the time?
A. Yeah. I -- I might have made a decision -- different decision to, you know, take the opportunity at Liberty had I known that, because that's a red flag.
Q. And did you express that was an issue with people other than Tim Vigue at Liberty Mutual?
A. Umm, Jen and I had a quick conversation about it where, again, she just listened, umm, deferred me back to, I think, Dawn or Kathy, one of them. She like never took accountability for anything.
MR. HERRMANN: This will be 36.
(* Exhibit 36 was marked *)
THE WITNESS: Thank you.
Q. (Mr. Herrmann) All right, the court reporter has handed you what's been marked as Exhibit 36.

Do you recognize this document?
A. I do. It's either an Instant Message or a email to Tim Vigue.
Q. And what's the date on it?
A. August 12th.
Q. At what time?
A. Six twenty-nine p.m.
Q. And this is from you to Timothy Vigue?
A. Correct.
Q. And what do you say in this Instant Message?
A. How many black execs are there and how many have left in the last five years.
Q. All right, and why did you want to know that in August of 2021?
A. Again, it's just more food for thought. Like, again, just validating that I'm not crazy.
This has not only been my experience, this has been lots of black execs that have come here, have not been successful, have felt the racial bias, discrimination, and exit the organization very quickly.
MR. HERRMANN: What did I just do -- 36?
This will be 37.

MS. STRICKLIN: I just have a couple of follow-up questions on that.

THE WITNESS: Sure.

EXAMINATION

BY MS. STRICKLIN:

Q. As of September 16, 2021, you'd already had the meeting with Kathy and Jen where Kathy had talked about an exit plan for you.

Isn't that right?

A. I don't remember the specific date without looking at it on the paper, because the dates all blend for me, and they were three years ago.

I will concede that that sounds like it makes sense, around that time.

Q. Do you have any knowledge of what Tim or anyone else did to support Alice Lin and -- and wrap -- put their arms around her and help her to succeed?

A. Just what Tim said he did. Like provide like unwritten norms of what goes on here, given the political landscape. Tell them how to navigate organizational dynamics. Give them the lay of the land. Who is important, who is not.

Like all of those things, Tim actually put in writing, that those things were done for Alice Lin. And that, perhaps, maybe you should incorporate

some of that into your onboarding plan for Stacie.
I had zero. I had none of those. I had none of that. I had to seek out other people that looked like me.
Q. Were the -- for example, the Instant Message or Teams messages that were shared with you today between you and Jen Ughetta about your skip-level meeting with Melanie Foley ---
A. --- Uh-huh.
Q. --- Wasn't that Jen Ughetta providing you with unwritten norms and political dynamics about the organization that were a part of?
A. A CHRO telling a new employee that they have nothing encouraging -- no, it's not.
Q. That's not what I'm referring to.
A. Okay, then I don't know what you're referring to.
Q. And I can pull the exhibits out.
A. Please.
Q. Let's see if I can find it quickly.
Please take a look at Exhibit Number 28.
A. Sure.
Q. These are Instant Messages that you testified about earlier between you and Jen Ughetta preparing for your skip-level meeting with Melanie

VIDEOGRAPHER: The time is 11:10. We're on the record.
Q. (Ms. Balson) Ms. McLean, before we took the break I believe I was asking you a question about if there were any pages in either of those notebooks that reflect the alleged microaggressions that you believe you experienced during your time at Liberty Mutual.
A. Yes.
Q. And so now you've had a chance to review them. We were off the record for about 30 minutes while you did so.
So which pages have you identified?
A. Let's see. I mean, they're not numbered, so I don't know how, like ---
Q. --- Is there a date at the top?
MR. HERRMANN: Well....
THE WITNESS: I don't know that there is for all of them. There is for this particular page. It says August 30th.
MS. BALSON: August 30th.
Q. (Ms. Balson) And what does it say at the top of the page?
A. First, one-to-one with Sam.
Q. Okay, and what microaggression do you

believe is reflected on that page?

A. Well, this is just a conversation that I had with Donald Roach about the challenges that Liberty has with black women and how ---

Q. --- I'm sorry to interrupt you. I just want to make sure I understand your answer.

What on the page reflects a micro-aggression?

A. Well, I stated here how people receive me as a black woman.

Q. So the specific language is how people receive me as a black woman?

A. As a black woman. Not just a woman at Liberty. That started -- why do I have to....

Q. Is there any detail on the page about how people receive -- I understand the words say how people receive you -- but any description of what means.

A. Well, the next couple of lines down it says that GRM is devoid of senior black people.

Q. Okay, let's back up.

The how people receive me as a black woman, in what way does that reflect a micro-aggression?

A. Well, you're asking me what's on the page.

So do you want me to provide the context of the conversation? Because I didn't write every single thing down that came out of Donald's mouth.

Q. Yeah.

A. But am I giving you context or do you want to just know what's on the page?

So can you clarify that for me?

Q. Yeah.

So the question that you're answering ---

A. --- Uh-huh.

Q. --- Is which of those pages reflect microaggressions.

A. Uh-huh.

Q. And you have identified this page.

A. Uh-huh.

Q. And so I'm asking what aspect of that page reflects the microaggression.

A. Right. And I answered that how people receive me as a black woman instead of just as a woman that's working at Liberty. I find that to have undertones of microaggression.

Q. Okay, but there's nothing reflected about anything anyone specifically said to you. Is that right?

A. This is something that someone

specifically said to me that's on this page that I wrote.

Q. Who is it that was the speaker?

A. Donald Roach.

Q. And you believe Donald Roach used a microaggression against you?

A. No. He was sharing with me the microaggressions that black women face there at Liberty, and understanding that I'm a black woman, that I'm going to be experiencing some, as well.

Q. Okay. So if I'm understanding correctly, you think that note reflects something Don Roach told you that occurred to some other black woman at Liberty?

A. That's not what I said. And I don't think I know. Because I wrote it and I was there with him talking.

Q. Okay. I just want to make sure I understand.

A. I know. And I don't know how else to explain it.

Q. So what do you recall specifically that Don Roach said to you?

A. Sure.

That because I'm a black woman, I'm going

to be perceived differently at Liberty because most black women there are.

Q. And you believe Don Roach said because most black women are?

A. Don went on further to tell me that a lot of black women at Liberty have challenges.

Q. And that's not reflected on the notes, but that's your recollection of the conversation?

A. Yes.

Q. Okay, and so that is your recollection of the part of those notes that says how you're perceived as a black woman.

I think then you were starting to point to a different part of that page.

A. Just a couple sentences down, it says GRM is devoid of senior black people.

Q. Okay, and in what way does that reflect a microaggression?

A. It's docking back in to what I just shared about me being -- how people receive me as a black woman. I'm the only one in GRM.

Q. And that's something that Don Roach told you?

A. Yes.

MS. BALSON: Okay, so I did find the

page for the record.

THE WITNESS: Uh-huh.

MS. BALSON: The page that Ms. McLean is looking at has been Bates numbered SM3151. I think we've got that here.

Why don't we go ahead -- you can keep looking at the original. I want to make sure the record is clear.

So I'm going to hand the court reporter this exhibit.

You've been doing these sequentially with Jill, do you know, or did you have a separate numbering system?

MR. HERRMANN: I had my own. I think Jill used a completely separate system for Stacie's.

MS. BALSON: Okay, that's fine.

I'm going to just start it again and call it 1A.

If you could pass this down.

(* Exhibit 1A was marked *)

Q. Okay, so the document that has just been labeled as Exhibit 1A....

MR. HERRMANN: Here it is.

THE WITNESS: Oh, I have it in front

of me.

MS. BALSON: Yeah. So that's a photocopy. I know you have the original.

THE WITNESS: Okay.

MS. BALSON: I want to make sure that those are identical.

And the photocopy you have is actually several pages, so it starts, as I said, the Bates number begins with SM3151, and it continues -- can you just confirm on the last page of that packet there.

I believe it should be 3154.

THE WITNESS: Yes. I see that on the bottom.

MS. BALSON: Okay. Okay, so feel free to refer to both the copy and the original.

THE WITNESS: I'm just looking at my original here, because I can read my notes very clearly.

Q. (Ms. Balson) So on page 3151 you had pointed to how people receive me as a black woman here, and then you pointed to the line that says GRM is devoid of senior black people.

A. Uh-huh. Yes.

Q. And if I am understanding your testimony

right, those are both statements that Don Roach made to you during this conversation on August 30th that you had with Don. Is that right?

A. Correct.

Q. And I was trying to get an understanding of why the statement GRM is devoid of senior black people you believe is a reflection of a micro-aggression.

A. Oh, I'm sorry. Was that a question?

Q. Yes.

Can you explain to me how that statement, GRM is devoid of senior black people, is micro-aggression to you.

A. Didn't I just answer that?

Q. I must have misunderstood.

A. How can I help clarify?

Q. You could just answer how is that a microaggression.

A. I think what I said was why can't I just be a person, not a black woman. Why is that such a big thing in GRM.

He's highlighting -- go ahead.

Q. Sorry.

I'm asking about GRM is devoid of senior black people. That's the ---

A. --- Right.
Q. That's what you're talking about?
A. It is.
And so that relates back to the earlier statement about how people receive me as a black woman. Because I'm the only one in GRM, I am -- I need to be ready -- something like that. He said I need to be ready for some of the stuff that black women face every day, like biases, microaggressions, racism.
Q. And that phrasing that you recalled just now, that you need to be ready for bias ---
A. --- Be prepared for it.
Q. Let me finish my question.
The testimony you just gave, that you recall Don Roach saying you need to be ready for biases, microaggressions, that's not reflected in the notes, but you remember that?
A. So ---
MR. HERRMANN: --- Objection to form.
Go ahead.
THE WITNESS: I can't remember every specific thing, nor do I remember every specific thing that Donald Roach said, but I remember the gist

of what we were conversing about, and it was around black women facing biases.

I mean, I don't even use that term, biases and microaggressions, because it's fancy words for racism. That's what it is.

So that's what we were discussing in this context. And I feel, answering your question, because you're using the term, microaggression, I feel that's what it is.

And he was telling me -- and I can't specifically recall his exact words, whether it was be ready for, get ready for or be prepared for, but it's along that vein.

Q. (Ms. Balson) Okay, is there a reason you think that that aspect of the conversation didn't get documented in your notes here?

A. I'm not a transcriptionist. I do the best I can.

Q. Was this statement that GRM is devoid of senior black people -- was that new information to you as of this conversation?

A. I don't know. I don't recall.

I remember not seeing a lot of black people originally when I started. And this was in -- it looks like August. I don't recall specifically.

But I know I didn't see really any at all, not in GRM, for sure.

Q. Why do you think you wrote that part down?

A. Why I wrote it? I don't have any specific reason why I wrote it. I can't recall specifically why I wrote it. It was a conversation that I was having.

Q. And you didn't write down the part about whether it was be ready for it, watch out for it, anything along those lines.

Do you know why you didn't write that?

A. Because I'm not a transcriptionist. I take notes.

Q. Anything else on this page that you believe reflects a microaggression?

A. Nothing that I can point to specifically at this time.

Q. Okay, so turn to the next page in the notebook, which is also the next page in that Exhibit 1A ---

A. --- Uh-huh.

Q. --- Which should be marked 3152.

A. Uh-huh.

Q. That appears to me to be continuing notes, still, of your conversation with Don Roach.

microaggressions on this page.

Q. Okay, what else on that page?

A. Just the end where Don talks about Julie and Parker, and he just was sharing information with me about how Julie and Parker were lifers there, and they've been put on in their jobs.

Like I think -- I don't remember his name, Sweeney or whoever, they both liked Julie and Parker, and so just be sure that I was aware that there's bias there. And I wrote black bias.

But he was just sharing that there's a lot of bias that happens here.

Q. So that starred couple of words at the bottom says PCM bias, and then black is written above it.

What's PCM?

A. I don't know what I -- what that means -- why I wrote that.

Q. But you think it just says black bias?

A. Uh-huh.

Q. Yes?

A. Correct. I'm sorry.

Q. Okay. And so you think that PCM doesn't have any significance?

A. It may. But at the time, I -- the context

of the conversation was more around black people, black women specifically, and bias. And that I'm likely to receive from -- some from Julie and Parker, because these are women that have just been put on in their careers.

Q. And none of that about you expecting to receive bias from Julie and Parker, none of that is written in the notes here, but that's your memory of the conversation?

A. Correct.

Q. Okay. So then, the next page, 3154, are those also a continuation of your notes from the conversation with Don Roach?

A. Yes.

Q. And you see at the very bottom of the page, it says spoke with Don from five p.m. to 8:30 p.m.?

A. Yeah. I remember it was dark. Uh-huh.

Q. Yes?

A. Correct.

Q. So you testified earlier that you'd had a conversation with Don earlier in the day, followed by the meeting and then further conversation.

A. Excuse me. Yes. I mean ---

Q. --- So five to 8:30 is just the later part

Q. And do you know why you wrote down that she has a lot of power and is well-loved by leaders?
A. Because that's what Don told me.
Q. Do you have any reason to think that's not true?
A. I really wouldn't know one way or the other.
Q. Okay. At the top of this page there's a note that says I need to position myself.
What do you recall about that part of the conversation?
A. This is -- these are things that Don is telling me to do. And he's telling me I need to position myself, but be careful and watch out for -- watch my back -- for Cate Stevenson, Jen Ughetta and Kathy -- that was Kathy Jonas -- telling me that they can't be trusted.
Because he was also sharing that Jen U and Kathy were socializing on how -- what a tough time Stacie was having, she's so overwhelmed and, you know, she can't do the job, and this isn't the right place for her and blah, blah, blah.
So he's telling me to watch my back because they're setting me up for failure is what he was telling me.

Q. And the testimony you just gave about Don purportedly saying that Jen and Kathy were telling others you were having a hard time, that's from your independent memory of this conversation, not reflected in the words in the notes?

A. I think it's reflected in the notes. He's saying watch your back.

Q. But there's nothing more than that?

A. Again, I'm not a transcriptionist. I take notes. And, you know, I have a -- I have a memory. I can remember.

Q. How would you characterize your memory?

A. I have a memory. That's how I characterize it.

Q. Do you think it's better than average?

MR. HERRMANN: Objection. Form.

THE WITNESS: Depends on what it is. Stuff that I care about, sure.

Q. (Ms. Balson) Okay, and so you think here for these notes you're able to remember a lot of detail that's not actually reflected on the page?

A. I think I can remember details about things that are important to me, like this lawsuit. So yeah, I can remember certain things.

Q. But you can't remember any of your email

where that's starred ---

A. --- Uh-huh.

Q. --- Being the only black person, you believe is a reflection of something that you said. And then she doesn't see black is you writing down something that you believe Kristy said.

And then the LOL is your reaction to Kristy's statement?

A. It's not something I believe she said, it's something she said.

Q. Okay. So yes, that's how you're interpreting the bottom of that page?

A. I'm not interpreting it. I'm sharing with you in my recollection of what happened.

Q. Okay. Did you respond in any way after Kristy said that she doesn't see black?

A. What is there to say?

Q. So is that a yes or a no?

A. It's a no.

Q. Okay, what's the next page that you believe reflects a microaggression?

A. I think we did this one.

Q. What page is it that you have flagged?

A. I don't ---

Q. --- Does it have a date at the top?

A. It's September 9th.

I don't know if this is a microaggression, per se, because she's black, but it's just kind of -- what's the right way to say it.

You know, there's black people who drink the Kool-Aid and become part of the culture as well.

So this is Latichia Fleming telling me that she used to work there. I don't remember or recall why she left specifically.

But then she came back, and I was sharing with her all of the microaggressions and the experiences and how I was feeling, like being held to a different standard. And the things that were bothering me in my experience there.

And she agreed with what it was, how it was to be a black woman there, and she agreed with my assessment of all the dysfunction and the racism that exists.

And I asked her why did she come back if she knows this is the culture. I don't really remember what she responded.

But I remember I was just blown away, knowing that this was my meet-and-greet with a ER alignment that I had, and -- yeah.

Q. Okay, so I want to make sure our record is

that Tichia had for you about how to be successful at Liberty?

A. No. There -- it was kind of just us -- the answer is no.

Q. Did you consider the comments that you were sharing with Tichia to be venting?

A. I considered the comments to be sharing with Tichia to be my experience. And she was asking me how I was doing and I was sharing how I was doing.

Q. Did you expect her to take any action as a result of those statements that you made to her?

A. I would have imagined me sharing that I was feeling like I was being treated differently because I was black and highlighting the experiences that I was having, and feeling those microaggressions and -- I'm using your words -- biases, etcetera, racism. As an ER consult to the business, I would expect for her to go back and do her job.

Q. And what do you mean by that?

A. Usually ER would investigate. So what does Stacie mean by that. Maybe have a conversation with my boss? Maybe have a conversation with the senior talent advisor lying to my boss? Maybe have a conversation with the two leaders that I support?

I've only been there what, a few months,

and I'm experiencing those things. That's her role, compliance. Right?

Q. Did you provide any examples to Tichia about what you believe you had experienced?

A. I believe I did, and I think my notes reflect that here. I said being black here and the dysfunction.

Q. So that's not a specific example of something that occurred.

So I'm asking do you think you shared more than what's on the page here that was a specific example?

A. I may have. I don't remember every single thing I said.

But I did give her examples and she agreed with much of what I said.

Q. And you think -- and I want to be clear about it. Don't use my language, use whatever language you believe you used in the conversation.

A. Uh-huh.

Q. You think you said to Tichia in that meeting that you were being treated differently because you're black?

A. I absolutely said that, yes.

Q. With those words?

A. I can't be certain those were the exact words, but I wrote down being black here and dysfunction, and my recollection in my conversation with her about being black here and the things I was experiencing.

So yes, I did share that explicitly with her.

Q. You were at Tichia Fleming's deposition that just took place last week. Correct?

A. Correct.

Q. Okay. Do you remember her being asked whether you had ever shared with her any complaints of discrimination, that she said you had not?

MR. HERRMANN: Objection. Mischaracterizes.

THE WITNESS: I don't remember what Tichia said.

Q. (Ms. Balson) Okay, do you think her testimony was false?

MR. HERRMANN: Objection. Same.

THE WITNESS: I think most of the people that have been disposed in this case have said many false things, including Tichia.

Q. (Ms. Balson) You heard her asked by your attorney whether she stood by her approval of the

don't want to screw everyone's schedule up tonight, but, you know, we'll reach an agreement.

Q. (Ms. Balson) Okay, so September....

A. 14th.

Q. 14th.

MR. HERRMANN: I believe it's Bates -- Bates SM3187, but....

Q. (Ms. Balson) Does it say at the top of it connect with Anthony?

A. Yes, it does.

MS. BALSON: Okay. Yep, that is SM3187.

I've got that right here, so we'll go ahead and mark this one -- I believe it's 4A.

(* Exhibit 4A was marked *)

THE WITNESS: Thank you. You can have this one.

MR. HERRMANN: Well, but....

THE WITNESS: Okay, I'll keep it.

Q. (Ms. Balson) Okay, so what on the document that's just been handed to you marked as Exhibit 4A, do you believe reflects a micro-aggression?

A. Well, I don't know -- I mean, it's aligned to micro -- I'm just going to say racism.

I don't know that it's like directly in terms of me, but what Anthony was doing was confirming all the stuff that I thought I knew already by being in here at this organization for, you know, four months now, just the institutionalized racism that exists.

He was providing additional color for me about what was happening in the organization with respect to black leaders and their inability to have any type of mobility or promotional opportunities in the org.

There were org changes happening at the time. And in fact, Jen Ughetta had asked me to get some insight into -- noise is what she called it -- around those changes.

And a lot of black people, in fact, weren't really happy about it, because what was happening was white peers are easily slotted into positions without any type of, you know, consultation really around it. It's just like people get put on there by virtue of the -- I think Peter principle, like just their tenure there.

And Anthony was sharing with me a little bit more color on how, you know, people had to build some real business cases for -- not just black

people, but people of color in general, to be promoted into higher roles and senior leadership roles. But again, white counterparts don't have to go through the same thing.

So it's not really a microaggression, per se, but it's just more fodder for what I was seeing and hearing and experiencing on my own.

Q. Okay, so the page that you're pointing to is -- are notes from a conversation that you had with Anthony Lewis on September 14th? Is that right?

A. Correct.

Q. Okay, and there's -- I see his name, and then there's a number of kind of dashes, it looks like, of different points. So one says no career progression, one says no POC as a FELT member or direct report.

So are those all basically different concerns or observations that Anthony raised that you were writing down?

A. Correct.

Q. Okay, and Anthony Lewis is himself a black person? Is that right?

A. Correct.

Q. Okay. Had you spoken with Anthony prior to this September 14th conversation?

A. I don't know. He was one of the first black people that I saw on camera on one of the meetings that we had.

I can't say for sure, but he definitely was like one of the first few that I connected with.

Q. Did he have an executive-level role at this time?

A. No, for certain.

Q. Do you remember what his role was?

A. I can't be certain, but he, I think, maybe like director level. I'm really not sure.

He wasn't -- he was beneath someone that reported into Julie, I believe, so a couple levels down.

I don't really recall what his specific position was, but -- I mean, his observations weren't just specifically for him, it was for GRM, you know, as a whole.

Q. Okay, and these comments that you wrote down from your conversation with Anthony, were those things that were about his own personal experiences or were they about things he thought he'd seen other people experience?

A. They were both.

Because if you look at the top, the top

seems to be about the organization as a whole. And then we drill down to Anthony's specific experience where you see there's a line at the bottom, like bottom third -- okay.

Q. Yes.

A. And these are things that -- like I see it's here, I wrote that Anthony wanted a role. He shared with me he wanted a big team, he wanted to mentor and coach other people in the organization.

Let's see, access to a lot of broadness -- yeah. He wanted to have visibility essentially, and have access to work on cross-functional teams and other projects, etcetera, to give him more visibility, to be able to be -- have opportunity to be promoted within the org.

Q. Okay, so the portion of the notes above the line on this page are things that he observed, and the portion below the line are things that were about him personally, his own experiences working at Liberty?

A. Well, I see a comment here that he made about himself on the top, too, on the left-hand side. He says there is no one above -- no one that looks like him above him on the finance executive leadership team. That's what FELT stands for.

Q. Okay, and in either part of the conversation, whether it was about his own experience or others ---

A. --- Uh-huh.

Q. --- Did you think Anthony was describing specific instances of discriminatory conduct?

A. I think I had prior conversations with Anthony about that. I don't think that's what this specifically was about.

This was specifically like giving me line of sight to -- there were murmurs that people knew -- like people had some ideas around some changes that like might be happening and that would have been impacted him and his team. And so he was giving me kind of of like the headlines of Liberty and how institutionalized the racism is there.

And this was just a high level of that conversation, me taking notes. In fact, I was taking notes to carry back to my boss, who had asked me to -- you know, what's the word on the street, what's the noise about these changes.

Q. Okay, so just to make sure I'm following.

A. Uh-huh.

Q. It was either on this day or around this day there had been either a formal or informal

announcement about some changes, and you were specifically trying to solicit from him what was his impression or what had he heard about those changes. Is that right?

A. No, it's not right. I wasn't trying to solicit anything.

Q. Okay.

A. We had connect points. That's why it's called connect with Anthony. And Anthony was just sharing what he was feeling. I wasn't soliciting anything.

In fact, from none of these people did I solicit anything. They just shared.

Q. Okay, so you didn't specifically ask him for this feedback?

A. No, I don't believe I did. I believe he was just sharing what his experience at Liberty was like.

Q. Okay, do you remember if you had asked him any kind of question that prompted these comments?

A. I don't remember specifically.

Q. Okay, and then did you have the impression that Anthony expected you to do something with this information, meaning take some next steps?

A. I think Anthony wanted to socialize some

of this with me so that maybe, perhaps in my conversations with Julie and her leadership team about succession planning and promotional opportunities in the future, that he would be, you know, somewhere in there -- what's the right word -- somewhere -- you know, just have some visibility to him, just be aware that Anthony wanted to have a bigger role.

And I don't know that -- that's my answer.

Q. I'm not that familiar with the phrasing he wanted to socialize it with you.

What do you mean by that?

A. Well, he knew I sat at the table with the leader that ran his organization.

So that if I had conversations about talent that wanted to be promoted from a succession planning standpoint, mobility standpoint, that maybe I could potentially raise the concern about there's no people of color, nobody that -- there's nobody black here ---

Q. --- Okay.

A. --- In finance.

Q. Okay, so your impression was it was important for you to know all this information because there might be an opportunity for you to

either advocate for him or raise it in some way at a later point?

A. I don't think that's the full picture here, because there's two parts.

Q. Okay.

A. Right?

So one is changes that are happening and why don't these people take into account that there's no career -- let's read it -- no career progression at all. There's no career progression for any POC or black people on the FELT.

As part of my role as an STA, that's a concern of mine, because DEI is front and center at Liberty at this time. That's like one of their mandates. So why -- this was a big red flag -- right -- for blacks and people of color there.

Q. Okay.

A. So that's one part of it.

And then the second part of it is Anthony personally. Like he's being impacted by the first part, that there's no -- right? So it's two-fold.

Q. Okay. Did you have the impression that Anthony was seeking any guidance from you about where he could go to report what his concerns were?

A. I don't think so.

I think Anthony was very -- had been very vocal with Julie and FELT as a whole. I mean, he's written them letters about how they could be better allies and all kinds of stuff. So I think they were aware, not that it matters.

But yeah, I don't think he was expecting somebody that had been there just four months to really be able to have any influence over anything around his ability to be promoted.

I think he was speaking to me as one black person to another.

Q. Okay. Did you interpret any of his comments as a complaint of discrimination that would fall under, for example, the anti-discrimination policy?

A. I don't think so.

I think Anthony has been there a while and he was expressing his frustration. He's -- chose to stay there, knowing what the environment is like.

I think he was just more sharing with me the environment that I was in.

Q. Do you remember how you responded, if at all, to what he was saying?

A. I think I listened more, but I wasn't surprised, because by then -- this is September 14th

very top Charlotte Streat presenting?

A. Yes. Correct.

Q. Okay. Got it.

MS. BALSON: So 3194, let's call Exhibit 6A.

(* Exhibit 6A was marked *)

Q. (Ms. Balson) And what on that page do you believe reflects a microaggression?

A. I mean, I wrote microaggressions on this page, and I wrote held to a different standard. And then I wrote turn camera on. Am I on FTO.

I vaguely remember this page.

Q. So what -- what conversation are these notes from?

A. So I believe Charlotte Streat held some type of -- I wouldn't call it a training, but like a meeting, I'm going to call it, because I don't really know.

But it was called DEI talent essentials, consulting through performance. I don't really remember what the -- I mean, that's the title of the meeting, so that's the content, but I don't really remember much else about that.

Q. Do you remember who was in attendance?

A. I don't. But I wrote a name, and I only

recognize this name now because I've seen it in other documents in discovery, but Tina Dumas, who is black. I might have seen her face. Because every time I saw somebody black it was like few and far between, so I'd write their name down. So I might have seen her face on the Teams meeting. Not sure a hundred percent.

But I -- and again, I -- I don't remember fully, but I think why I wrote those notes around held to a different standard was because the things that Charlotte was talking about in the meeting was like resonating with me, like this is all BS.

You guys -- and she's black. You guys have all these meetings about DEI and it's front and center and all these, you know, initiatives around it, and that we've got to really do it.

But she might have said something in that meeting, and I'm like, oh, my God, this is what's happening to me. You're talking about it and you're saying that these are things we shouldn't be doing. But I am -- I am being held to a different standard. I have experienced microaggressions.

And then I put two examples from my boss, where every meeting, you know, you can see me on camera. And when I'm having tech issues, you know

it, because I am using -- hey, I'm having tech issues again.

But every single meeting, even when not everybody had their camera on, I'm the only person she's constantly asking is your camera on, Stacie. Constantly.

Then asking me -- I got to submit approval to take what they call FTO there. So she knows if I'm on FTO. But she would ask and -- you know, constantly asking me like sending me texts, like are you on FTO. You know I'm on FTO. I submitted an approval. You have to like approve it, you know.

So just constant little stuff like that.

Q. So those are examples, turn camera on, question mark.

A. Yes.

Q. Am I on FTO, question mark. Those are examples of being ---

A. --- Held to a different standard.

Q. Just to make sure I understand, those are examples of things that Jen Ughetta had previously asked you during group meetings?

A. Yes, constantly.

Q. And do you know whether these notes, held to a different standard, microaggressions, were those

resonated with me some way and I'm writing notes about that. It can be one or the other. I can't be sure, it's so long ago and....

Q. Do you remember if you said anything in this meeting?

A. I don't. I don't remember.

Q. Do you remember were there any slides or visuals that Charlotte shared?

A. I don't remember. Just don't -- I don't recall.

Oh, I'm so sorry. I don't recall.

Q. Okay, and going back up to the two bulleted items that you identified were questions from Jen Ughetta, just to make sure I understand, you consider both of those things to be microaggressions from Jen?

A. I believe those coupled with all the other stuff that I experienced was -- yeah.

I don't need -- I'm, you know, 52 years old. I've been in corporate America my entire career. I don't need you to ask me to turn my camera on. I'm pretty technologically savvy. And am I on FTO when you already know that. I feel like she was talking to a child.

Q. Okay. Anything else on this page that you

Q. Okay. Anything else on this page that you believe reflects a microaggression?

A. I think the whole page is for me, truly. I mean, I felt it's -- but that's all I have to say about it.

Q. And is there anything -- I want to ask you some more questions about that page.

A. Oh, sure.

Q. Is there anything on that page that reflects to you a complaint you were making about some specific discrimination or discrimination -- discriminatory act?

A. I mean, I don't believe so, because I didn't say much in that meeting.

I was kind of shocked that they immediate went -- after just four months of being there, and just a comment about my temperament not being able to deal with Groundhog's Day and being turned around every day from talent delivery, not having my tools, not -- all the whole kit and caboodle to, hey, Stacie, it's time to talk about exit plan, so -- yeah.

Q. Are there -- either in your notes or from your own recollection, is there anything that makes you think Kathy called you angry during that meeting?

plan would look like for me. That's what they -- they were asking me and telling me that they were going to give me time to think about that, so yeah.

Q. Did you have an idea of what kind of exit plan might be something you would agree to?

A. No. I -- no.

Q. The bottom asterisk here that says timing on what that could look like for exit, do you think that's another question that was posed to you?

A. Yeah. It's an extension of what that might mean.

Excuse me. Uh-huh.

Q. And you don't think either of those questions were something you answered in the meeting?

A. I did not answer those questions in the meeting. It's not I think I did not answer that.

Q. Was there any discussion about when the next follow up would be?

A. Umm, I don't remember exactly. I just -- I think either ER or Kathy reached out to me after that to put something on the calendar where -- yeah. I -- I can't be sure.

I think we had a more in-depth conversation. I think she wanted me to walk away and think about it, and then I think I came back and --

So 3376 and 3377, are those part of the same conversation?

A. I mean, I can't be sure, but it seems to be. I didn't have tons of meetings with Jen.

MS. BALSON: Okay, so we'll call that Exhibit 11A, spans the two pages, 3376 through 77.

(* Exhibit 11A was marked *)

Q. (Ms. Balson) And although this page is not dated, the page before it is dated July 14th. Right?

A. (No response)

Q. Is that right?

A. Oh, I'm sorry. I thought you were talking to yourself.

What was that?

Q. The page before it is dated July 14th?

A. Yeah, I think that's what I said. It is. Correct.

Q. So what is it on this page that you think reflects a microaggression?

A. Well, this is a conversation with Jen about all the challenges that I was having and me sharing with her that I felt like I was a shiny black toy.

Q. Where does it ---
A. --- On the left-hand side in a -- it looks like a circle, like there's all these little circles around it.
Q. Me, black, shiny toy?
A. Yeah.
Q. Okay, and what did you mean by that?
A. There just were instances of people -- I felt like, you know, their DEI front spokesperson. Anything that had -- anything -- I mean, DEI is so bigger than black and white, but I just felt at Liberty it was all just about black and white.
And constantly like asking me questions around, you know, not my -- just constantly asking me questions around like blackness and my perspective on, you know, their DEI initiatives and -- I mean, DEI is a part of an STA's role, but -- I mean, there's a reason why we have a DEI organization. It's not the biggest piece of the role.
Just constantly putting me on -- I felt like a spectacle, like asking me questions around my black perspective and asking me questions around, you know, blackness, period. And, you know, me joining the organization as a -- you know, a black woman, you know, from external and, you know, just my

experiences there.

Just black, black, black, black, black. That's what I felt every day. Something black. And if it wasn't black about me, it was black about something else. You know, waiting to hear my opinion on anything with respect to something black, it just was constant.

And then it was ---

Q. --- There was more than one occasion that Jen Ughetta asked for your perspective as a black woman?

A. I don't know that Jen was the only one that asked for my perspective on it as a black woman. But I don't remember every single conversation.

I remember having -- I felt tired having conversations with people around black stuff. I don't think I've talked about being black as much as I talked about it here at Liberty. There's really no reason to do that in a corporate environ -- as much as it was done here.

Q. But as far as questions from Jen, can you remember anything more than one time?

A. I remember lots of conversations with Jen around stuff where blackness came up.

Q. And as you said, as a talent advisor, DEI

was part of your role?

A. A small part of my role.

But there was a large agenda at Liberty for DEI initiatives. But it -- it's not the primary reason for my role.

Q. Okay, so I'm asking specifically about can you remember anything more than one time where Jen Ughetta specifically asked you for your perspective as a black woman?

A. Not in this moment, I can't remember any others.

Q. Okay. What else on this page do you -- you think reflects a microaggression?

A. Telling her that I feel like I was being treated differently. That's where different -- t-a-x is, you know, shortened for treatment.

Q. Okay, so ---

A. --- Different treatment.

Q. --- The bottom third where it says different t-x?

A. Yeah. I'm being treated differently.

Q. And you think that's something that you told her?

A. I don't think. I did tell her.

Q. Okay, and did you give any examples of

ways in which you thought you were being treated differently?

A. I don't know that she asked. Jen didn't ask a lot of questions. Jen just -- you know.

Q. Okay, but did you volunteer them, whether asked or not?

A. I don't remember or recall in this specific moment.

Q. And there's nothing on this page that says?

A. Says what?

Q. Whether you gave any examples of ways in which you thought you were being treated differently.

A. Well, I think at the very bottom does.

I said I was uncomfortable, because now I'm in this organization for a couple of months and I still don't have access to stuff to do my job. Where all the other STAs have access to stuff to do their -- the systems that allow them to do their jobs effectively. Not just tech, but the HR systems.

Q. But it doesn't say anything about other STAs here. All it says is I don't have access.

So is that one of the ways that you specifically said you thought you were being treated differently?

A. That's how I answered your question. Correct.

This is a way that I am being treated different. Everybody else had -- I'm calling these other STAs to get the information that I need from these systems. They have it. I don't.

Q. But it doesn't say anything about other STAs on this page. Right?

A. I don't think that was your initial question, so can you rephrase it, because I'm confused why we're going down a different path. So....

Q. I had asked you whether there were examples that you gave Jen in this conversation of ways that you thought you were being treated differently.

A. And this is one example of that. I don't have access to stuff to do my job.

Q. Okay.

A. And that's how -- one of the ways I feel I'm being treated differently and not being set up for success.

Q. So I guess the distinction I'm making is, if what you said to Jen was I don't have access to do my job, that's one point. Versus I don't have access

A. Well, let me just hang on on this page for a second, because you want all the microaggressions. Right? I want to be sure to capture them.

Q. Please.

A. Thank you.

I mean, there's so much other stuff here -- me sharing. You asked for examples that I shared with Jen.

Q. Right.

A. And so here's more.

So I didn't have any training on the business. Like I -- like you have onboarding, and as part of your onboarding like you need to understand the businesses that you support. That was not given to me. And I asked for that. That was something else.

That I felt like I'm being held to a different standard. That's like, you know, standard operating procedures anywhere, like you're new to an organization, you're supporting new lines of business, you're going to want to have some insight into how that business operates. I didn't get any of that.

Me again sharing that people were just dumping -- I mean, the PowerPoint decks. I've never

support, yeah, that I needed.

So these are the things I'm talking about, so it's actually opposite of what you just said.

Q. Okay, so it seems like there were a lot of things about the way Liberty operated that you were pretty unhappy about.

A. I was concerned that these people hired me, but didn't give me the tools to do my job effectively. Never once did I tell anyone at Liberty that I was unhappy.

Q. Were you?

A. Actually at that point I was just pretty much trying to figure out how was I going to survive there. That's why I was talking to all the black people. Me reaching out to them on my own to see how they did it.

Q. I thought you said you didn't reach out to any of them.

You said they all put meetings ---

A. --- I didn't tell you that.

Q. Your earlier testimony was you didn't reach out to any of them, they all contacted you or put meetings on your calendar without your permission.

A. No.

wasn't about to just throw up my hands and be done with simple -- some simple things like give me access to the tools to do my job.

Q. Did you say at some point during your employment to your boss I'm done?

A. I might have. I'm not sure. I can't recall specifically.

But I know there was one point -- I mean, I think that's when I used the word, shit. Like I need you to get me the tools to do my job. I've been here a few months, so it could have been ---

Q. --- Do you remember writing ---

A. --- Can I finish answering your question?

Q. Please.

A. Thank you.

So I think it was along that vein. I don't remember specifically my words, but I know that I was extremely frustrated.

Q. Do you remember writing I'm not built for this?

A. I do remember something along that line, along my temperament.

No, I'm not built for running around in circles to do my job. I'm not. I echo that today.

Q. Did you think Liberty was the right place

for you?

A. If I had the right tools and the right support from my boss, sure. Why not. I could have made it work. I wasn't going to quit.

Q. What's the next page that you have flagged?

A. July 16th. Excuse me. It says Jen U at the top.

Excuse me.

MR. HERRMANN: 3389.

MS. BALSON: 3389. Okay, so this one we'll mark as 12A.

(* Exhibit 12A was marked *)

Q. (Ms. Balson) Okay, so the document we just marked as Exhibit 12A is the page that's been Bates labeled SM3389.

And what on this page do you think reflects microaggression?

A. I think it's the whole page again.

I think Jen reached out to me because she was going on vacation and wanted to have a quick meet-up -- because that's what I wrote at the top -- quick chat with me before she left, considering I had shared all this stuff with her, you know, a few days prior and just wanted to check in with me.

Q. --- Or have we gone through that whole ---
A. --- I think that was it. Hold on.
Yeah, that was it.
MS. BALSON: So let's go ahead and take a short break.
THE WITNESS: Sure.
VIDEOGRAPHER: The time is 2:41. We're off the record.
(2:41-2:50 p.m. - recess)
VIDEOGRAPHER: The time is 2:50. We're on the record.
Q. (Ms. Balson) Okay, before we took that last break, we had gone through all the pages in your notebooks that you had flagged in response to my request about pages that you thought had anything to do with microaggressions.
The next thing I wanted to ask you about is whether there are any pages in those notebooks that you think reflect you making a report of discrimination to anyone at Liberty Mutual.
A. I definitely think there are.
Whenever I mentioned me feeling like I was being held to a different standard, whenever I reported that I felt like I was a black, shiny new toy or a spokesperson. Whenever I felt that I was

being treated differently, whenever I called out racism specifically to Jen, to Kathy, to -- I mean -- Charlotte, Tim -- I mean, the whole kit and caboodle.

I think all of those are examples of me expressing -- and you want to call it reporting, but when I tell my boss that I feel like I'm being held to a different standard and being discriminated against, that's who you're supposed to go to.

When I have a conversation with ER, and then also another STA who is aligned to your boss, having those conversations, yeah, that's reporting.

Q. You're an experienced HR professional.

Is that a fair statement?

A. Yes.

Q. And so you know the significance of an employee making an internal report of discrimination is that that starts a process for an internal investigation. Right?

A. Absolutely.

Q. Okay, is it your understanding that all of those conversations were you trying to start the process of the company doing an internal investigation?

A. I think specifically my conversations with Kathy Jonas, with my boss, Jen Ughetta. I mean, I

shouldn't have had to go beyond that. But even having a conversation with Tichia, the ER person, around how I was experiencing things -- and maybe didn't specifically say discrimination, but as an experienced HR professional, as you just mentioned, any of those conversations with anybody would like -- some red flags in here. And maybe I would dig a little deeper to see what's going on and why Stacie is feeling this way.

Q. And is that how you intended them when you made those comments?

A. Directly, especially to my boss and Kathy, for sure. I mean, I wrote a whole email to Jen about how I was feeling, especially towards the end.

But we had conversations about this and, you know, that's when she would be telling me that, you know, we're going to wrap our arms around you and make sure you're successful here. And, you know, you're -- this is your home now, you know, you belong here, Stacie.

All those conversations were like inputs -- or outputs, rather, of me expressing, hey, I feel like you all treat me different because I'm black.

So I don't know what other -- I mean, did I have to hang up a sign or -- these are the things

that you would do, and as an experienced HR professional I know that. And I think I did the right things.

Q. And you think you did them throughout your employment?

A. I mean, I don't think I was feeling that way when I just got there.

Q. But as early as -- I think we had just been looking ---

A. --- In July.

Q. --- In July.

A. Yeah, for sure. Because I'm not a dummy.

I am experienced. I have been on the other side. Right? And coaching and counseling people through these things, I have worked in ER. That's been a part of my job. I was a generalist before, so yeah, I have line of sight to that.

And me having those conversations and raising those inflammatory words with people who are very senior in HR, this should have been like let's have a more deeper conversation with Stacie about how she's feeling as the lone black woman in GRM.

Q. And just now in your testimony you put air quotes around inflammatory words.

A. Sure.

certain level. Do I want to see all the leaders who exited the company in this time frame.

Like I didn't have access to it yet, but my analytics person did. And spending my time running around trying to have either my EA or the talent delivery team do it just wasn't happening.

Q. Okay. You had testified in your earlier deposition about certain retention data that you had asked for that you think you weren't able to get.

Did you ever ask your designated analytics person to run you those reports?

A. I don't recall whether I did or not.

But I -- the people that I did ask, who would know better than me, because they've been at the company -- for instance, Kathy Jonas for 40-something years, she told me that it would be the analytics -- no, not the -- it wasn't even Kathy Jonas. No, I'm sorry. It is -- I forget her name. She was the head of -- Tim Vigue told me to speak to my boss, who I did. My boss -- this is the merry-go-round.

Tim told me to speak to my boss. I asked Tim, as the DEI person, he should have access to that stuff. He told me I should be talking to Jen Ughetta. And Jen Ughetta said no, you shouldn't be

talking to me, you should be talking to -- she was the head of the DEI org. I forget her name in this moment, but she was a black woman who was the head of the DEI org. She never gave it to me.

I asked Charlotte Streat for it, because she's in DEI as well. I never got it from her.

So they just kept sending me around in a circle to get this information and -- I mean, I could clearly see they didn't want me to have it.

And that type of information, I don't know that necessarily talent analytics would have, because they really guarded that information very closely. It's con -- it's highly confidential information so I don't know that they have it.

In any event, nobody -- the information that I would have talent analytics run for me would be for GRM only and I wanted it for the whole company. I wanted to have line of sight for me of how many black people in the last -- I don't remember specifically -- could have been three or five years, you know, exited the organization, how long they had been there and what level they -- like I was asking for that type of information.

So that -- I don't think talent analytics could have ran that report for me anyways.

Q. And why did you want it for the whole company?

A. I wanted to have a lens into all that I was feeling, and that would have validated some stuff for me.

Because people talk and people lie. Right? I've seen it here in this whole process.

So I couldn't really take everything that Jen was saying to me, because she was gaslighting me. Same with Parker, same with Julie.

I've already been warned not to trust Charlotte Streat and, you know, the whole lot of them.

So the data doesn't lie, so I just wanted to look at it for my own eyes to validate all that I was feeling the entire time I was there. Simply that.

Q. In the roughly four months that you worked at Liberty Mutual ---

A. --- Uh-huh.

Q. --- Did you ever lie to anyone?

A. I mean, I don't believe I have. I'm not a liar, so no, I don't think so.

Q. Do you think you did anything wrong in your employment at Liberty?