UNITED STATES DISTRICT COURT MIDDLE

DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.:I-23-cv-897-LCB-JLW

STACIE MCLEAN,

Plaintiff,

Vs.

LIBERTY MUTUAL GROUP, INC.,

Defendant.

CIVIL ACTION

Videotaped Deposition of:
JENNIFER UGHETTA
January 13, 2025

\- - - - - - - - - - - - - - - -

SCHULMAN, WIEGMANN & ASSOCIATES

CERTIFIED COURT REPORTERS

216 Stelton Road / Suite C1

Piscataway, New Jersey 08854

732-752-7800

fb977170-587a-49c4-83e8-8badddf5ca08

Q All right. And what job were you hired in to?

A I believe my title was Chief Talent Officer.

MS. STRICKLIN: Do you need a break? Are you okay?

THE WITNESS: I'm okay, thank you. Actually I'll take a break.

MS. STRICKLIN: I'm asking because of the coughing.

THE WITNESS: Yeah.

MR. HERRMANN: Sure, let's take a quick break.

THE VIDEOGRAPHER: Okay, going off the video at 9:37 a.m.

(Whereupon, a brief recess is taken.)

THE VIDEOGRAPHER: Back on the video 9:43 a.m.

Q What is your current job at Liberty Mutual?

A Yeah, I apologize for all of the clearing of my throat, I'm having sinus issues.

Q It's okay.

A I'm sorry, repeat the question.

Q Yeah. What's your current job at

Liberty Mutual?
A My title is Chief People Officer.
Q When did you become Chief People Officer?
A I don't recall a specific date.
Q Was it within the last year?
A No, it's been a couple of years.
Q Okay. Was it some time in 2023?
A I don't recall the specific date.
Q All right. Was it prior to 2022?
A I don't believe so.
Q And what role were you in before you were the Chief People Officer?
A I was the Chief Talent Officer.
Q Have you had any other job titles at Liberty Mutual other than Chief Talent Officer and Chief People Officer?
A No, I don't believe so.
Q Was your move to the Chief People Officer job title was that a promotion?
A Yes, it was.
Q Okay. Did it come with a pay increase?
A Yes, it did.
Q Do you know who decided to give you

Q Okay. Did someone named Steven Chase report to you in 2021?
A He may have.
Q What do you recall about Mr. Chase as it relates to maybe reporting to you?
MS. STRICKLIN: Objection.
A I don't recall if he reported directly to me in that specific timeframe. He has reported directly to me, I just don't know if it's in that timeframe.
Q Okay. When did he report directly to you?
A I don't recall.
Q Was it before 2021?
A I don't recall.
Q Was it after 2021?
A I don't recall.
Q Did he report to you -- in the time that he did report directly to you, after Ms. McLean's employment with Liberty Mutual ended?
A I'm sorry, can you repeat the question or rephrase the question?
Q Yeah. You testified that at some point Steven Chase reported directly to you, right?
A Yes.

Q All right. My question is was that after Ms. McLean no longer worked at Liberty Mutual?
A I don't recall if he reported directly to me prior. I do remember him reporting directly to me after.
Q All right. Other than related we'll say other than Ms. McLean, have you ever had to terminate anyone at Liberty Mutual or you're involved in terminations dealings?
MS. STRICKLIN: Objection.
A Yes.
Q All right. Who?
A So can you define termination?
Q Yeah. Just like earlier, their employment is ending, it's not by their choice.
A Yes.
Q Okay, how many others?
A I don't recall exact numbers.
Q Do you recall any of the names?
A Yes.
Q All right. And we'll start if there's more than one we can do that, but what's the first one you can recall?
A Bobby Brenneck.
Q All right. And we can come back to

A I don't.

Q Okay. Is this something you will talk about with Melanie Foley when you return to work?

MS. STRICKLIN: Objection.

A I don't know.

Q Do you know someone named Tim Vigue?

A I do.

Q And is Vigue how you would pronounce his last name?

A It is.

Q Are you aware that he had his deposition taken in this case?

A I'm not.

Q Okay. I'll represent to you his deposition was taken on November 26th of 2024 and he testified that Beike van den Broek had interpersonal challenges during her employment at Liberty Mutual. Would you disagree with that?

MS. STRICKLIN: Objection.

A How did he define interpersonal challenges?

Q Nothing specific, he just recalls that she had them.

MS. STRICKLIN: Objection.

A That would be hard for me to answer.

Q I'm asking do you recall any

interpersonal challenges related to Beike van den Broek?

A And how would you define that?

Q How would you define it?

A I don't know that I would classify it as interpersonal challenges. I think Beike spoke in a way that people didn't always hear what she had to say.

Q What do you mean by that?

A Maybe she didn't always read the room.

Q And Mr. Vigue testified that he thought you had coached her on that, is that something you coached her on?

MS. STRICKLIN: Objection.

A I certainly had conversations with her about how to navigate.

Q And about how many conversations do you think you had with her?

A I couldn't guess, I don't recall.

Q All right. Did you ever give her any sort of performance improvement plan related to that?

A I don't believe so, no.

Q Any sort of written discipline related to what you just described?

A I don't recall that.

Q Are you aware that Kathy Jonas had her deposition taken on this case on November 13th of last year?

A I know that Kathy was deposed.

Q And she testified that professionally she can speak out, express herself and people didn't always understand what she was expressing so we were helping her to be clear and professional in her communications. Is that essentially what you just described?

MS. STRICKLIN: Objection.

A Could you read it again, please?

Q Yeah. I guess professionally she can speak out, express herself and people didn't always understand quite what she was expressing so we were helping her to be clear and professional in her communications.

MS. STRICKLIN: Objection.

A I think that's fair.

Q And she testified that she believed, this, she, Kathy Jonas, discussed this what we just talked about related to Beike with you, do you recall having conversations with Ms. Jonas?

A I don't recall.

Q Would you deny that you did?
A I would not deny it, I don't recall it.
Q Did you ever consider terminating Beike van den Broek's employment?
A I don't recall that.
Q Do you ever recall discussing terminating Beike van den Broek's employment with anyone else at Liberty Mutual?
A I don't recall that.
Q Would you deny that you discussed terminating her employment with anyone at Liberty Mutual?
A I would not deny it, I don't recall it.
Q Did Beike report to you when you were, up until you were promoted to Chief People Officer?
A I don't recall.
Q Okay. Do you recall when she stopped reporting to you?
A I do not.
Q Did she report to you after you became Chief People Officer?
A I don't recall.
Q Did she report directly to you at some point when she was, when you were in the CTO role?
A In the CTO role, yes.

references before hiring someone?
A That would not be my role.
Q Okay. Is it important for you that that happens?
MS. STRICKLIN: Objection.
Q Even if it's not your role?
A It's a part of the process.
Q Okay. Is it important to you that background checks happen when you hire somebody?
MS. STRICKLIN: Objection.
A I think that a background check is a good thing.
Q And why is that?
A To ensure accuracy.
MR. HERRMANN: This will be 15.
(Whereupon, E-mail 5-5-21 is received and marked as Plaintiff's Exhibit-15 for Identification.)
Q All right. The court reporter has handed you Exhibit-15. Take a minute to read it and my question to you is whether you've seen this document before?
A I don't recall seeing that.
Q Who is Parker Koppelman or who, what role was she in in May of 2021?

A I don't know what role she was specifically in, she was in the actuarial function.
Q Did she report to you?
A Parker?
Q Yeah.
A No.
Q It's someone you worked with?
MS. STRICKLIN: Objection.
A Parker was a business leader.
Q Was Parker involved in the hiring of Ms. McLean?
A I believe she was a part of the process.
Q All right. And Ms. Julie Haase part of the process as well?
A I believe so.
Q All right. And you were part of that process, right?
A I was.
Q Other than you, Parker Koppelman and Julie Haase, who else was involved in the process of hiring Ms. McLean?
A I think Kathy Jonas was. I don't recall specifics, some folks from my organization.
Q All right. In this e-mail from Parker to Julie from May 5th, 2021 says aside: it's really

back from Parker Koppelman about picking Stacie?

MS. STRICKLIN: Objection.

A I see that here but I don't recall that.

Q Do you recall any courageous conversation with Parker about feeling pressure to pick Stacie?

MS. STRICKLIN: Objection.

A I see that here but I don't recall that.

MR. HERRMANN: Okay. Let's go off the record and do a lunch break.

THE VIDEOGRAPHER: Going off the video at 1:17 p.m.

(Whereupon, a brief recess is taken.)

(Laticia Fleming has now joined via telephone.)

THE VIDEOGRAPHER: Back on the video 2:27 p.m.

MR. HERRMANN: All right, let's go ahead to Exhibit-94.

(Whereupon, Text Messages is received and marked as Plaintiff's Exhibit-94 for Identification.)

Q All right. The court reporter has handed you Exhibit-94. This is Bates defendant

18,049 through 51, it was produced to me by your lawyers. My question is gonna be whether you've seen this document before?

A I'd like to read it.

Q Yeah.

A Okay.

Q All right. Have you seen this document before?

A I don't recall it.

Q All right. Have you seen this document before?

A I don't recall seeing this document.

Q Okay. This looks like text messages with you.

A It looks that way.

Q All right. It looks like this is a text from you on May 19th, 2021 that says hey sorry for the late text. I have a nagging worry about Stacie's announcement and the line about bringing quote diverse perspective unquote, can be taken as being hired b/c she is a POC. Do you see that?

A I do.

Q All right. Do you recall sending that text message?

A I do not.

Q All right. Do you recall the announcement about Stacie's hiring?
A Do I recall -- could you rephrase the question?
Q Yeah. Liberty Mutual hired Stacie McLean, right?
A Yes.
Q All right. And you were involved in that process, right?
A In the hiring process, yes.
Q And there was an announcement about her hiring, right?
A Yes.
Q All right. And you had a nagging worry about a line you it said diverse perspective, right?
A I see that here.
Q Do you recall that?
A I don't recall that.
Q Do you deny that you sent this text message?
A Not denying it, just don't recall it.
Q All right. And this says thanks, Parked just pinged me about it and I had already been struggling with it. Do you recall Parker

pinging you about diverse perspective language?
A I do not.
Q All right. And do you know why you had issues with bringing diverse perspective?
MS. STRICKLIN: Objection.
A Don't recall it other than what's written here.
Q Okay. And you do recall what's written here?
MS. STRICKLIN: Objection.
A It's because I see it right now.
Q Okay. And this is from May of 2021, right?
A That's what it looks like, yes.
Q All right. How is your ability today to recall events from 2021?
MS. STRICKLIN: Objection.
A I don't know how to answer that, that's broad.
Q Okay. It looks like it says because she's a POC. What does POC mean here?
A I can't be certain.
Q It's your words, right?
A I would imagine it's person of color.
Q Okay. And why would you imagine that?

Q Okay. And do you recall doing that?
A Yes.
Q All right. Let's go back to Exhibit-4 the EEOC, there you go, go ahead and go to page five and in roughly the middle of the page do you see where it says her manager, Ms. Ughetta as well as others, made every effort to resolve complainant's issues and even personally contacted IT on complainant's behalf. Do you see that?
A I do.
Q And then after that it says there is a quote, she's been having tons of tech issues and she really needs some dedicated support to get her issues resolved. Just sending a quick note to ask that you prioritize this for me. It's been super hard for her and I really need to get her operating at full speed quickly. Thanks so much. Do you recall sending that to IT?
A I do.
Q All right. And was that true that you really need to get her operating at full speed quickly when you said that?
A Yes, we were still trying to resolve things.
Q And this would have been before you decided to fire Ms. McLean, right?

MS. STRICKLIN: Objection.

A The notice to -- if this was nine, is this 9-14?

Q I believe so but.

A So at the end of 9-14, I was strong in my conviction and 9-15 was the conversation.

Q Okay. In the 9-14 you were strong in your conviction and then 9-15 was the conversation?

A That's my recollection, yes.

Q When you say strong in your conviction, what conviction was that?

A I made the decision that I was done trying.

Q All right. And that was at the end of 9-14? Is that a yes?

A Yes.

MR. HERRMANN: This is just a one page exhibit, it's Exhibit-80.

(Whereupon, E-mail dated 9-16-21 is received and marked as Plaintiff's Exhibit-80 for Identification.)

A Okay.

Q Do you recognize Exhibit-80?

A Looks familiar.

Q And this is another e-mail from you to Kathy Jonas on 9-16-2021 at 9:18 p.m., right?

A I'm assuming it's the 14th of September.

Q Okay. If we go back to the statement of position, Exhibit-4 on page five where we were before, just going back, we've looked at Exhibit -- L and M those were Exhibits-133 and 134 and the quote it says can you please help someone to fix this shit for me once and for all, see highlighted portion of an IM conversation between complainant and HR and IM conversation between complainant and Ms. Ughetta as Exhibit-L and Exhibit-M, page two. Do you see that?

A I do.

Q Would this refresh your recollection about whether HR here is referring to Ms. Jonas?

A I can't answer that, I don't know.

Q Okay. Exhibit-L is 134, that's a conversation with Ms. Jonas, right?

A I see that.

Q Now in that quote Ms. McLean uses the word shit, right?

A Yes.

Q Is that a word that you ever use?

A Yes.

Q Okay. Do you ever -- and do you use other curse words?

A Yes.

Q Sometimes at the workplace?

A Yes.

Q Did you reprimand Ms. McLean for using the word shit here?

A I don't recall.

Q All right. Did you have a problem with her using the word shit here in this instant message?

A I did.

Q And what was that?

A I thought it was inappropriate for a subordinate to be barking orders at their manager and using it in that context.

Q And you took this as her barking orders at you?

A I did.

Q All right. And after she -- that message where she used the word shit, that's when you reached out to Chris Moon about getting her operating at full speed quickly, right?

A It looks that way.

Q Right. And at that time had you decided to terminate Ms. McLean?

A I hadn't taken action yet so I was still

Stacie said no to the separation agreement?
A I don't believe I was a part of these discussions. I had the conversation on the 15th as the manager and then this is the work that Kathy and it looks like Ticia did. So I don't know.
Q Was the 15th your last involvement in the decision to terminate?
A I can't say for certain but I believe so.
Q Did you ever discuss the decision to terminate with Melanie Foley?
A Yes.
Q All right. And when did you talk to her?
A I don't know the date.
Q All right. And what do you recall talking about?
A I don't recall specifics.
Q Did you have any discussions about putting Ms. McLean on a performance improvement plan?
A I don't recall that.
Q All right. Do you recall any discussions about issuing Ms. McLean any sort of written discipline?
A I don't recall that.

related to retention of black employees at Liberty Mutual?

A I don't recall that.

Q Do you recall any consideration of how Ms. McLean's experience as a person of color was related to some of these other issues we've seen as it relates to DEI?

MS. STRICKLIN: Objection.

A I don't recall.

Q Now we'll do 45. Okay, have you seen this document before?

A I don't recall it.

Q It looks like a message from Tim Vigue to Charlotte Streat, S-t-r-e-a-t?

A I see that.

Q And it says okay, Stacie pinged me asking for number of black execs at Liberty and a number who left in last five years. She said she asked you also. Before I reply to her, I wanted to touch base quickly. Do you see that?

A Yes.

Q Do you ever recall Stacie asking you for this type of information?

A I do.

Q All right. And what do you recall

about that?

A I recall referring her to Dawn.

Q Okay. And why did you refer her to Dawn?

A Cause Dawn was the chief diversity officer.

MR. HERRMANN: Okay. We'll go to, this will be 73.

(Whereupon, E-mail dated 9-16-21 is received and marked as Plaintiff's Exhibit-73 for Identification.)

A Okay.

Q All right. Do you recognize this document?

A I do.

Q All right. Looks like on August 18th, 2021 Stacie e-mailed you and said hey Jen, hope you had a great hump day. Was wondering if the info I asked around turnover for black execs is confidential as I haven't been able to get that info from anyone. I don't need the hard data just the headline would be helpful to me. Do you see that?

A I do.

Q And it looks like you told her hi, Stacie, did you not have the discussions with Dawn? Part of the reason I provided that introduction was

because Dawn is the best person to understand the data and discuss it with you, right?

A Agreed, yes.

Q And you agree with that statement today?

A I do.

Q And it looks like Stacie responded hi, Jen, I did speak with Dawn and followed up with an e-mail requesting the same thing I asked you, Tim and Charlotte. It's okay, no worries, thanks for making the introduction, right?

A I see that.

Q And then at the top on September 16th, 2021 at 9:03 p.m. you forwarded this exchange to Kathy Jonas, right?

A I see that, yes.

Q Why did you forward this exchange to Kathy Jonas on 9-16?

A I believe I was forwarding her all of the things for Stacie's file having had the exit conversation on the 15th.

Q Why did you forward this particular chain for Stacie's file?

A I thought she should have it.

Q Why do you think she should have it?

fb977170-587a-49c4-83e8-8badddf5ca08

A I don't know.

Q Is it your testimony today that you don't know why you thought this should go in the file?

A Yes, I don't recall.

MR. HERRMANN: This will be Exhibit-50.

(Whereupon, E-mail dated 8-12-21 is received and marked as Plaintiff's Exhibit-50 for Identification.)

A Okay.

Q All right. Do you recognize this document?

A I don't recall it.

Q Okay. It's an e-mail from August 12th, 2021 at 9:43 p.m. from Tim Vigue to you, right?

A I see that.

Q Hey, you may know this already but Stacie reached out to both Charlotte and I earlier, right?

A I see that.

Q Did you discuss Stacie's reaching out for information on black employees with Mr. Vigue?

A I don't recall that.

that Dawn was the best person to understand the data and discuss it with Stacie. He asked me to rephrase and I did. And I said would you agree with me with what Ms. Ughetta said to Stacie here, that Dawn is the best person to understand the data and discussing it with Stacie and he said no and I said why would you disagree with that and he said I don't think Dawn would be the best person to have that conversation. Why did you think Dawn was the best person to have that conversation?

MS. STRICKLIN: Objection. Go ahead.

A Because Dawn was the chief diversity officer for Liberty.

Q Does it surprise you that Mr. Vigue testified that he thought you were the person that she should have had that conversation with?

MS. STRICKLIN: Objection.

A I don't have an opinion on what he thought.

Q Do you know whether Stacie was ever able to get the data she was looking for?

A I don't recall.

Q Did you think it was important that she get that data?

MS. STRICKLIN: Objection.

A Stacie needed data for her job which she had access to.

Q In the e-mail to you it didn't look like she had data to the or access to the data she was looking for, right?

MS. STRICKLIN: Objection.

A Stacie was asking for data that's bigger than her job which is why I was referring her to the chief diversity officer who's responsible for all of Liberty.

Q And the data that she was looking for that was bigger than her job was about the number of black executives at Liberty who had left in the last five years, right?

A Yes.

Q And as she said to you in an e-mail it was about turnover for black execs that was the info she wanted, right?

A The data that Stacie had access to was for the part of the organization that she supported. What she was asking for was bigger which is data that Dawn would have.

MR. HERRMANN: This will be Exhibit-53.

(Whereupon, E-mail dated 8-24-21

black executive has experienced onboarding with Liberty and then there is stuff that's not legible, do you see that?

A I do.

Q Do you think Ms. Jonas should have reported these comments to you after the 9-16 meeting?

MS. STRICKLIN: Objection.

A I don't.

Q Why not?

A I was the manager, this was her follow-up HR work.

Q It says I was told by Melanie that I have no words of encouragement and dropping the words severance I wondered if I were not a black woman would she be saying the same things. Would you take that as a complaint about racial bias at Liberty Mutual?

A I would not.

Q And why not?

A I think she's speculating.

Q Okay. Do any black employees report to you today?

A No.

Q Okay. Would your testimony be that if

you believe a black employee is speculating and making comments like this, you should not look into it?

MS. STRICKLIN: Objection.

A That's broad, I can't answer that.

Q All right. What do you mean by she is speculating?

A Can you repeat the sentence?

Q I was told by Melanie that I have no words of encouragement in dropping the word severance, I wonder if I were not a black woman would she be saying the same things. Does that comment raise any red flags with you whatsoever?

MS. STRICKLIN: Objection.

A I see it as pure speculation, she's just wondering, she's not rasing anything. She's not filing a complaint.

Q What is the process for filing a complaint at Liberty Mutual related to race discrimination?

A I don't know all of the details of the policy but would have taken it to employee relations.

Q Other people are set up for success but the first reaction to the only back female exec is here to exit her. Do you feel like that is a

comment that should have been looked into?

MS. STRICKLIN: Objection.

A Can you repeat the sentence?

Q Other people are set up for success but the first reaction to the only black female exec is here is to exit her. Should a comment like that at least get some attention at Liberty Mutual?

MS. STRICKLIN: Objection.

A I don't even think it's accurate. She's saying the only female executive. You know, I just, I don't know that there's even accuracy in that comment. And, no, I don't think it warrants concern, it's more speculation.

Q As part of your DEI work would you encourage black employees at Liberty to share honestly their experience working there?

MS. STRICKLIN: Objection.

A Possibly.

Q Okay. And what do you mean by possibly?

A Depends on the situation, the context, hypothetical I don't know.

Q During her deposition Ms. McLean testified that you had told her about a nephew of yours and it was related to some sort of drug use or

people is attributed to something to their core personality whereas for white workers it's more attributed to external stimuli, is that related to something you've heard?

MS. STRICKLIN: Objection.

A I'm sorry, can you repeat that?

Q Yeah, let me just ask a different question. Have you ever had any training on how to combat that stereo type at the workplace?

A I don't recall that.

Q Do you recall any training at all that you've had related to combating stereo types as they relate to race?

A I don't recall that.

MR. HERRMANN: This will be Exhibit-54.

(Whereupon, E-mail dated 8-24-21 is received and marked as Plaintiff's Exhibit-54 for Identification.)

A Okay.

Q Do you recognize this document?

A I'm sorry?

Q Do you recognize this Exhibit-54?

A I don't recall it.

Q All right. It's an e-mail from Donna

Andujo to you on August 24th, 2021, right?
MS. STRICKLIN: Objection.
A Yes, I believe so.
Q Who's Donna Andujo?
A She was a part of the talent advisor community.
Q It looks like she says in this e-mail I'm happy to help in any way that I can with Stacie. There is so many things that come up as an outsider/newbie, as woman and as a person of color at Liberty in particular. Do you see that?
A I do?
MS. STRICKLIN: Objection.
Q All right. And did you reach out to Donna Andujo for help with Stacie?
A I don't recall.
Q It says LM can feel like a bunch of little cliques that one may not have ever experienced before professionally or even personally, do you see that?
A I do.
Q Do you recall discussing issues that Ms. McLean was having as a person of color at Liberty with Donna Andujo?
A I don't recall that.