**KIMBERLY HOUSTON DRUMMOND**
**Sr. Corporate Counsel**

Employment Legal Department
7900 Windrose Avenue
Plano, TX 75024
(469) 997-6559
(603) 334-8810 Fax
Kimberly.Houstondrummond@libertymutual.com

April 5, 2022

***Via EEOC Electronic Portal***

Rebecca Conway
Investigator
U.S. Equal Employment Opportunity Commission
Charlotte District Office
129 West Trade Street, Ste. 400
Charlotte, North Carolina 28202

RE: *Stacie McLean v. Liberty Mutual Group, Inc.*
**EEOC Charge No. 430-2022-01216**

Dear Ms. Conway:

Liberty Mutual Group Inc., (Liberty Mutual" or the "Company") submits this position statement in response to the above referenced Charge of Discrimination ("Charge") based on race (Black) and sex (Female, and retaliation filed by Stacie McLean ("Complainant").[1]

## SUMMARY OF ARGUMENT

Complainant was employed with Liberty Mutual for a total of four months in the 2021 calendar year as a Vice President and Senior Talent Advisor. Complainant was highly sought after by Liberty Mutual after reviewing her experience and a successful interview that showed her enthusiasm in becoming a part of the Liberty team. This coupled with Liberty Mutual's dedication to having a diverse workplace where all employees can work across and navigate many cultures made Complainant an attractive candidate and fit for the role.

[1] Liberty Mutual's response is based upon our understanding of the facts and the information reviewed thus far. Although there has not been an opportunity for formal discovery, this response is submitted for the purpose of aiding the Commission in its investigation and facilitating the informal resolution of these matters. This response, while believed to be accurate, does not constitute an affidavit or a binding statement of the Company's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with Complainant's allegations. Because additional facts would likely be uncovered through discovery or following a full investigation, the Company does not waive its right to present new or additional information at a later date, for substance or clarification. Moreover, by responding to this Charge, the Company does not waive, and hereby affirmatively preserves, any and all substantive and procedural defenses.

Prior to completing onboarding and training, Complainant determined that she was ready to begin working in her role, and that she did not need to complete the onboarding and training process. Soon after, Complainant communicated to her direct supervisor and other employees that she in fact wasn't ready to work in her role, but instead wanted to return to onboarding and training. Once made aware, Complainant's manager immediately supported Complainant's request. Additionally and at the same time, Complainant expressed dissatisfaction for the Liberty Talent operating model. Specifically, among other things, Complainant did not like how her business clients ("clients") engaged with her in her role, and their expectations of her. Complainant told many of her peers and members of leadership that she probably would not be staying with Liberty as she was not happy. Subsequently, Complainant met with her manager and human resources to discuss her behaviors, engagement with clients, and overall dissatisfaction with Liberty Mutual. In the meeting, Complainant again expressed her dissatisfaction with the Company's operating model. By the end of the meeting it was clear that Complainant had disengaged and was no longer interested in finding a path forward with Liberty Mutual. As a result, her employment was separated.

The Company vehemently denies Complainant's allegation that it discriminated against her based on race and sex, and retaliated against her. The Company maintains that at all times it treated Complainant properly and in accordance with the law and Company policy.

Further, Complainant provides insufficient evidence that rises to the level of a race or sex discrimination claim as well as a retaliation claim to even establish a *prima facie* case, and thus fails to state a claim upon which *any* relief can be granted for her claims.

Even if Complainant establishes a *prima facie* case of discrimination of any kind or retaliation, which she cannot, Liberty Mutual took appropriate, non-discriminatory actions in separating Complainant's employment with the Company.

As there is no legal or factual support for Complainant's claims of race or sex discrimination and retaliation, Liberty Mutual requests that the Charge be dismissed in its entirety.

## FACTUAL BACKGROUND

### 1. *The Company Maintains its Commitment to Compliance and Equal Opportunities for All*

Liberty Mutual is an equal employment opportunity employer committed to providing an inclusive workplace for *all* employees. Its treatment of Complainant is no exception. It complies with all applicable federal, state and local laws governing nondiscrimination, harassment, and retaliation in employment and maintains an employee handbook, Liberty Mutual Employee Handbook (the "Handbook"), that is distributed to all employees. Therein contains its Equal Employment Opportunity ("EEO") policy. (*See* EEO Policy as **Exhibit A**). Employees are also required to participate in a Compliance training of the Company's Business Code ("Code") and Ethics, which confirms that the employee read the Code and explains the Company's zero tolerance of discrimination, harassment, and retaliation in any form, while also linking to the Discrimination, Harassment, and Retaliation policy. Complainant certified that

she took this training on July 12, 2021 and a training on Unconscious Bias on the same day. (*See* Complainant's training transcripts as **Exhibit B).**

Liberty Mutual affirms zero-tolerance for discrimination, harassment, and retaliation in a separate Handbook policy where it explicitly defines these terms and outlines the internal process for reporting such behavior to Liberty Mutual, and further provides information about the EEOC. It also requires managers who receive complaints of discrimination, harassment or retaliation to report the same to the Company's Employee Relations department. (*See* Discrimination, Harassment and Retaliation Policy as **Exhibit C).**

Liberty Mutual further maintains a Behavior Expectations policy which states that all employees are "expected to always exhibit appropriate behavior and a high degree of integrity." It further states that employees are "…expected to observe Company policies, procedures, and safety rules." (*See* Behavior Expectations Policy as **Exhibit D**).

As important, Liberty Mutual has a Diversity, Equity, and Inclusion (DEI) department led by a Chief Diversity Officer who has multiple teams dedicated to communicating and implementing the Company's DEI initiatives through programing, social groups, and events. This is discussed further below. (*See* Liberty's DEI Mission and Framework as **Exhibit E**).

2. ***Complainant's Short Tenure with the Company and Inappropriate and Unprofessional Behaviors***

Hire and Onboarding/Training

Complainant began employment with Liberty Mutual on May 24, 2021 as a Vice President and Senior Talent Advisor. During her short tenure, she reported directly to a female manager – Jennifer Ughetta - and a next level manager, also female. During her tenure, Complainant had a total of 11 peers, 8 were female and 3 were male.

In recruiting a Senior Talent Advisor to join the team, management was seeking someone with prior experience in Human Resources ("HR"), one who could contribute and bring diversity of thought, perspective, and experience to the team, one who welcomed the challenge in working multiple leaders, and who could navigate the complexities of a large company. The Company spent months interviewing candidates and believed it had found that fit in Complainant. Indeed at the outset, Ms. Ughetta and others on the interview team viewed her as a strong candidate throughout the entire application/interview process. (*See* email exchanges on 4-22-21 and 5-1-21 attached and incorporated herein as **Exhibit F**).

Ms. Ughetta was excited to have Complainant join her team, and sent out an internal announcement to Liberty's Executive leadership welcoming Complainant, wherein she complimented Complainant on her accomplishments:

> "Stacie brings a breadth of over twenty years of business consulting and HR leadership experience. She has a proven track record in strategic talent consultation, working directly with senior leaders of Fortune 500 companies to identify and address business challenges.

> She has served as a trusted advisor for leaders across the globe, driving talent and organizational strategies and drawing on an extensive global network to achieve successful engagements. Stacie has designed and executed talent strategies with a strong focus on executive coaching, talent development, workforce planning, internal mobility, organization design and business growth.
>
> Most recently, she worked as a Senior HR Business Partner at Aetna, helping to integrate Aetna and CVS employees through the largest acquisition in the health insurance industry.
>
> Stacie graduated summa cum laude from American International College with a master's degree in Organizational Development and holds a bachelor's degree in Political Science from Central Connecticut State University. Additionally, she graduated from the Executive Education program at The Wharton School.
>
> She resides in Charlotte, North Carolina with her family and is an active member of the community partnering with several non-profit and social organizations. She is a proud mom, active mentor, avid traveler, and is passionate about practicing minimalism.
>
> [*Sr. Talent Advisor*[2]] will work with Stacie over the coming weeks to ensure a seamless transition.
>
> Please join us in welcoming Stacie!" (*See* internal Welcome announcement as **Exhibit G**).

Upon hire, Complainant was supposed to complete the onboarding and training process prior to independently performing her duties as a Senior Talent Advisor. This would allow her the opportunity to engage with those currently in the role, to walk through scenarios and ask questions, and allow her the time to understand the Talent model and business structure of those she would be supporting in her role. (*See* welcome email discussing Complainant's onboarding content as **Exhibit H**). Onboarding is a crucial part of the process for Complainant's role. This was explained to Complainant. The Company's Talent team was eager to help Complainant acclimate to the department and expressed their desire to help in multiple ways. (*See* May and June 2021 email correspondence with the Talent team as **Exhibit I**).

Notwithstanding, a little shy of one month into her role, Complainant still hadn't completed the onboarding process designed for her success, but instead abandoned the onboarding process stating that she didn't begin the process because she was "eager to get started and meet with the business/key stakeholders…" (*See* highlighted sections an email exchange dated 6-17-22 as **Exhibit J**). However, Complainant herself admitted that she did not complete any of the plan and that she should have stuck with it (*See* **Exhibit J**).

<u>Complainant's IT Problems and Inappropriate and Unprofessional Communication</u>

From the outset, peers and management alike welcomed Complainant and accommodated her special requests, one of which was purchasing her a MAC computer, even though the

---

[22] Name omitted. Will provide upon request.

Company supplies and supports Windows-based computers. Complainant was very complimentary of the IT team that helped her with her MAC computer stating:

> "I wanted to take the time to let you know how thankful I am for Chris Moon. I'm new to Liberty and have had a bit of a time with tech issues these last few weeks. Chris went above and beyond to make sure I not only had the right equipment, but also that they were set up properly. Additionally, he gave me tips and tricks to help me be more efficient. Chris is incredibly patient and his knowledge about all things iOS is impressive. He has a way of explaining sometimes complex technological concepts into very easy to understand quick bites of information. He's a natural trainer and I'm sure you already know that he's amazing. I'm eternally grateful for his support and willingness to carve out time in his busy day to help troubleshoot my issues and make sure that I have the right tools to be successful in my new role. He's a gem and one of the most talented tech support individuals I've ever worked with in my career." (*See* an email from Complainant dated 7-23-21 praising the IT team as **Exhibit K**).

However, when Complainant began having IT problems with her computer, she not only complained about the service she was receiving from IT, but was inappropriate and unprofessional in communicating her issues to both HR and Ms. Ughetta stating to both:

> "Can you please help and get someone to fix this shit for me once and for all?" (*See* highlighted portion of an IM conversation between Complainant and HR and IM conversation between Complainant and Ms. Ughetta as **Exhibit L and Exhibit M, p. 2**).

Her manager, Ms. Ughetta (as well as others) made every effort to resolve Complainant's IT issues, and even personally contacted IT on Complainant's behalf stating:

> "She has been having tons of tech issues and she really needs some dedicated support to get her issues resolved. Just sending a quick note to ask that you prioritize this for me. It's been super hard for her and I really need to get her operating at full speed quickly. Thank so much!" (*See* an IM conversation between Ms. Ughetta and IT as **Exhibit M-1**).

<u>Complainant's Dissatisfaction with Liberty's Talent Model and the Company's Repeated Attempts to Support Complainant</u>

Approximately 60 days into her position, in July 2021, Complainant communicated to the clients, to whom she was assigned, her feedback and intention to level set expectations around the support she would provide them. This was supported. However, in doing so Complainant expressly told the business leaders that the TA model "sucks" because she doesn't have her own team and processes are broken. Nonetheless, leadership was open to this feedback and a fresh perspective and wanted to find solutions so that Complainant could be successful in her role and at Liberty Mutual. (*See* email chain dated 7-27-21 as **Exhibit N**). At all times, Ms. Ughetta continued to ensure that Complainant had a voice in the organization and communicated the same to Stacie and Stacie's clients, stating in part:

> "…I can relate to what she is feeling since I was there feeling similarly overwhelmed and quite honestly lonely) just a few short years ago. Knowing how it can feel, **I want to make sure that I am helping her navigate and empower her to have the**

> **conversations she needs to be successful here.** I have encouraged her to have "contracting conversations" with both of you…what is important to you, where do you want her to focus, where can she add the most value, what are you getting that you appreciate, what are you getting that you want, etc. **I also want her to have a voice and share where she thinks she can add the most value – which may be slightly different than what you are asking for**…I'm not sure of that, but I encouraged her to start that kind of open strategic dialogue. **She should share some of her experience so that you know what she can bring to your table**. Ultimately you will have to decide together with her on what her focus and priorities should be in order to be the stronger partner for each of you.
>
> …**I think Stacie can be an asset and a change agent for us in GRM as well as T&ES and I don't want to lose her, so I appreciate your help in leaning in and making sure we do everything we can to help this be a successful relationship!**"(*See* **Exhibit N**).

Complainant's inappropriate and unprofessional communication to HR (and others at times) quickly became a pattern when she was unhappy:

> "Good morning Kathy –
>
> I went around and around with Carolyn Gannon this morning on this simple EOS ask**. I must tell you that I'm done with the swirl. I'm not built for this level of foolery day in and day out. I'm not going to bumble around pulling data, it's not the best use of my time. I'm not going to chase people down and beg for support. I'm going to let it be. Whatever happens I'm fine with it. It's unfortunate but yea I'm not going to be complicit in craziness.** (*See* highlighted on page 1 of the email dated 9-14-21 from Complainant to HR as **Exhibit O**).

In addition to Ms. Ughetta, Stacie's clients also wanted her to be successful in her support of their departments, stating in part:

> "We had a very candid conversation, and I appreciate that she shared so openly what she's observed and experienced in her first ~60 days. A fresh perspective is helpful and welcome and makes me rethink certain things."
>
> …I'm fully committed to helping her be successful and will continue to work with her on it. If there are other things you're hearing or seeing, please let me know." (*See* **Exhibit N**).

A month later, in August 2021, Complainant requested from Ms. Ughetta a change that would reorganize the department's structure. Specifically, Complainant wanted another member of her department to handle certain daily tasks that she was uninterested in handling. This would result in having that employee report directly to Complainant. Although unprecedented, it was nevertheless accommodated in part by Ms. Ughetta as she agreed to make the employee available to Complainant on a temporary basis and re-evaluate the arrangement at a later date based on need. (*See* email exchange between Complainant and Ms. Ughetta as **Exhibit P**).

Complainant's Request to Step Away from her Clients and Return to Onboarding/Training and the Company's Continuous Support

Also in August 2021, Complainant requested to take a break from servicing her clients, and to return to onboarding and training. She stated to Ms. Ughetta in an email the following:

> "…Gave some thought to the question what you can do to help me as I'm feeling like I need to reset…I'd like to take a step back from the business and onboard in a way that I feel will be meaningful for me…and therefore the business. I'm having a difficult time acclimating to the level of "production" and volume of marathon meetings…I feel like I can't gain any traction, as most people seem to have forgotten that I'm new and talk in non-stop acronymns, to first names only like Madonna 😊 etc. The culture is definetly a lot different than what I'm used to. I want to be successful at Liberty. I need time to gain a solid foundation and I feel like I'm in Groundhog Day… Please let me know your thoughts." (*See* email chain dated 7-25-22 as **Exhibit Q**)

Again, Ms. Ughetta was completely receptive replying "I will help however I can! Let's chat tomorrow…" (*See* **Exhibit Q**). Ms. Ughetta immediately engaged HR to also help Complainant. Complainant's abandoning the onboarding process, among other things, disadvantaged her to the point that she was unaware of the resources needed and how to efficiently use them to do her job. Notwithstanding, HR was more than willing and committed to ensuring she had everything she needed to succeed in her role. (*See* email chain between Ms. Ughetta and HR dated 7-26-21 as **Exhibit R**).

Further, when Complainant requested to step away from supporting her clients so that she could return to onboarding, her clients were equally supportive. Subsequently, Complainant's clients learned that Complainant never actually returned to onboarding as she requested she was still too busy with other duties. Upon discovery, Complainant's clients aligned to ensure that she was fully supported to have the time to reboot and return to onboarding:

> "…Jen and I talked yesterday and I'm fully supportive of clearing your calendar for real this time and giving you the time to really lean into T&ES onboarding…We are all here to support you and give you the space to onboard properly….We all want you to be successful and are here to help however!" (*See* email from client supporting Complainant as **Exhibit T**).

Both Ms. Ughetta and the clients collectively continued to offer their support to Complainant, again wanting her to be successful in her role. (*See* 8-9-21 email chain between Ms. Ughetta and Complainant's clients as **Exhibit S**). Similarly, Ms. Ughetta and HR continued their united efforts to ensure that Complainant was getting everything she believed she needed in terms of support in her role. (*See* highlighted section of email dated 8-18-21 as **Exhibit U**)[3]. Additionally, HR and Ms. Ughetta worked to coordinate two seasoned employees from two other teams to help Complainant better acclimate to her role and the department's business model. (*See* email dated 8-13-21 as **Exhibit V**); (*See also* email dated 8-17-21 attached and incorporated herein as **Exhibit W**).

[3] The last part of this exhibit is redacted as it contains other employee information.

<u>Complainant Decided Liberty Mutual Was Not The Place For Her</u>

By September 2021, Complainant was telling anyone who would listen how dissatisfied she was in working at Liberty and implied that she would not be there long. Specifically, in September 2021, Complainant told Ms. Ughetta that Complainant was not a good fit to remain at Liberty stating: "I'm likely not the right person for Liberty and the way things get done here. I don't have the temperament for it." *See* **Exhibit M**, **p. 4**). Around this same time, Complainant had told various people that she was unhappy at Liberty Mutual and/or that she wouldn't be long at the Company both verbally and some in writing. (*See* a small written sample as **Exhibit X**).

Indeed, by September, it had become quite clear that Complainant was not happy working at Liberty Mutual and had given up on a path forward to remain with the Company, specifically stating that she was not going to engage in the way Liberty Mutual gets work done. Complainant made this decision almost immediately when she began in her role and it did not change throughout her short tenure. She stated numerous times how she did not like the department's operating model, that the department had too many meetings, and that she was not aligned with the way clients engaged her in her role and the type of work they expected her to perform. (*See* two emails dated 9-13-21 and 10-26-21 as examples Complainant provided where she disagreed with how her clients were engaging with her as **Exhibit Y**; ***see also*** **Exhibit O**.

Complainant's clients also experienced Complainant's resistance and expressed their concerns to Ms. Ughetta about Complainant's negative engagement, while still being optimistic that they would find a solution that would work with them and Complainant. (*See* **Exhibit N**). After considering Complainant's behaviors and disengagement, the Company ultimately separated Complainant's employment on September 24, 2021, as it was clear she was not happy at Liberty Mutual and was not going to perform the functions of her job.

### ***3. Liberty Mutual's Diversity Equity and Inclusion Department and Initiatives and Complainant's Allegations***

Liberty Mutual's DEI department, led by a Black, female Chief Diversity Equity & Inclusion Officer – Dawn Frazier-Bohnert, is missioned to communicate and implement the Company's DEI values through programing, social groups, and events. As a global company, Liberty Mutual understands that all employees must effectively work across and navigate many cultures. It values the differences of its employees and takes pride in having a diverse workplace. As such, it believes that a diverse and inclusive workplace environment with equitable opportunities for everyone fosters employee engagement and innovation. Liberty Mutual has developed many initiatives to put this into action. Advancing the Company's DEI plans include: training in unconscious bias awareness and inclusive communication skills; toolkits for managers; and employee-wide discussions about race and ethnicity and racial bias through different programs. As a part of the Company's existing Race & Ethnicity Collaboration initiative, in direct response to George Floyd's death, it introduced a program called Eight Weeks of Action to Disrupt Racial Bias which was aimed at providing employees with resources, virtual sessions and a discussion guide to help increase understanding across racial differences. An open forum with employees across the United States was also held to discuss race and ethnicity in the workplace, featuring the Company's CEO, David Long, and its Chief Diversity Equity & Inclusion Officer. Additionally, all managers and employees were invited to participate in a

virtual session focused on how race and ethnicity affect us differently at work. This session was offered on a recurring basis and was hosted by an external consultant and DEI author. Liberty Mutual also maintains 7 Employee Resource Groups (ERGs) that bring employees together while fostering an inclusive culture. The ERG philosophy is to strengthen the Company's welcoming environment by offering employees a way to connect, learn and engage. The ERG for Black employees is called LEADA – Liberty Employees of African Descent and Allies. At the call of the Company's Executive Leaders and members of LEADA, in response to the increase of social and racial injustice and unrest, a company-wide discussion was held with the CEO David Long and a DEI expert, whereby the forum allowed for reflection and discussion.

Further, the DEI department created and introduced its Guidelines for Inclusion, which are nine practices designed to increase effective communication, collaboration and problem-solving between individuals and groups: Be Trustworthy; Practice Both/And Thinking; Try On; Notice Both Interpersonal Process and Content; It's Okay to Disagree; Be Aware of Intent and Impact; It's Not Okay to Blame, Shame or Attack Yourself or Others; Step Up/Step Back; and Practice Self-Focus. The idea is when the Guidelines for Inclusion are practiced, they can enhance working relationships, leader effectiveness, and individual and team performance. (*See* attached Guidelines for Inclusion as **Exhibit Z**). Trainings on the Guidelines for Inclusion and many of the other diversity initiatives mentioned above were provided to employees Company-wide.

In her Charge, Complainant alleged that Ms. Ughetta asked her to "share her experiences and black perspective…" This was taken out of context. As shown herein and through exhibits attached hereto, Ms. Ughetta tried everything she could to ensure Complainant had all the support she needed, that she had a good experience acclimating to Liberty, and that she was an advocate for Complainant in her role. In utilizing the Company's "Try On" Guideline for Inclusion, Ms. Ughetta tried to connect with Complainant on a personal level to understand her experience as a woman of color, as Ms. Ughetta understood it would be different and more challenging than her own experience as a White woman. What Ms. Ughetta actually said to Complainant was:

> "Been thinking about you a lot and wondering if you'd like to spend some time sharing with me your observations/perspective on what it feels to be a newcomer at LM through the lens of a black woman. I understand how it feels as a non-Liberty lifer and a white woman – but I recognize that I'm probably missing things through that lens…" (*See* attached IM dated 8-24-2 from Ms. Ughetta to Complainant as **Exhibit AA**).

Ms. Ughetta's communication was directed in a positive way as she was trying to understand how she could be an ally to Complainant in every way. It was not at all meant to insult, demean, or degrade Complainant as she asserts in her Charge. Contrary to what Complainant alleges in her Charge, Ms. Ughetta denies telling her to be careful of the words and examples she used about race and culture. To the contrary, Ms. Ughetta encouraged Complainant to speak up and express her opinions and suggestions. **(***See* **Exhibit N).** Further, Ms. Ughetta denies ever having a conversation in front of Complainant and senior leadership whereby she discussed that it was difficult for Complainant to join a financial services company as a Black woman.

## LEGAL ANALYSIS AND ARGUMENT

### *1. Complainant provides insufficient evidence to sustain a claim of race or sex discrimination under Title VII*

Complainant has no cognizant claim of discrimination of *any* kind, including race and sex. To establish a *prima facie* case for race discrimination under Title VII, Complainant must: (1) belong to a protected class (black or female); (2) be qualified for the position sought and perform her job satisfactorily; (3) suffer an adverse employment action; and (4) demonstrate that others, not members of the protected class, were treated differently under similar circumstances. *Bryant v. Bell Atlantic Maryland, Inc.,* 288 F.3d 124, 133 (4th Cir. 2002).

Once the employee establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory justification for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the employer is able to establish such justification, the burden shifts back to the employee to produce evidence that the articulated reasons are not true, but instead a pretext for discrimination. *See id*., *see also Cook v. CSX Transp. Corp*., 988 F.2d 507, 511 (4th Cir. 2002). Thus, the ultimate burden of persuasion remains with Complainant.

First, Complainant cannot establish that she maintained satisfactory job performance when, as explained herein, even when she was provided the resources to do so. Instead, Complainant complained that the Talent model "sucks" and at one point refused to work within the model, negatively stating that what was requested of her by her clients was not a good use of her time. *See e.g.* **Exhibit N and Exhibit O.** Additionally, due to Complainant's own premature choice, she abandoned the structured onboarding process designed to set her up for success and began working with her clients only to find out that there were things about her job that she didn't know. This affected the services that she could provide to her clients. Complainant admitted that she regretted her choice to abandon the onboarding process, and ultimately requested to return to onboarding. *See* **Exhibits J and Q.** However, even upon return, Complainant never completed the onboarding process. At all times, the Company engaged in substantive discussions with Complainant to provide her with support and resources to perform the functions of her job, to no avail.

Second, Complaint cannot establish that her other non-Black or male similarly situated colleagues were treated differently than she. Importantly, Complainant provides *no* facts to support her conclusion that her non-Black or male colleagues were treated better than she. Instead, Complainant simply concludes that she was not successful because she is a Black female, absent any evidence.

The Company spent a lot of time interviewing candidates, particularly Complainant, to ensure a good fit. The Company believed in Complainant and her ability to do the job, which is why Complainant was their solid, number one choice, as explained herein. The Company obviously was aware that Complainant was a Black female when it interviewed her and ultimately offered her the job. The Company invested a lot of time and resources in Complainant to ensure that she would be successful in her role. Despite Complainant's repeated inappropriate and unprofessional language and behavior, the Company continued her employment and tried to work with Complainant on go-forward solutions to resolve what she believed was a broken system, as explained herein. Complainant's refusal to perform tasks, her negative interaction

with clients, and her consistent communications that she was not a good fit with the Company and would likely not be there in the near future forced the Company to ultimately separate her employment.

Additionally, Complainant's allegation of sex discrimination makes no sense. All but three people that were on her team are female as is Complainant, as well as Complainant's direct supervisor – Ms. Ughetta, Complainant's next level supervisor – Melanie Foley, and HR – Kathy Jonas. Complainant does not allege *any* facts that the three men on her team were treated more fairly than she. In fact, all of the individuals she complains about are women, not men.

Complainant fails to meet all four elements to establish a *prima facie* case of discrimination based on race or sex. Even if you assume that Complainant does meet the initial threshold of an actionable race or sex claim, which she does not, the Company has provided an overwhelming amount of factual evidence to justify its legitimate and non-discriminatory actions for separating Complainant's employment, that does not amount to pretext for race or sex discrimination. Consequently, Complainant's race and sex discrimination claims must fail.

***2. Complainant provides insufficient evidence of retaliation to sustain a claim under Title VII***

Complainant establishes a retaliation case under Title VII by showing that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected activity. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 653 (4th Cir. 2021) citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

The same burden-shifting analysis occurs as described above with race and sex discrimination under Title VII. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998). *Id*. at 653-54.

Complainant cannot show a causal link between her allegations of race and sex discrimination and her separation of employment to meet the initial threshold of a retaliation case under Title VII. It wasn't until the Company scheduled a meeting in September 2021 (the "September Meeting") with Complainant to discuss her behaviors, client feedback, and the status of her role with the Company that Complainant first mentioned, in that same meeting, that being a Black female played a factor in the way she believed she was being treated by the Company. This was a shock to both Ms. Ughetta and HR as Complainant had never mentioned this to either of them prior to the September Meeting – a meeting initiated by Ms. Ughetta and HR to address Complainant's ongoing negative behaviors, lack of desire to work within the existing Talent model, and negative responses to her clients' requests. It was only *then,* in response to Ms. Ughetta's and HR's concerns, and when separation of employment became a real possibility, that Complainant stated that she felt as though her race and sex were the reasons she was not experiencing success in her role.

Complainant was fully aware of the Company's anti-discrimination and retaliation policies, as well as the Code of Business Ethics, as she underwent training for both, and was made aware of the resources in which to report a claim of discrimination, harassment, retaliation, hostile work environment, or any other mistreatment. While Complainant was not shy about

telling many within the Company how much she disliked the Talent model, the work requests of her clients, and her dissatisfaction with IT, she could have also raised, with the appropriate Company representatives, allegations of discrimination based on race or sex so that it could be investigated. But she did not.

It wasn't until Complainant made clear in the September Meeting that she was not going to work within the Talent model, work on building a positive rapport with her clients or perform the job duties that she was hired to perform that the Company decided to separate Complainant's employment. Complainant made clear that she did not have a desire to remain with the Company, nor was she motivated to work with leaders to positively effect change within the department, a notion that management and business leaders were open to. The Company's separation decision had nothing to do with Complainants mention of allegations of race and sex discrimination in the September Meeting.

Even if assumed that Complainant makes a *prima facie* case for retaliation under Title VII, the Company has provided numerous legitimate, non-discriminatory reasons and mounds of evidence herein for its decision to separate Complainant's employment that are not a pre-text for retaliation. Therefore, Complainant's retaliation claim must fail.

## CONCLUSION

At no time did Liberty Mutual discriminate against Complainant on the basis of race or sex, nor did it retaliate against Complainant. On the contrary, Liberty Mutual provided Complainant with enormous support and resources to perform her job duties and had multiple substantive discussions seeking input from her on what she needed to succeed. Instead of collaborating to find a path forward, Complainant determined and expressed that she was not happy at Liberty Mutual and refused to perform certain of her job duties, which is why she was ultimately separated from the Company.

## AFFIRMATIVE DEFENSES AND RESERVATION OF RIGHTS

Liberty Mutual denies all of the allegations set forth in Complainant's Charge to the extent they have not been addressed. In addition to the foregoing, Liberty Mutual asserts the following affirmative defenses and reservation of rights:

1. Complainant fails, in whole or in part, to state a claim upon which relief may be granted.

2. Some or all of the damages claimed by Complainant are not recoverable as a matter of law, including not but not limited to any claims for punitive damages as such claims are barred because she has not alleged facts sufficient to demonstrate that Liberty Mutual's conduct rose to the level of high moral culpability required.

3. Claims for punitive damages, if any, are also barred, in whole or in part, to the extent that the alleged conduct on which Complainant bases those claims was contrary to the Company's good faith efforts to comply with the applicable anti-discrimination laws.

4. Complainant's claims are barred, in whole or in part, by the doctrines of laches, waiver and/or estoppel.

5. Any alleged damages sustained by Complainant were caused by her own conduct.

6. Complainant has suffered no damages or has failed to mitigate her damages.

7. Any allegation contained in the Charge not specifically admitted herein is denied.

Liberty Mutual reserves its right to raise additional defenses which may become apparent during the course of this administrative process or thereafter.

As set forth herein, Complainant's allegations are not supported by fact or law. Accordingly, Liberty Mutual respectfully requests that the Charge be dismissed in its entirety. Thank you for the opportunity to provide a response on behalf of Liberty Mutual.

Sincerely,

Kimberly Houston Drummond

Attachments: **Exhibits A through AA**